**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| v. | ) | No. 1:08-mc-00411-RJL |
| | ) | |
| DELOITTE & TOUCHE USA LLP, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

**DELOITTE LLP'S MEMORANDUM OF LAW IN OPPOSITION TO
UNITED STATES' MOTION TO COMPEL DELOITTE & TOUCHE USA LLP
TO PRODUCE DOCUMENTS**

Respondent Deloitte LLP, formerly known as Deloitte & Touche USA LLP, by undersigned counsel, respectfully submits this memorandum of law in opposition to the United States' Motion To Compel Deloitte & Touche USA LLP To Produce Documents.

## INTRODUCTION

Deloitte LLP was served on September 20, 2007 with a non-party subpoena by the United States in a civil tax refund case pending in the Middle District of Louisiana. Deloitte LLP complied with the subpoena by producing all non-privileged responsive documents (approximately 3000) in its possession, custody, or control. The United States now moves to compel Deloitte LLP to produce documents that it could not produce: (i) documents in the possession of the legally separate and distinct Deloitte Touche Tohmatsu ("DTT") member firm in Switzerland ("Deloitte Switzerland"), and (ii) three documents over which Deloitte LLP's client asserted attorney-client, attorney work-product, and other privileges.[1]

---

[1] In this regard, Deloitte LLP did not withhold any documents based on its own attorney-client privilege but simply honored the assertion of privilege by its client. The privilege issues in this case will be briefed separately by Chemtech Royalty Associates, L.P., as the real party in interest with respect to those issues.

In seeking to require Deloitte LLP to produce documents in the possession of Deloitte Switzerland, the United States ignores several critical points:

- Deloitte LLP does not have possession of the documents or the legal right to obtain them. Indeed, Deloitte LLP has never had access to those documents.

- Deloitte LLP does not have the practical ability to obtain the documents from Deloitte Switzerland. Deloitte LLP asked Deloitte Switzerland to produce documents responsive to the subpoena, but Deloitte Switzerland refused. Deloitte LLP has no other means to request or obtain the documents.

- In refusing to provide the documents, Deloitte Switzerland indicated that, absent a valid order from a Swiss court, producing the documents would violate the Swiss penal code. Thus, not only is Deloitte LLP unable to obtain the documents from Deloitte Switzerland, doing so may constitute a crime under Swiss law. In effect, the United States is asking this Court to issue an order compliance with which may very well require a violation of Swiss law.

- The United States did not even attempt to obtain these documents from Deloitte Switzerland through the Hague Convention, a treaty to which the United States and Switzerland are both signatories.

- Finally and most fundamentally, courts routinely reject motions to compel the United States member firm of a Swiss accounting *verein* (or association) to produce documents in possession another member firm. The United States offers no valid reason why these decisions should not control here.

## BACKGROUND

1.  **Deloitte Touche Tohmatsu and its Member Firms**. Deloitte Touche Tohmatsu is a Swiss *verein*. Decl. of Leo L. Kessel ¶¶ 5-7 (Ex. A). A *verein* is an entity without an exact legal counterpart in the United States, but which is somewhat akin to a membership association. A *verein* is legally distinct from its members and exercises no control over its member firms. *Id.*; *see also Jeffries* v. *Deloitte Touche Tohmatsu Int'l*, 893 F. Supp. 455, 457 n.l (E.D. Pa. 1995) (describing *verein*).

As the United States acknowledges, DTT's member firms consist of various independent professional service firms which are entitled to use the brand name Deloitte or certain components thereof. U.S. Mem. 3; *see* Kessel Decl. ¶¶ 5-7. DTT helps to coordinate the

activities of the member firms, but itself performs no accounting, auditing, consulting or other management or professional services for clients.  Kessel Decl. ¶¶ 4-7.  Each DTT member firm is structured differently in accordance with the national laws, regulations, customary practice and other factors in the territory in which it operates, and may provide of professional services in their territories through subsidiaries, affiliates, and/or other entities.  *Id.*  As the United States acknowledges, each firm is a separate and legally independent entity owned exclusively by its own partners or shareholders.  U.S. Mem. 3; *see* Kessel Decl. ¶¶ 6-7.

Although the DTT organization contemplates the cooperation of member firms, including the participation of multiple member firms on audits of financial statements of companies with international operations, they are separate and distinct legal entities, which cannot obligate the other member firms.  Kessel Decl. ¶¶ 6-8.  International cooperation in a financial statement audit generally occurs between a "referring firm" that coordinates the audit work and issues the audit opinion on the financial statements, and the "participating firm" that performs audit procedures based on instructions from the referring firm and reports its work to the referring firm.  *Id.*

Deloitte LLP is the member firm of DTT in the United States.[2]  At the relevant time, Deloitte AG ("Deloitte Switzerland") was the member firm of DTT in Switzerland.  *Id.* ¶¶ 2-4, 8-9.  As the United States concedes, these firms are separate and distinct legal entities.  U.S. Mem. 3; *see* Kessel Decl. ¶¶ 8-9.  Deloitte US is not an agent for Deloitte Switzerland, nor is Deloitte Switzerland an agent for Deloitte US.  Kessel Decl. ¶ 8.  Deloitte US has no right to direct or control the operations of Deloitte Switzerland, nor does that firm have any right to direct or

---

[2] Deloitte LLP does not provide services to clients.  Kessel Decl. ¶¶ 2-3.  Rather, those services are provided through four operating partnerships, including Deloitte & Touche LLP, which provides audit services.  *Id.*  For ease of reference, Deloitte LLP and its operating partnerships will be described as "Deloitte US" throughout the balance of this brief.

control the operations of Deloitte US.  *Id.*  Partners of Deloitte US are not partners of Deloitte Switzerland.  *Id.*  Deloitte US does not share the profits or losses of Deloitte Switzerland, and vice versa.  *Id.*

Deloitte US does not have the right to obtain working papers or other documents from Deloitte Switzerland on demand, and vice versa.  *Id.* ¶ 10.  Although a member firm may decide to provide documents to another member firm in the course of an audit or other engagement, the decision to provide documents is entirely within the discretion of the member firm from which the documents are sought.  *Id.*

2.      **The Chemtech Audit**.  Deloitte US serves as the independent auditor of the consolidated financial statements of The Dow Chemical Company ("Dow").  Kessel Decl. ¶ 15; *see* U.S. Mem. 1-3.  As the United States notes, in 1993, subsidiaries of Dow formed a limited partnership known as Chemtech Royalty Associates L.P. ("Chemtech").  U.S. Mem. 1.  Dow contributed certain assets to Chemtech, including the rights in certain patented technologies, and Chemtech then licensed those rights back to Dow, under a licensing agreement that allowed Dow to use the patented technologies in the United States in exchange for defined royalty payments.  *See id.*  Apart from this transaction, relating to U.S. patents and activities, Chemtech's business activities were conducted in Switzerland through the offices of its general partner, Dow Europe S.A.  *See id.*

The Chemtech partnership agreement required an annual audit of its financial statements.  *See id.* Ex. 9.  Dow notified Deloitte US of this requirement, and Deloitte US in turn notified Deloitte Switzerland (as the DTT member firm in Switzerland) suggesting that it meet with Chemtech's management regarding the proposed engagement.  *Id.*  Deloitte US also informed Deloitte Switzerland that, because the engagement would likely involve audit procedures

regarding royalty payments made in the United States from Dow to Chemtech, Deloitte US (as the DTT member firm in the United States) would be available to assist with that work.  *Id.*

Deloitte Switzerland met with the management of Chemtech and was retained to audit its annual financial statements.  *Id.* Ex. 10; *see* Kessel Decl. ¶ 11.  As part of the audit, Deloitte Switzerland (as the "referring firm") requested that Deloitte US (as the "participating firm") perform certain audit procedures in the United States.  Kessel Decl. ¶ 12.  Specifically, it asked Deloitte US to test the patent royalty payments from Dow to Chemtech and to confirm the amount of certain loans from Chemtech to Dow entities.  *Id.*  Deloitte US agreed to perform these procedures and to provide the results to Deloitte Switzerland.[3]  *Id.*; *see also* U.S. Mem. Ex. 11.

Deloitte Switzerland audited the financial statements of Chemtech for Chemtech's fiscal years ended 1993 through 1997 and issued reports on those financial statements.  Kessel Decl. ¶ 11.  Deloitte US performed the requested audit procedures with respect to the U.S. transactions and provided memoranda to Deloitte Switzerland reflecting the results of that work.  *Id.* ¶ 12.  During the Chemtech audits, Deloitte US and Deloitte Switzerland coordinated their work but had separate responsibilities and operated as independent firms.  *Id.* ¶¶ 13-14.  Deloitte Switzerland maintained responsibility for the Chemtech audits and retained exclusive control over its working papers and other documents in its possession relating to those audits.  *Id.*

---

[3] Not surprisingly, Deloitte Switzerland and Deloitte US discussed other routine matters, such as the fees to be charged for Deloitte US's work and how those fees would be presented in the overall fee estimate provided by Deloitte Switzerland.  *See* U.S. Mem. Exs. 11-13.  The United States also tries to make much of the fact that Deloitte US read and commented on the Chemtech financial statements that were issued under *United States* generally accepted accounting principles ("US GAAP").  Again, it is not surprising that Deloitte US – as accountants experienced in US GAAP – would have comments on those financial statements.

Deloitte US did not have access to Deloitte Switzerland working papers, did not request copies of those working papers, and did not receive copies of those working papers. *Id.*

      3.    **The Non-Party Subpoena**.  The subpoena at issue relates to litigation pending in the Middle District of Louisiana between Chemtech and the United States. *Chemtech Royalty Associates, L.P.* v. *United States*, No. 3:05-cv-944 (M.D. La. filed July 13, 2005). In that suit, Chemtech challenges certain tax determinations of the Internal Revenue Service. *Id.* As part of the litigation, on September 20, 2007, the United States served a non-party subpoena on Deloitte US, requesting that it produce all documents relating to Dow or Chemtech in connection with the Chemtech audits in the possession of Deloitte US *or any other "Deloitte" firm, subsidiary, or employee*. U.S. Mem. Ex. 1.

      Deloitte US complied with the subpoena by providing to the United States approximately 3000 non-privileged responsive documents in its possession, custody, or control. U.S. Mem. 4. Some of these documents were produced from Deloitte US's working papers from its audits of the consolidated financial statements of Dow, while others related to the procedures that it performed for the Chemtech audits. It objected to the request to the extent it sought documents held by other entities, including other DTT member firms. *Id.* Ex. 4.

      The United States responded by accusing Deloitte US of "refusing to produce responsive documents that are located at Deloitte's Zurich office." *Id.* Ex. 7. Deloitte US replied that it was not "refusing" to produce those documents, but that it was unable to comply with the request for documents in the possession of Deloitte Switzerland. *Id.* Ex. 8. It explained that Deloitte Switzerland "is a separate and independent legal entity" from Deloitte US and that Deloitte US neither "ha[s] any ownership interest" in nor "exercise[s] any control" over Deloitte Switzerland. *Id.*

Deloitte US nevertheless offered to provide the United States with contact information for a representative of DTT, who might "facilitate … communication with someone at or authorized to communicate on behalf of the DTT member firm in Zurich." *Id.* The United States, however, did not accept this offer. Nor did it pursue any of other avenues for attempting to secure the documents directly from Deloitte Switzerland, such as service of a request on Deloitte Switzerland under the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, 23 U.S.T. 2555.[4] Instead, notwithstanding Deloitte US's repeated representations that it lacked the ability to obtain documents from Deloitte Switzerland, the United States filed the instant motion to compel.

Because that motion repeatedly proclaimed (again, notwithstanding Deloitte US's representations to the contrary) that Deloitte US could obtain documents from Deloitte Switzerland "upon request," Deloitte US made that very request directly to Deloitte Switzerland, asking it to produce "documents responsive to the Subpoena in the possession of [Deloitte Switzerland]." Ex. E; *see* Decl. of Eric Witiw ¶ 2 (Ex. B). Deloitte Switzerland refused. It explained that "[w]e have not been provided with an order from a Swiss court" and that "submission of documents by us in these circumstances[,] … for use in foreign court

---

[4] Signatories to the Hague Convention are permitted to "declare that [they] will not execute Letters of Request issued for the purpose of obtaining pre-trial discovery of documents," *see* Hague Convention art. 23, but Switzerland has not done so generally (unlike some other countries) and will execute such requests except in certain defined circumstances, *see* Hague Conference on Private Int'l Law, *Reservations Declarations*, *at* http://hcch.e-vision.nl/index_en.php?act=status.comment&csid =561&disp=resdn. The United States also has mutual legal assistance treaty obligations with Switzerland regarding the production of documents in criminal tax matters. Treaty on Mutual Assistance in Criminal Matters, 27 U.S.T. 2019. There are no comparable treaties specifically governing production of documents in civil tax cases.

proceedings, is prohibited by Swiss law … [and] punishable by imprisonment of up to 3 years." Ex. F; *see* Witiw Decl. ¶ 3.[5]

## ARGUMENT

Documents are subject to production under Federal Rule of Civil Procedure 45 only if they are within the subpoenaed party's "possession, custody, or control." Fed. R. Civ. P. 45(a)(1)(A)(iii). The party issuing the subpoena bears the burden, in the context of a motion to compel, of proving that the documents at issue are in fact under the other party's "control." *U.S. Int'l Trade Comm'n* v. *ASAT, Inc.*, 411 F.3d 245, 254 (D.C. Cir. 2005). If not, production of the documents cannot be compelled. *Id.*

The United States has failed to sustain its burden as a matter of both law and fact. Consistent with Deloitte US's communications with the United States in this matter, decisions from other courts, squarely on point, have consistently held that the member firms of DTT have no authority to dictate the actions of other firms and therefore lack "possession, custody, or control" over documents held by those firms. *In re Nortel Networks Corp. Sec. Litig.*, No. 01 Civ. 1855, 2004 WL 2149111, at *3 (S.D.N.Y. Sept. 23, 2004); *Motorola Credit Corp.* v. *Uzan*, No. 02-CV-666, slip op. at 3 (S.D.N.Y. Feb. 19, 2003) (Ex. H); *see In re Citric Acid Litig.*, 191 F.3d 1090 (9th Cir. 1999); *SEC* v. *Credit Bancorp, Ltd.*, 194 F.R.D. 469, 471-72 (S.D.N.Y. 2000); *Goh* v. *Baldor Elec. Co.*, No. 3:98-MC-064-T, 1999 WL 20943, at *1-3 (N.D. Tex. Jan. 13, 1999); *In re Delorean Motor Co. Litig.*, No. 83-CV-2137-DT, slip op. at 8 (E.D. Mich. Nov. 19, 1985) (Ex. I); *see also In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 385

---

[5] Article 271 of the Swiss Penal Code, the provision cited by Deloitte Switzerland, reads: "Whoever, without being authorized, performs acts for a foreign state on Swiss territory that are reserved to an authority or an official, whoever performs such acts for a foreign party or another foreign organization, whoever aids and abets such acts, shall be punished with imprisonment and, in serious cases, sentenced to the penitentiary." A copy of the Swiss law is attached as Exhibit G.

n.41 (D. Md. 2004); *Nuevo Mundo Holdings* v. *Pricewaterhouse Coopers LLP*, No. 03-0613, 2004 WL 112948, at *3 (S.D.N.Y. Jan. 22, 2004); *In re Lernout & Hauspie Sec. Litig.*, 230 F. Supp. 2d 152, 170-71 (D. Mass. 2002).   The United States offers no reason to discount these decisions, and no basis to distinguish them.   The only evidence offered by the United States, a series of routine letters between Deloitte US and Deloitte Switzerland in connection with the Chemtech audits, in fact demonstrates that these separate firms operated as independent entities. And the record before this Court is unambiguous that Deloitte US and Deloitte Switzerland did not share ownership of working papers or other documents and that each maintained exclusive control over working papers in its possession.

In short, nothing in law or fact establishes that documents in the possession of Deloitte Switzerland are under the "control" of Deloitte US for purposes of Rule 45.   The motion to compel should therefore be denied.

### A.     Deloitte US Does Not Have The "Legal Right" To Obtain Documents Held By Deloitte Switzerland.

None of the materials submitted by the United States suggests that Deloitte US has the "legal right" to obtain documents in the possession of Deloitte Switzerland, such that Deloitte US could be said to "control" those documents.  *See Tequila Centinela, S.A. de C.V.* v. *Bacardi & Co. Ltd.*, 242 F.R.D. 1, 8 (D.D.C. 2007) ("With regards to the term 'control,' it has been well established that the test [is defined] … as the *legal right* to obtain such documents on demand.") (emphasis added); *see also, e.g.*, *ASAT*, 411 F.3d at 254 ("Control is defined as the *legal* right, authority or ability to obtain documents upon demand.") (emphasis added); *Chaveriat* v. *Williams Pipe Line Co.*, 11 F.3d 1420, 1426 (7th Cir. 1993) (same).  The United States acknowledges in its brief that Deloitte US and Deloitte Switzerland are separate and independent legal entities.  U.S. Mem. 3.  Deloitte US lacks any authority to direct the actions of Deloitte

Switzerland.   Kessel Decl. ¶¶ 8-10.   It can hardly be said, in light of this relationship, that Deloitte US has the "legal right" to obtain documents from Deloitte Switzerland.

The cases cited by the United States, holding that *corporate affiliates* can sometimes be said to have "control" over documents held by each other, *see* U.S. Mem. 13-16, are not to the contrary.   None of those cases involves the member firms of an international accounting association.   Instead, they deal with the entirely distinct situation of corporate entities that are legally under common control.  *See Dietrich* v. *Bauer*, No. 95-cv-7051, 2000 WL 1171132, at *4 (S.D.N.Y. Aug. 16, 2000) (documents in possession of foreign subsidiary corporation are under "control" of U.S. parent corporation); *Hunter Douglas, Inc.* v. *Comfortex Corp.*, No. Civ. A. M8-85, 1999 WL 14007, at *3 (S.D.N.Y. Jan. 11, 1999) (documents in possession of foreign parent corporation are under "control" of U.S. subsidiary corporation).   Without exception, each of those cases presented strong indicia that the corporation that was the subject of the document request and its foreign affiliate were effectively a single entity, or otherwise had the ability to obtain documents from each other upon demand.  *See Dietrich*, 2000 WL 1171132, at *4; *Hunter*, 1999 WL 14007, at *3; *see also Bank of New York* v. *Meridien BIAO Bank Tanzania Ltd.*, 171 F.R.D. 135, 146-49 (S.D.N.Y. 1997) (documents transferred from party to non-party successor-in-interest during the course of litigation were still in party's "control" for purposes of Rule 45); *Ssangyong Corp.* v. *Vida Shoes Int'l, Inc.*, No. 03-5014, 2004 WL 1125659, at *2-5 (S.D.N.Y. May 20, 2004) (documents held in foreign headquarters of a bank with a domestic branch, subject to subpoena, were in bank's "control").   In contrast, the member firms of DTT are not corporate affiliates, are not commonly owned or commonly controlled, and have no right to obtain documents from each other upon demand.   The corporate affiliate cases cited by the

United States provide no support for its contention that Deloitte US has control over Deloitte Switzerland's documents.

The only decision cited by the United States addressing member firms of an international association, *In re Citric Acid Litigation*, 191 F.3d 1090 (9th Cir. 1999), is squarely at odds with its position. There, the court of appeals held that the U.S. member firm of a Swiss accounting association (Coopers & Lybrand International) did not have "control" over documents in the possession of a Swiss member firm and could not be compelled to produce those documents under Rule 45. *Id.* at 1106-08. Although the United States argues that *Citric Acid* is distinguishable because the subpoenaed firm in that case "had already requested the documents but could not force its foreign affiliate to produce them," U.S. Mem. 15-16, Deloitte US has in fact made a request for Deloitte Switzerland to produce documents responsive to the subpoena. Ex. E. Deloitte Switzerland refused, and Deloitte US has no ability to compel Deloitte Switzerland to comply with this request – nor any other means to obtain the documents. Kessel Decl. ¶¶ 8-10, Ex. F. The instant case precisely mirrors the facts of *Citric Acid*.

The United States also overlooks the numerous other cases holding that member firms of an international association – and specifically the member firms of DTT – do not have "control" over documents held by other firms. In *In re Nortel Networks Corp. Sec. Litig.*, No. 01 Civ. 1855, 2004 WL 2149111 (S.D.N.Y. Sept. 23, 2004), for example, the district court found that, although U.S. and foreign DTT firms are members of the same association, the firms are distinct and separate legal entities and do not have the ability to obtain documents from others. *Id.* at *3. Likewise, in *Motorola Credit Corp.* v. *Uzan*, No. 02-CV-666 (S.D.N.Y. Feb. 19, 2003) (Ex. H), the district court held that, because U.S. and foreign DTT member firms operate as independent legal entities, they do not have the right to secure documents held by other firms, even though

they are all associated with DTT.  *Id.* at 3. And, in *In re Royal Ahold N.V. Securities & ERISA Litigation*, 351 F. Supp. 2d 334 (D. Md. 2004), the district court concluded unequivocally that the member firms of DTT could not be treated as a single entity in which all firms share control over operations and documents:  "It is well recognized that '[m]ember firms in an international accounting association are not part of a single firm and are neither agents nor partners of other member firms simply by virtue of using the same brand name.'"  *Id.* at 385 n.41 (citations omitted).  Other courts addressing the issue in the context of other international associations with U.S. member firms have reached the same conclusion.  *See, e.g.*, *Nuevo Mundo*, 2004 WL 112948, at *3; *Lernout*, 230 F. Supp. 2d at 170-71; *Goh*, 1999 WL 20943, at *1-3; *Delorean*, No. 83-CV-2137-DT, slip op. at 8 (Ex. I).

The United States does not challenge these decisions, or suggest that Deloitte US has the "legal right" to compel production of the documents from Deloitte Switzerland.  And, in fact, nothing in the record suggests that Deloitte US has any right to secure documents from Deloitte Switzerland.  For that reason, the documents are outside of Deloitte US's "control," and the motion to compel should be denied.

### B.    Deloitte US Does Not Have The "Practical Ability" To Obtain Documents Held By Deloitte Switzerland.

Perhaps recognizing that it cannot meet the "legal right" standard, the United States argues that this Court should instead adopt a unique, "more practical test" in assessing whether Deloitte US has "control" over documents held by Deloitte Switzerland.  U.S. Mem. 16.  It argues that a firm should be deemed to have the requisite control over documents whenever a request for those documents would likely be honored.  *Id.*  At no time during the course of the Chemtech audits did Deloitte US request or did Deloitte Switzerland provide working papers to Deloitte US.  More recently, Deloitte US requested that Deloitte Switzerland produce any

responsive documents in its possession.  Ex. E.  Deloitte Switzerland refused that request, noting

that it was prohibited from producing the documents under Swiss law, leaving Deloitte US with

no other means to request or obtain the documents.  Ex. F; *see* Kessel Decl. ¶¶ 8-10.  Deloitte

Switzerland's refusal to provide documents as requested by Deloitte US confirms, contrary to the

arguments of the United States, that Deloitte US lacks even the "practical ability" to secure

documents from Deloitte Switzerland.

The United States erroneously characterizes correspondence between Deloitte US and

Deloitte Switzerland during the Chemtech audits as showing that the firms "act[ed] as one

entity," U.S. Mem. 17, but those letters actually demonstrate the contrary – that the firms

operated as separate entities.   In the letters, Deloitte US notifies Deloitte Switzerland of the

proposed engagement with Chemtech and advises the firm to contact Chemtech's management to

discuss the matter.   *Id.* Ex. 9.   After accepting the engagement, Deloitte Switzerland asks

Deloitte US to perform certain specific procedures, testing U.S. royalty payments and certain

loans, and to provide the results of those procedures to Deloitte Switzerland.  *Id.* Ex. 10.  The

fees to be charged by Deloitte US are discussed – as would be expected – as is the form of the

final audit opinion and the standards under which the financial statements should be reviewed.

*Id.* Exs. 11-22.  The results of Deloitte US's work, along with the bill for services rendered, were

to be provided directly to Deloitte Switzerland.   *Id.*; *see also* Ex. D.  Reports on the financial

statements were issued by Deloitte Switzerland, not Deloitte US.  U.S. Mem. Ex. 24; *see also*

Ex. C.

Far from suggesting that the Chemtech audits were a "joint undertaking" or a "joint

engagement," these letters confirm that Deloitte Switzerland was responsible for conducting the

Chemtech audits and issuing audit reports, with Deloitte US providing limited support to Deloitte

Switzerland for a fee charged to Deloitte Switzerland. This reflects nothing more than the role of Deloitte US and Deloitte Switzerland as the participating and referring firm, respectively. [6] The letters certainly provide no support for the government's argument that Deloitte US "controls" or can otherwise obtain working papers and other documents held by Deloitte Switzerland.

Numerous cases have rejected the government's position. In *Nortel*, the district court found that, although the relevant U.S. and foreign DTT member firms had collaborated on the audit that was the subject of the lawsuit, the U.S. firm did not have the "practical ability" to obtain documents from the foreign firm because the firms did not generally share documents with one another absent a specific business-related need. 2004 WL 2149111, at *3. The court specifically noted, in support of this conclusion, that the foreign firm had already refused the U.S. firm's request for the documents at issue. *Id.* Likewise, in *Motorola*, the district court held that "Deloitte USA" did not have the "practical ability" to secure documents in the possession of "Deloitte Turkey," even though the firms had cooperated on certain projects, because they did not share materials in the routine course of business outside the context of a particular audit. No. 02-CV-666, slip op. at 3 (Ex. H). It noted that the "transfer of documents in circumstances

---

[6] In fact, Congress, in enacting the Sarbanes-Oxley Act, has specifically recognized and addressed the production of working papers from member firms operating as referring and participating firms in cooperation in issuing audit opinions. By enacting a statutory scheme of limited consent by and registration of foreign public accounting firms, Congress required the consent of public of foreign public accounting firms to production of their working papers to the U.S. Public Company Accounting Oversight Board ("PCAOB") and the U.S. Securities and Exchange Commission when the foreign firm "issues an opinion or otherwise performs material services upon which a registered public accounting firm relies in issuing all or part of any audit report" on the financial statements of a public company that files with the SEC. See Sarbanes-Oxley Act SOX § 106(b). This provision may apply in a PCAOB or a SEC investigation when, for example, Deloitte US issues an audit opinion on a public company client (as the referring firm) and the foreign member firm (as the participating firm) "performs material services upon which" Deloitte US relies. This case presents the exact opposite situation: the foreign firm as the referring firm and Deloitte US as the participating firm. In any event, Congress did not authorize the IRS or the United States in a tax dispute to obtain working papers from a foreign accounting firm from its audits of the financial statements of a non-public company.

where the transfer was in the mutual interests of Deloitte USA and Deloitte Turkey [*i.e.*, during an audit in which both firms participated] does not necessarily imply that Deloitte USA has the ability to obtain documents from Deloitte Turkey in circumstances where the transfer would not have benefited (and might even conceivably have harmed) Deloitte Turkey." *Id.* Other courts have similarly held that member firms of an international association, despite their collaboration on certain projects, cannot be viewed as a single unit with control over all documents held by any single firm. *See, e.g.*, *Nuevo Mundo*, 2004 WL 112948, at *3; *Lernout*, 230 F. Supp. 2d at 170-71; *Goh*, 1999 WL 20943, at *1-3; *Delorean*, No. 83-CV-2137-DT, slip op. at 8 (Ex. I).[7]

The United States does not challenge these decisions, and there is no reason to believe that Deloitte US has control over documents held by Deloitte Switzerland. Deloitte Switzerland maintained responsibility for the Chemtech audit, and retained exclusive control over documents in its possession relating to that audit. Kessel Decl. ¶¶ 13-14. In fact, Deloitte US sought to address the United States' position when it directly requested information from Deloitte Switzerland. The Swiss firm did not provide to Deloitte US – even upon express request – copies of its working papers for the audits of the financial statements of Chemtech, citing Swiss law prohibiting such disclosure. Witiw Decl. ¶¶ 2-3. The record indicates that Deloitte Switzerland did not honor a request for documents by Deloitte US, and therefore, contrary to the United States' position, Deloitte US cannot be said to have the "practical ability" to obtain those documents.

---

[7] *Cf. Chaveriat*, 11 F.3d at 1427 ("[T]he fact that a party could obtain a document [from a nonparty] if it tried hard enough … does not mean that the document is in its possession, custody, or control; in fact, it means the opposite.").

**CONCLUSION**

Deloitte US has neither the "legal right" nor the "practical ability" to obtain the documents at issue from Deloitte Switzerland. Those firms are bound only by common membership in a Swiss association, with no authority to direct one another, and Deloitte Switzerland has no reason to comply with a request for documents by Deloitte US, as demonstrated by its refusal to accede to the firm's prior request. Deloitte US thus does not have "control" over the documents and cannot be compelled to produce them under Rule 45.

For the foregoing reasons, Deloitte US respectfully requests that the motion to compel be denied.

Dated:  August 25, 2007                    Respectfully submitted,

                                           /s/ Michael D. Warden
                                           Michael D. Warden (D.C. Bar No. 419449)
                                           Quin M. Sorenson (D.C. Bar No. 501292)
                                           SIDLEY AUSTIN LLP
                                           1501 K Street, N.W.
                                           Washington, D.C.  20005-1401
                                           (202) 736-8000
                                           Email:  mwarden@sidley.com
                                                   qsorenson@sidley.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused true and correct copies of the foregoing DELOITTE LLP'S

MEMORANDUM OF LAW IN OPPOSITION TO UNITED STATES' MOTION TO COMPEL

DELOITTE & TOUCHE USA LLP TO PRODUCE DOCUMENTS to be served upon the following

counsel in this matter through the Court's Electronic Filing System, or by mailing the same to the

offices of said counsel by United States mail, postage prepaid, on this 25th day of August, 2008:

Thomas F. Koelbl
U.S. DEPARTMENT OF JUSTICE
555 Fourth Street, NW
Room 6223
Washington, DC 20001
(202) 514-5891
Email: thomas.f.koelbl@usdoj.gov

John B. Magee
Hartman E.  Blanchard, Jr.
MCKEE NELSON LLP
1919 M Street, N.W., Suite 200
Washington, D.C.  20036
Email: hblanchard@mckeenelson.com

/s/ Michael D. Warden
Michael D. Warden (D.C. Bar No. 419449)
Quin M. Sorenson (D.C. Bar No. 501292)
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C.  20005-1401
(202) 736-800
Email:  mwarden@sidley.com
        qsorenson@sidley.com

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| v. | ) | No. 1:08-mc-00411-RJL |
| | ) | |
| DELOITTE & TOUCHE USA LLP, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |
| | ) | |

## <u>DECLARATION OF LEO L. KESSEL</u>

I, Leo L. Kessel, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am a Partner in Deloitte LLP and Deloitte & Touche LLP, one of the operating partnerships of Deloitte LLP. My office is located at Ten Westport Road, Wilton, Connecticut 06897. This declaration has been prepared in support of Deloitte LLP's Memorandum Of Law In Opposition To United States' Motion To Compel Deloitte & Touche USA LLP To Produce Documents.

2.      Deloitte LLP, formerly known as Deloitte & Touche USA LLP, does not provide services to clients. Instead, services are primarily provided by four operating partnerships of Deloitte LLP: Deloitte & Touche LLP (which provides audit services), Deloitte Consulting LLP (which provides consulting services), Deloitte Financial Advisory Services LLP (which provides financial advisory services), and Deloitte Tax LLP (which provides tax services).

3.      Each of these partnerships is a limited liability partnership organized under the laws of the State of Delaware. Deloitte LLP is and each of the other Deloitte US partnerships is owned exclusively by its partners.

4.    Deloitte LLP is the member firm of Deloitte Touche Tohmatsu ("DTT") in the United States. DTT itself performs no accounting, auditing, consulting or other management or professional services for clients.

5.    DTT is a Swiss *verein*. A *verein* is an entity without an exact legal counterpart in the United States, but which is somewhat akin to a membership association. DTT is legally distinct from its members.

6.    There are other DTT member firms in other countries throughout the world. DTT member firms consist of various independent professional service firms which are entitled to use the brand name Deloitte or certain components thereof. Each of DTT's member firms is a separate and legally independent entity owned exclusively by its own partners or shareholders. DTT member firms are not commonly owned and do not have authority and control over one another. DTT member firms are separate and distinct legal entities.

7.    As is stated in the DTT web site, and as I have observed first-hand, DTT "helps coordinate the activities of the member firms .... DTT and the member firms are separate and distinct legal entities, which cannot obligate the other entities." The DTT web site also states that "DTT and each member firm are only liable for their own acts or omissions, not those of each other.... Each DTT member firm is structured differently in accordance with national laws, regulations, customary practice and other factors, and may secure the provision of professional services in their territories through subsidiaries, affiliates, and/or other entities."

8.    Although the organization contemplates the cooperation of DTT member firms, including the participation of multiple member firms on audits of financial statements of companies with international operations, they are separate and distinct legal entities. International cooperation in a financial statement audit generally occurs between a  "referring

2

firm" that coordinates the audit work, instructs one or more "participating firms," and issues the audit opinion, and the participating firm or firms that perform audit procedures based on those instructions from the referring firm and reports their work to the referring firm.

9.      I have a working knowledge as to the relationships and actual conduct of the member firms with one another and with DTT.  Deloitte & Touche AG ("Deloitte AG") was at the relevant time a member firm of DTT in Switzerland.  Deloitte LLP is separate and distinct from Deloitte AG.  Deloitte LLP is not an agent for Deloitte AG, nor is Deloitte AG an agent for Deloitte LLP.  Deloitte LLP has no right to direct or control the operations of Deloitte AG, nor does that firm have any right to direct or control the operations of Deloitte LLP.  Partners of Deloitte LLP are not partners of Deloitte AG.  Deloitte LLP does not share the profits or losses of Deloitte AG and vice versa.  Deloitte LLP is a separate and independent legal entity from Deloitte AG, and Deloitte LLP has neither any ownership interest in, nor exercises any control over, Deloitte AG.

10.     Deloitte LLP does not have the right to obtain documents from Deloitte AG on demand, and vice versa.  Although a member firm may decide to provide documents to another member firm in the course of an audit or other engagement, the decision to provide documents is entirely within the discretion of the member firm from whom the documents are sought.

11.     Deloitte AG (or, to the extent applicable, its successor firms) was engaged to audit the annual financial statements of Chemtech Royalty Associates, L.P. ("Chemtech"). Deloitte AG audited the financial statements of Chemtech for Chemtech's fiscal years ended 1993 through 1997 and issued reports on those financial statements. Attached as Exhibit C to Deloitte LLP's Memorandum Of Law is an example of those financial statements – the Consolidated Financial Statements of Chemtech for the year ended December 31, 1994.

12.     As part of Deloitte AG's audit of the Chemtech financial statements, Deloitte AG (as the "referring firm") requested that Deloitte & Touche LLP (as the "participating firm") perform certain audit procedures in the United States. At the request of Deloitte AG, Deloitte & Touche LLP performed certain audit procedures, including testing patent royalty payments from Dow Chemical Company ("Dow") to Chemtech, confirmed the amount of loans from Chemtech to Dow entities, and provided the results of these procedures to Deloitte AG. Attached as Exhibit D to Deloitte LLP's Memorandum Of Law is the memorandum provided to Deloitte AG by Deloitte & Touche LLP reflecting the results of that work. Because certain of the Chemtech financial statements were presented in accordance with United States Generally Accepted Accounting Principles ("US GAAP"), Deloitte & Touche LLP also reviewed the draft US GAAP financial statements issued by Chemtech and provided comments to Deloitte AG.

13.     Deloitte & Touche LLP and Deloitte AG coordinated their work but had separate responsibilities and operated as independent firms.

14.     Deloitte AG maintained responsibility for the Chemtech audit and retained exclusive control over documents in its possession relating to that audit, including Deloitte AG working papers.   During the course of Deloitte & Touche LLP's work in performing certain procedures in the United States at the request of Deloitte AG, Deloitte & Touche LLP never requested copies of any Deloitte AG working papers. Deloitte AG likewise did not provide to Deloitte & Touche LLP copies of its working papers for the audits of the financial statements of Chemtech.

15.     Deloitte & Touche LLP separately audited the annual consolidated financial statements of Dow.

4

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 22, 2008.

Leo L. Kessel

# Exhibit B

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| v. | ) | No. 1:08-mc-00411-RJL |
| | ) | |
| DELOITTE & TOUCHE USA LLP, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |
| _____ | ) | |

## DECLARATION OF ERIC WITIW

I, Eric Witiw, pursuant to 28 U.S.C. § 1746, declare as follows:

1.     I am Assistant General Counsel at Deloitte LLP ("Deloitte US"), formerly known as Deloitte & Touche USA LLP.  My office is located at 555 Twelfth Street, NW, Suite 500, Washington, D.C.  20004.  This declaration has been prepared in support of Deloitte LLP's Memorandum Of Law In Opposition To United States' Motion To Compel Deloitte & Touche USA LLP To Produce Documents.

2.     On or about July 7, 2008, Deloitte US sent a letter to Deloitte AG, requesting that it produce documents described in the subpoena served by the United States on Deloitte US.  A true and correct copy of that letter is attached as Exhibit E to Deloitte LLP's Memorandum Of Law In Opposition To United States' Motion To Compel Deloitte & Touche USA LLP To Produce Documents.

3.     On or about July 14, 2008, Deloitte AG responded to Deloitte US, refusing to produce responsive documents and noting that, absent an "order from a Swiss Court," production of the requested documents would be prohibited under Swiss law and punishable by three years' imprisonment under article 271 of the Swiss Penal Code.  A true and correct copy of that letter is

attached as Exhibit F to Deloitte LLP's Memorandum Of Law In Opposition To United States'

Motion To Compel Deloitte & Touche USA LLP To Produce Documents.

    I declare under penalty of perjury that the foregoing is true and correct.  Executed on

August 22, 2008.

Eric Witiw

Exhibit C

# CHEMTECH ROYALTY ASSOCIATES, L.P.

*Consolidated financial statements for the year ended December 31, 1994, the nine months ended December 31, 1993, and Independent Auditors' Report*

CONFIDENTIAL
DT001848



## Deloitte & Touche



| | |
|---|---|
| Seestrasse 59  Postfach 530 | Tel. (01) 914 22 22 |
| 8703 Erlenbach-Zürich | Fax (01) 914 22 33 |

### INDEPENDENT AUDITORS' REPORT

To the partners of Chemtech Royalty Associates, L.P., Delaware/USA

We have audited the accompanying consolidated balance sheets of Chemtech Royalty Associates, L.P. and subsidiary as of December 31, 1994 and 1993, and the related consolidated statements of income, changes in partners' equity and cash flows for the year ended December 31, 1994 and the nine months ended December 31, 1993 (expressed in US dollars). These financial statements are the responsibility of the partnership's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Chemtech Royalty Associates, L.P. and subsidiary as of December 31, 1994 and 1993, and the results of operations, changes in partners' equity and their cash flows for the year ended December 31, 1994 and the nine months ended December 31, 1993 in accordance with accounting principles generally accepted in the United States of America.

**DELOITTE & TOUCHE AG**

Klaus Amstad          Bruce Herard

April 4, 1995

**Deloitte Touche
Tohmatsu
International**

Mitglied der TREUHAND ⊕ KAMMER

CONFIDENTIAL
DT001849

# CHEMTECH ROYALTY ASSOCIATES, L.P. AND SUBSIDIARY

## CONSOLIDATED BALANCE SHEETS AT DECEMBER 31, 1994 AND 1993

|  | NOTES | US DOLLARS 1994 | US DOLLARS 1993 |
|---|---|---|---|
| **ASSETS** | | | |
| Cash | | 154,699 | 16,326 |
| Marketable securities | 4 | 52,511,753 | 50,494,407 |
| Accounts receivable - related parties | 5 | 899,764 | 332,151 |
| Notes receivable - related parties | 4 | 350,169,805 | 234,187,609 |
| **TOTAL** | | 403,736,021 | 285,030,493 |
| **LIABILITIES AND PARTNERS' EQUITY** | | | |
| Accounts payable - related parties | 5 | 785,000 | 491,117 |
| Accrued liabilities | | 30,000 | - |
| Accrued taxes on income | 9 | 755,917 | 158,189 |
| Total liabilities | | 1,570,917 | 649,306 |
| Partners' equity | 10 | 402,165,104 | 284,381,187 |
| **TOTAL** | | 403,736,021 | 285,030,493 |

See notes to consolidated financial statements

- 1 -

CONFIDENTIAL
DT001850

# CHEMTECH ROYALTY ASSOCIATES, L.P. AND SUBSIDIARY

CONSOLIDATED STATEMENTS OF INCOME FOR THE YEAR ENDED
DECEMBER 31, 1994 AND THE NINE MONTHS ENDED DECEMBER 31, 1993

| | NOTES | US DOLLARS 1994 | US DOLLARS 1993 |
|---|---|---|---|
| Revenues: | | | |
| – Royalties - related parties | 6 | 143,259,731 | 95,622,074 |
| – Interest | | 14,661,466 | 4,316,919 |
| Guaranteed payments – related parties | 7 | (19,958,423) | (15,101,226) |
| Other expenses | | (948,854) | (635,650) |
| Other income | | 2,419 | 2,276 |
| INCOME BEFORE TAX | | 137,016,339 | 84,204,393 |
| Provision for taxes on income | 9 | (5,120,000) | (1,495,593) |
| NET INCOME | | 131,896,339 | 82,708,800 |

See notes to consolidated financial statements

- 2 -

CONFIDENTIAL
DT001851

## CHEMTECH ROYALTY ASSOCIATES, L.P. AND SUBSIDIARY

### CHANGES IN PARTNERS' EQUITY FOR THE YEAR ENDED DECEMBER 31, 1994 AND FOR THE NINE MONTHS ENDED DECEMBER 31, 1993

|  | NOTES | US DOLLARS 1994 | US DOLLARS 1993 |
|---|---|---|---|
| BALANCE ON JANUARY 1 |  | 284,381,187 | - |
| Capital contributions |  | - | 209,768,000 |
| Net income |  | 131,896,339 | 82,708,800 |
| Distribution: |  |  |  |
| - Priority return |  | (13,894,000) | (7,538,463) |
| - Secondary return |  | (140,344) | (57,307) |
| - Residual income distribution |  | - | (449,843) |
| - Other, net |  | (78,078) | (50,000) |
| BALANCE ON DECEMBER 31 | 10 | 402,165,104 | 284,381,187 |

See notes to consolidated financial statements

- 3 -

CONFIDENTIAL
DT001852

## CHEMTECH ROYALTY ASSOCIATES, L.P. AND SUBSIDIARY

### CONSOLIDATED STATEMENTS OF CASH FLOWS FOR THE YEAR ENDED DECEMBER 31, 1994 AND THE NINE MONTHS ENDED DECEMBER 31, 1993

| | NOTES | US DOLLARS 1994 | US DOLLARS 1993 |
|---|---|---|---|
| **OPERATING ACTIVITIES:** | | | |
| Net income | | 131,896,339 | 82,708,800 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Changes in assets and liabilities that provided/(used) cash: | | | |
| Receivables | | (567,613) | (332,151) |
| Accounts payable, and accrued taxes on income | | 921,611 | 649,306 |
| Cash provided by operating activities | | 132,250,337 | 83,025,955 |
| **INVESTING ACTIVITIES:** | | | |
| Payment of related company loans | | (115,982,196) | (234,187,609) |
| Purchases of marketable securities | | (2,017,346) | (50,494,407) |
| Cash used in investing activities | | (117,999,542) | (284,682,016) |
| **FINANCING ACTIVITIES:** | | | |
| Capital contribution | 10 | - | 209,768,000 |
| Priority return distribution | 10 | (13,894,000) | (7,538,463) |
| Secondary return distribution | 10 | (140,344) | (57,307) |
| Residual income distribution | 10 | - | (449,843) |
| Other partners' distributions | | (78,078) | (50,000) |
| Cash (used)/provided by financing activities | | (14,112,422) | 201,672,387 |
| **INCREASE IN CASH** | | 138,373 | 16,326 |
| **CASH AT BEGINNING OF YEAR/PERIOD** | | 16,326 | - |
| **CASH AT END OF YEAR/PERIOD** | | 154,699 | 16,326 |
| **DISCLOSURE OF CASH PAID FOR INCOME TAXES:** | | | |
| Income taxes paid | | 4,522,272 | 1,337,404 |

See notes to consolidated financial statements

- 4 -

CONFIDENTIAL
DT001853

<u>CHEMTECH ROYALTY ASSOCIATES, L.P. AND SUBSIDIARY</u>

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS FOR YEAR ENDED
DECEMBER 31, 1994 AND THE NINE MONTHS ENDED DECEMBER 31, 1993

### 1.    BASIS OF PRESENTATION

On April 30, 1993, wholly owned subsidiaries of The Dow Chemical Company
("Dow") contributed assets with an aggregate fair value of US$ 977 million to
Chemtech Royalty Associates L.P. ("Chemtech"), a newly formed Delaware limited
partnership. In August and October 1993, outside investors, all located outside the
United States of America (the "Outside Investors") acquired limited partnership
interests in Chemtech totalling 20 percent in exchange for US$ 200 million.

Included in the fair value of assets contributed by Dow were patent assets appraised by
an unrelated party to have a fair value of US$ 867 million. Under accounting principles
generally accepted in the United States of America (US GAAP), such patents have not
been recorded in Chemtech's accompanying US GAAP financial statements as US
GAAP requires assets to be transferred at the historical book value, which was zero.

Chemtech is a separate and distinct legal entity from Dow and its affiliates and has
separate assets, liabilities, businesses, and operations. A wholly owned subsidiary of
Dow located outside the United States is the general partner, and directs the business
activities of the partnership and has fiduciary responsibilities to the partnership and its
other partners. Chemtech's principal business activity is to license its patents to Dow
for use in Dow's United States operations. Under the license arrangement, Chemtech
receives market rate royalty payments (see note 6).

The Outside Investors in the partnership receive a cumulative annual priority return on
their investments in the partnership and participate in residual earnings. The annual
priority return is US$ 14 million for Chemtech.

The partnership will not terminate unless a termination or liquidation event occurs. One
such event, which is within the control of Outside Investors, occurs in the year 2000.
In addition, the partnership agreement provides for various windup provisions wherein
subsidiaries of Dow may purchase at any time the limited partnership interests of the
Outside Investors. Upon windup, liquidation or termination the partners' capital
accounts will be redeemed at current fair values.

### 2.    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

The financial statements are presented on the basis of US GAAP. The consolidated
financial statements include the accounts of the partnership and its subsidiary Chemtech
Portfolio Inc. Intercompany balances are eliminated upon consolidation.

CONFIDENTIAL
DT001854

3.    **INVESTMENT IN SUBSIDIARY**

The partnership is a 100% owner of the subsidiary, Chemtech Portfolio Inc. ("CPI"), which is herein consolidated. The partnership contributes excess cash to CPI which invests the funds in loans and securities as directed by the partnership agreement.

4.    **INVESTMENTS OF THE SUBSIDIARY COMPANY**

The subsidiary company, CPI, held marketable securities totalling US$ 52,511,753 and US$ 50,494,407 at December 31, 1994 and 1993 respectively. Marketable securities, comprising United States treasury bills on a held-to-maturity basis, are valued at the lower of cost or market value. At December 31, 1994 and 1993, market value of these securities was not significantly different from the balance sheet carrying value. Related party notes held by CPI totalled US$ 350,169,805 and US$ 234,187,609 at December 31, 1994 and 1993, respectively. The fair value of these notes are estimated to be equivalent to the carrying amounts.

5.    **RELATED PARTIES**

Related parties consist of Dow and its subsidiaries.

6.    **ROYALTIES**

On April 30, 1993, Chemtech entered into a patent license agreement with Dow. The terms of the agreement, which was amended on August 4, 1993, allow Dow to use the 73 patents owned by Chemtech in exchange for royalties based on the quantity of products manufactured by Dow. The royalty rate varies by production, and is subject to certain minimum royalties. Royalty payments totalled US$ 143,248,764 and US$ 95,295,747 for the year ended December 31, 1994 and for the nine months ended December 31, 1993, respectively.

7.    **GUARANTEED PAYMENTS**

Guaranteed payments represent expenses paid to the class B limited partner and the general partner. Payments are based on the initial contributed fair value of the patents multiplied by a contractually agreed upon percentage.

8.    **LEGAL PROCEEDINGS**

There was no patent litigation or other legal proceedings pending against the partnership at December 31, 1994.

CONFIDENTIAL
DT001855

9. **TAXES ON INCOME**

The partnership is not a taxable entity for federal and state taxes. Income and losses are reported to the individual partners for inclusion on their respective income tax returns. Taxes on income for CPI are computed using the rules of the appropriate tax jurisdiction.

10. **PARTNERSHIP CAPITAL ACCOUNTS**

The basis of the partnership capital accounts is defined in the partnership agreements and does differ with capital account balances recorded herein for US GAAP purposes. Partnership distributions are based upon the partnership agreements.

11. **ANNUAL TAX DISTRIBUTIONS**

The 1994 annual Tax Distributions were made pursuant to section 4.2 (b) of the Partnership agreement and were paid on May 31, 1994. Payments were charged directly to the partners capital accounts.

12. **CHANGE IN PARTNERSHIP RETURN**

On August 11, 1994, the partners amended section 3.1 of the partnership agreement to require that profits be allocated among the Class A Limited Partners in the ratio necessary to result in each Class A Limited Partner having a capital account balance such that its percentage interest is equal to a percentage specified in the amendment. The amendment had no effect on the partner's capital accounts.

- 7 -

CONFIDENTIAL
DT001856

Exhibit D



# Memo

| | |
|---|---|
| Date: | March 20, 1995 |
| To: | Klaus Amstad, ZURICH |
| From: | Leo L. Kessel, MIDLAND |
| Subject: | Chemtech Royalty Associates L.P. |

We have completed our audit procedures related to Chemtech Royalty Associates L.P. for the year ended December 31, 1994. Please find enclosed the following items related to our audit:

- Summary Memo

- Our bill for services rendered for $15,000. This bill was rendered directly to the Zurich office through the Firm's intercompany billing arrangements.

Please forward a draft of the U.S. GAAP financial statements for my review prior to issuing them. Please arrange for Bruce Herard to be the concurring reviewer on such statements.

If you have questions, please feel free to contact me.

**Deloitte Touche
Tohmatsu
International**

CONFIDENTIAL
DT002624

Prepared by:          JMK Mar 17, 1995

Reviewed by:          MK  Mar 17, 1995

Chemtech  12/31/94
430  Audit Summary Memo

This memo is to document the adequacy and results of our audit
procedures performed for DTTI in Zurich in connection with the
computation of the eanened royalties for Chemtech Royalty
Associates, L.P. for the year ended December 31, 1994.

Our audit procedures included the following:

-   We tested the computation of the earned royalty for the
    year ended December 31, 1994 and noted that the calculation
    appeared to conformed to the terms of the Patent License
    Agreement between Chemtech and The Dow Chemical Company and
    appeared to be properly calculated. Our procedures
    addressed the minimum royalty, earned royalty, and the
    variable royalty. The royalty amounts audited were:

    | Minimum Royalty | US$ 142,349,000 |
    |-----------------|-----------------|
    | Variable Royalty | 899,764 |
    | | ---------------- |
    | TOTAL | US$ 143,248,764 |
    | | =============== |

-   We inquired of any potential valuation concerns related to
    the patents included in the Patent License Agreement. Dow
    represented that they are not aware of any impairments.

-   We confirmed without exception to DTTI Zurich the amount of
    loans and the related interest extended to Dow entities by
    Chemtech Portfolio Inc. in a memo dated March 1, 1995.

It should be noted that the royalty computations were made using
the Minimum Royalty Rate as opposed to the Adjusted Minimum
Royalty Rate as defined in Exhibit B of the Patent License
Agreement. The Minimum Royalty Rate remains appropriate if
Chemtech has not entered into Third Party License agreements as
defined in Section 3.2(b) of the Patent License Agreement. We
have been informed by Dow in Midland that no such Third Party
Licenses have been entered into by Chemtech. DTTI Zurich should
make similar inquires in Zurich.

We have also been requested to advise DTTI Zurich, which we are
doing in this memorandum, that the agreements have not been
amended to remove the US GAAP financial statement reporting
requirement. Accordingly, Dow requested that both US GAAP and
Swiss statutory financial statements be issued for 1994.

CONFIDENTIAL
DT002623

Exhibit E

# Deloitte.

**Deloitte LLP**
Suite 500
555 12th Street N.W.
Washington, DC 20004-1207
USA

Tel: +1 202 879 5600
Fax: +1 202 879 5353
www.deloitte.com

July 7, 2008

Sent via Email Transmission

Deloitte AG
General Guisan-Quai 38
P.O. Box 2232
CH-8022 Zürich
Switzerland

Attn:   Stephen Adshead
        Deloitte & Touche LLP

Re:   *Chemtech Royalty Associates, LP v. USA*
      *Case No. 05-944 (M.D. La.)*
      Subpoena addressed to Deloitte & Touche USA, LLP

Dear Mr. Adshead:

I write regarding a subpoena (the "Subpoena") for documents addressed to Deloitte LLP (formerly Deloitte & Touche USA LLP) issued on behalf of the United States, a defendant in the above civil case. A copy of the Subpoena is attached to this letter.

Deloitte LLP was served with the Subpoena last year. In response to the Subpoena, Deloitte LLP served objections to the Subpoena and also produced to the United States documents in the possession of the Deloitte US firms responsive to the Subpoena. As you can see from the Subpoena, the Subpoena purports to require the production of documents in the possession of the Deloitte Touche Tohmatsu ("DTT") member firms. This includes Deloitte AG in Switzerland. Deloitte LLP objected to the Subpoena on that basis, among others. Attached is a copy of Deloitte LLP's objections.

I also understand that the United States, through its Third Request for Production of Documents served on plaintiff Chemtech Royalty Associates, L.P., demanded that plaintiff produce documents in the possession of Deloitte AG that were also requested in the Subpoena. I also understand that counsel for plaintiff requested that Deloitte AG

produce documents described in that document request, but that Deloitte AG declined to do so.

Having failed to obtain documents in the possession of Deloitte AG through Deloitte LLP or plaintiff, on June 30, 2008, the United States moved in the United States District Court for the District of Columbia to compel Deloitte LLP to produce documents described in the subpoena that are in the possession of Deloitte AG. Deloitte LLP now requests that Deloitte AG produce documents responsive to the Subpoena in the possession of Deloitte AG.

The Court has not yet ruled on the motion or on Deloitte LLP's objections. Deloitte LLP's response to the motion is due July 14, 2008, at the earliest. (Deloitte LLP has requested that the Court extend its response time until July 28, 2008.) Consequently, we would appreciate it if you would respond to this request before July 14 so that we can inform the United States and the Court of Deloitte LLP's efforts to obtain the voluntary production of documents from Deloitte AG. Moreover, to the extent that Deloitte AG declines to produce documents responsive to the Subpoena as requested, we would also appreciate an explanation of the basis for your decision so that Deloitte LLP can inform the Court about any reasons for Deloitte AG's declining to do so. .

Please contact me if you would like to discuss this matter further. I can be reached at (202)879-5662.

Sincerely,

Eric Witiw
Assistant General Counsel

cc: Hartman Blanchard, Esq.

# Exhibit F

# Deloitte.

Deloitte AG
General Guisan-Quai 38
Postfach 2232
CH-8022 Zürich

Tel: +41 (0) 44 421 60 00
Fax: +41 (0) 44 421 66 00
www.deloitte.ch

Mr. Eric Witiw
Assistant General Counsel
Deloitte LLP
Suite 500
555 12th Street N.M.
Washington, DC 20004-1207
United States of America

July 14, 2008

Re: *Chemtech Royalty Associates LP v USA*

Dear Mr Witiw,

We are responding on behalf of Deloitte AG to your letter of 7 July.

Background

Deloitte AG is a Swiss entity. For the avoidance of doubt, Deloitte AG is a separate legal entity from Deloitte LLP (formerly Deloitte & Touche USA LLP) ("Deloitte US").

Deloitte AG audited various financial statements and statement of partners' capital accounts of Chemtech Royalty Associates L.P. for the years 1996 and 1997 and the period from January 1, 1998 to February 28, 1998.

Request for documents

We note your request, pursuant to a subpoena addressed to Deloitte US ("the Subpoena"), for Deloitte AG to produce documents responsive to the Subpoena in its possession. We have not been provided with an order from a Swiss Court.

The Subpoena does not compel production of documents by Deloitte AG; indeed, we believe that the submission of documents by us in these circumstances, i.e. by a third party for use in foreign court proceedings, is prohibited under Swiss law (article 271 of the Swiss Penal Code). Breaching article 271 is potentially punishable by imprisonment of up to 3 years.

We regret that we are therefore unwilling to produce voluntarily any documents in our possession.

Yours sincerely,

Deloitte AG

Peter Quigley
Partner

Alexandre Buga
Partner

---

Wirtschaftsprüfung . Steuerberatung . Consulting . Corporate Finance .

Member of
Deloitte Touche Tohmatsu

# Exhibit G



**Swiss-American Chamber of Commerce**

# Swiss Penal Code

## Selected Provisions Relevant to Business

English Translation of Official Text

Schulthess §

Swiss Penal Code

[2] Non si rende punibile secondo la presente disposizione chi si limita a tollerare l'eventualità che detti valori patrimoniali possano servire a finanziare il terrorismo.

[3] Non costituisce finanziamento di un atto terroristico l'atto volto a instaurare o ripristinare la democrazia o lo Stato di diritto oppure a permettere l'esercizio o il rispetto dei diritti dell'uomo.

[4] Il capoverso 1 non è applicabile se il finanziamento è destinato a sostenere atti che non contraddicono alle norme del diritto internazionale applicabili nei conflitti armati.

---

Titre treizième: Crimes ou délits contre l'Etat et la défense nationale

### Art. 271

*Actes exécutés sans droit pour un Etat étranger*

1. Celui qui, sans y être autorisé, aura procédé sur le territoire suisse pour un Etat étranger à des actes qui relèvent des pouvoirs publics,

celui qui aura procédé à de tels actes pour un parti étranger ou une autre organisation de l'étranger,

celui qui aura favorisé de tels actes,

sera puni de l'emprisonnement et, dans les cas graves, de la réclusion.

2. Celui qui, en usant de violence, ruse ou menace, aura entraîné une personne à l'étranger pour la livrer à une autorité, à un parti ou à une autre organisation de l'étranger, ou pour mettre sa vie ou son intégrité corporelle en danger, sera puni de la réclusion.

3. Celui qui aura préparé un tel enlèvement sera puni de la réclusion ou de l'emprisonnement.

Titolo tredicesimo: Dei crimini o dei delitti contro lo Stato e la difesa nazionale

### Art. 271

*Atti compiuti senza autorizzazione per conto di uno Stato estero*

1. Chiunque, senza esservi autorizzato, compie sul territorio svizzero per conto di uno Stato estero atti che spettano a poteri pubblici,

chiunque compie siffatti atti per conto di un partito estero o di un'altra organizzazione dell'estero,

chiunque favorisce tali atti,

è punito con la detenzione e, nei casi gravi, con la reclusione.

2. Chiunque, usando violenza, astuzia o minaccia, trae all'estero una persona per consegnarla ad un'autorità, ad un partito o ad una organizzazione analoga dell'estero o per metterne in pericolo la vita o la integrità personale, è punito con la reclusione.

3. Chiunque prepara un tale ratto, è punito con la reclusione o con la detenzione.

Economic intelligence service

### Art. 273

Whoever seeks out a manufacturing or business secret in order to make it accessible to a foreign official agency, a foreign organization, a private enterprise, or their agents,

whoever makes a manufacturing or business secret accessible to a foreign official agency, a foreign organization, a private enterprise, or their agents,

shall be punished with imprisonment or, in serious cases, sentenced to the penitentiary. Furthermore, the judge may impose a fine.

---

## 13th Title: Crimes and Offenses Against Country and National Defense

### Art. 271

1. Whoever, without being authorized, performs acts for a foreign state on Swiss territory that are reserved to an authority or an official,

whoever performs such acts for a foreign party or another foreign organization,

whoever aids and abets such acts,

shall be punished with imprisonment and, in serious cases, sentenced to the penitentiary.

2. Whoever abducts somebody to a foreign country using violence, ruse or threat in order to hand him over to a foreign authority, party or other organization, or to endanger his life and limb, shall be sentenced to the penitentiary.

3. Whoever prepares such abduction shall be sentenced to the penitentiary or imprisonment.

---

Dreizehnter Titel: Verbrechen und Vergehen gegen den Staat und die Landesverteidigung

### Art. 271

*Verbotene Handlungen für einen fremden Staat*

1. Wer auf schweizerischem Gebiet ohne Bewilligung für einen fremden Staat Handlungen vornimmt, die einer Behörde oder einem Beamten zukommen,

wer solche Handlungen für eine ausländische Partei oder eine andere Organisation des Auslandes vornimmt,

wer solchen Handlungen Vorschub leistet,

wird mit Gefängnis, in schweren Fällen mit Zuchthaus bestraft.

2. Wer jemanden durch Gewalt, List oder Drohung ins Ausland entführt, um ihn einer fremden Behörde, Partei oder anderen Organisation zu überliefern oder einer Gefahr für Leib und Leben auszusetzen, wird mit Zuchthaus bestraft.

3. Wer eine solche Entführung vorbereitet, wird mit Zuchthaus oder Gefängnis bestraft.

Money laundering

61

## 17th Title: Crimes and Offenses Against Judicial Authorities

### Art. 305<sup>bis</sup>

1. Whoever commits an act suited to frustrate the determination of the origin, the discovery or the confiscation of assets that he knows or should know derive from a crime,

   shall be punished with imprisonment or a fine.

2. In serious cases, the punishment shall be sentencing to the penitentiary for up to five years or imprisonment. The confinement shall be combined with a fine of up to 1 million Swiss francs.

   In particular, a case is serious if the offender:

   a. acts as a member of a criminal organization;

   b. acts as a member of a gang which was formed with the purpose of continuing money laundering;

   c. achieves a high turnover or a substantial profit by laundering money as a business.

3. The offender shall also be punished if the main offense has been committed abroad and if such offense is also punishable in the country where it was committed.

Siebzehnter Titel: Verbrechen und Vergehen gegen die Rechtspflege

### Art. 305<sup>bis</sup>

*Geldwäscherei*

1. Wer eine Handlung vornimmt, die geeignet ist, die Ermittlung der Herkunft, die Auffindung oder die Einziehung von Vermögenswerten zu vereiteln, die, wie er weiss oder annehmen muss, aus einem Verbrechen herrühren,

   wird mit Gefängnis oder Busse bestraft.

2. In schweren Fällen ist die Strafe Zuchthaus bis zu fünf Jahren oder Gefängnis. Mit der Freiheitsstrafe wird Busse bis zu 1 Million Franken verbunden.

   Ein schwerer Fall liegt insbesondere vor, wenn der Täter:

   a. als Mitglied einer Verbrechensorganisation handelt;

   b. als Mitglied einer Bande handelt, die sich zur fortgesetzten Ausübung der Geldwäscherei zusammengefunden hat;

   c. durch gewerbsmässige Geldwäscherei einen grossen Umsatz oder einen erheblichen Gewinn erzielt.

3. Der Täter wird auch bestraft, wenn die Haupttat im Ausland begangen wurde und diese auch am Begehungsort strafbar ist.

---

*Swiss Penal Code*

### Art. 273

*Wirtschaftlicher Nachrichtendienst*

Wer ein Fabrikations- oder Geschäftsgeheimnis auskundschaftet, um es einer fremden amtlichen Stelle oder einer ausländischen Organisation oder privaten Unternehmung oder ihren Agenten zugänglich zu machen,

wer ein Fabrikations- oder Geschäftsgeheimnis einer fremden amtlichen Stelle oder einer ausländischen Organisation oder privaten Unternehmung oder ihren Agenten zugänglich macht,

wird mit Gefängnis, in schweren Fällen mit Zuchthaus bestraft. Mit der Freiheitsstrafe kann Busse verbunden werden.

### Art. 273

*Service de renseignements économiques*

Celui qui aura cherché à découvrir un secret de fabrication ou d'affaires pour le rendre accessible à un organisme officiel ou privé étranger, ou à une entreprise privée étrangère, ou à leurs agents,

celui qui aura rendu accessible un secret de fabrication ou d'affaires à un organisme officiel ou privé étranger, ou à une entreprise privée étrangère, ou à leurs agents,

sera puni de l'emprisonnement ou, dans les cas graves, de la réclusion. Le juge pourra en outre prononcer l'amende.

### Art. 273

*Spionaggio economico*

Chiunque cerca di scoprire un segreto di fabbricazione o di affari per renderlo accessibile ad un organismo ufficiale o privato dell'estero, ovvero ad un'impresa od organizzazione privata estera, o ai loro agenti,

chiunque rende accessibile un segreto di fabbricazione o di affari ad un organismo ufficiale o privato dell'estero, ovvero ad una impresa od organizzazione privata estera, o ai loro agenti,

è punito con la detenzione o, nei casi gravi, con la reclusione. Con la pena privativa della libertà può essere cumulata la multa.

Exhibit H

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- X
MOTOROLA CREDIT CORPORATION and        :
NOKIA CORPORATION,                     :
                                       :
              Plaintiffs,              :        02 Civ. 666 (JSR)
                                       :
                                       :            ORDER
              -v-                      :
                                       :
KEMAL UZAN, et al.,                    :
                                       :
              Defendants.              :
------------------------------------- X

JED S. RAKOFF, U.S.D.J.

     The Court previously referred certain discovery aspects of

this case to Magistrate Judge Maas.  On September 20, 2002, Judge

Maas denied Motorola's motion to compel non-parties Deloitte

Touche Tohmatsu ("Deloitte Tohmatsu") and Deloitte & Touche LLP

("Deloitte USA") to produce documents relating to financial audits

of Telsim Mobil Telekomunikasyon Hizmetleri A.S. ("Telism") that

are in the physical possession of the sister entity in Turkey

(here referred to as "Deloitte Turkey").  See transcript of

hearing before Judge Maas, Sep. 20, 2002, at 25.  Plaintiff

Motorola Credit Corporation ("Motorola") timely appealed, and by

order, dated October 31, 2002, ("October 31 Order"), the Court

affirmed Judge Maas' ruling, without prejudice, however, to

Motorola's seeking to have the matter reconsidered by Judge Maas

on the basis of the Deloitte Tohmatsu Verein Agreements belatedly

obtained by Motorola and any other additional evidence Judge Maas

wished to consider.

Motorola duly sought reconsideration before Judge Maas, and
on December 5, 2001, Judge Maas again denied Motorola's motion to
compel. See transcript of hearing before Judge Maas, Dec. 5,
2002, at 25.    Motorola thereupon appealed this denial.    After
receiving briefing, the Court heard oral argument this morning
(February 19, 2003), at which time the Court informed the parties
that, because of the inextricable connections between the matters
raised in the appeal addressed by the Court's October 31 Order and
the instant appeal, the Court would reconsider the entire matter
in deciding the instant appeal and review the entire record with
respect to the issue of whether Deloitte USA and/or Deloitte
Tohmatsu could, as a practical matter, exercise sufficient control
over Deloitte Turkey as to obtain the documents here requested.

    That record establishes that from May 2000 until April 2001,
Deloitte USA worked, on behalf of Telsim, to convert Telsim's 1998
and 1999 financial statements, which were prepared by Deloitte
Turkey, from International Accounting Standards to U.S. GAAP in
connection with a proposed business transaction by Telsim that was
ultimately abandoned. See Declaration of Kevin B. Muhlendorf,
dated December 18, 2002, Exh. H (Deposition of Joel Osnoss,
November 20, 2002), at 25-29. During this period, Deloitte Turkey
provided certain Telism-related documents to Deloitte USA, but not
the ones here sought. See Declaration of John F. O'Connor, dated
October 2, 2002, Exh. G (Deloitte USA memorandum), at 1, Exh. H

2

(Email from Deloitte USA to Deloitte Turkey, dated October 24,

2000), Exh. I (Email from Deloitte USA to Deloitte Turkey, dated

October 25, 2000).

   As noted at oral argument, this transfer of documents in

circumstances where the transfer was in the mutual interests of

Deloitte USA and Deloitte Turkey does not necessarily imply that

Deloitte USA has the ability to obtain documents from Deloitte

Turkey in circumstances where the transfer would not have

benefitted (and might even conceivably have harmed) Deloitte

Turkey.  On the other hand, by preparing documents in an

accounting capacity for Telsim in reliance on financial statements

prepared by its sister corporation Deloitte Turkey, Deloitte USA

may have to some degree implicitly vouched for the materials, a

representation which might arguably imply Deloitte USA's ability

to obtain from Deloitte Turkey documentation necessary to justify

the implicit representation.

   These two, competing possibilities, however, are simply that:

theoretical possibilities.  Motorola has failed, as a factual

matter, to rebut the former or prove the latter.  Moreover, as to

the particular documents here requested by Motorola (specifically,

Telsim's 2000 audited financial statements), Motorola has not

under any theory met its burden of showing that Magistrate Judge

Maas' ruling was "clearly erroneous or contrary to law," Fed. R.

Civ. P. 72(a), because, even on Motorola's view of the applicable

law, it is undisputed as a factual matter that the specific work
here performed by Deloitte USA did not involve either the transfer
of the documents Motorola now requests or any implicit reliance
upon them.  Stated more generally, the Court, upon consideration
of all the evidence, finds that plaintiffs have failed to carry
their burden of showing that, even on the legal standards argued
by plaintiff, Judge Maas erred in concluding that neither Deloitte
USA or Deloitte Tohmatsu had the "legal right, authority, or
practical ability to obtain the materials sought upon demand."
S.E.C. v. Credit Bancorp, 194 F.R.D. 469, 471 (S.D.N.Y. 2000).

     In addition, the Court has considered the other arguments
raised by Motorola, and finds them to be without merit.  In
particular, the Court is not persuaded that the theoretical
ability of members of the Verein or of its Executive Committee to
pass a resolution requiring production of the requested documents
means that Deloitte USA and Deloitte Tohmatsu possess the
requisite control.

     Accordingly, the Court affirms Judge Maas' ruling and denies
Motorola's discovery request.

     SO ORDERED.

                              _____
                              JED S. RAKOFF, U.S.D.J.


Dated:     New York, New York
           February 19, 2003


                                4

Exhibit I

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE

DeLOREAN MOTOR COMPANY LITIGATION                    MDL Docket No. 559

SIDNEY J. RUDOLPH, et al.,

            Plaintiffs,                              E.D. Mich. Docket
                                                    No. 83-CV-2137-DT
v.

JOHN Z. DeLOREAN, et al.,                            HON. GEORGE E. WOODS

            Defendants.

OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART PLAINTIFFS' AND DEFENDANT
OPPENHEIMER & CO.'S MOTIONS TO COMPEL

AT A SESSION of said Court, held in the
United States Courthouse, in the City of
Detroit, State of Michigan, on the 19th
day of November, 1985.

PRESENT:  THE HONORABLE GEORGE E. WOODS
United States District Judge

This matter is before the Court on plaintiffs' Motion to
Compel the production of documents by non-party Arthur Andersen &
Co. ("Andersen") and on a similar motion filed by defendant Oppenheimer
& Co.  The documents at issue were requested by way of an amended
subpoena served upon Andersen on July 11, 1985 and were described
therein as follows:

All documents, records, memoranda or writings of any
kind relating to the entities described below, all
predecessors and successors thereto and affiliates
thereof:

1.  DeLorean Motor Company
2.  DeLorean Research Limited Partnership
3.  Composite Technology Corporation
4.  DeLorean Manufacturing Company, f/k/a
    John Z. DeLorean Corporation
5.  DeLorean Motor Cars, Ltd.
6.  DeLorean Motor Company, Inc., f/k/a
    DeLorean, Ltd.
7.  CHRISTINA [sic], a Nevada Corporation
8.  Logan Manufacturing Corporation

for the period January 1, 1975 to date.

\* \* \* \* \*

Such documents should include, but not be limited
to, accounting books and records, client documents
and correspondence, bank statements, communications
between Arthur Andersen and third parties relating
to the entities described above, as well as com-
munications between Arthur Andersen and the above-
referenced entities including attorneys' responses
to auditor's letters, financial statements, audit
files, audit working papers and supporting docu-
mentation.  Such documents should include documents
and work papers generated by Arthur Andersen & Co.
and those in the custody of Arthur Andersen & Co.
which are the property of the clients.  Documents
produced prusuant [sic] to Plaintiffs' October 17,
1983 subpoena need not be produced again.

Exhibit 1, Exhibits of Memorandum of Law in Support of Plaintiffs'
Motion to Compel.  (Hereinafter "Plaintiffs' Exhibit ____").

A similar subpoena was issued by defendant Oppenheimer & Co.,
Inc., at about the same time (Plaintiffs' Exhibit 2).  Neither subpoena
was honored, as Andersen responded instead with the following objections:

---

1/
Except for the omission of grounds 2 and 3, Andersen's objections to
the Oppenheimer subpoena were identical.  The Oppenheimer subpoena is
the subject of a similar motion to compel, and the resolution of the
instant motion is dispositive of Oppenheimer's.  Before becoming aware
that the two motions were virtually identical, the Court also ordered
Oppenheimer's motion submitted on the briefs, but because it was filed
later, called for any response thereto to be submitted by December 2,
1985.  In view of the instant disposition, any further consideration
of that motion is unnecessary.  The parties' expected agreement with
this conclusion is demonstrated by Andersen's having referred in their
response to the motions to compel in the plural.

1.  The subpoena purports to require wholesale
    production of all files related in any way
    to eight companies affiliated with John Z.
    DeLorean, regardless of whether the documents
    covered thereby bear any relation to plaintiffs,
    DeLorean Research Limited Partnership ("DRLP")
    or the issues in this action.  Accordingly,
    the subpoena is overly broad and oppressive,
    and compliance therewith would be unduly
    burdensome.

2.  This is the second subpoena duces tecum in this
    action served by plaintiffs on Andersen.  In
    connection with the prior subpoena, counsel
    for plaintiffs and counsel for Andersen stipu-
    lated and agreed that production of certain
    specified files would constitute full compliance
    with such subpoena.  Those specified files were
    produced.  The current subpoena, calling for
    many of the same documents called for by the
    first, including those whose production was
    waived, is thus unduly oppressive and harassing
    and also violates the stipulation and agreement
    of counsel respecting compliance with the first
    subpoena.

3.  Presently pending in the Untied [sic] States
    District Court for the Southern District of
    Florida is an action by plaintiffs against
    Andersen, styled Rudolph v. Arthur Andersen &
    Co., No. 84-0748 (S.D. Fla.)  In such action, by
    virtue of certain motions to dismiss and for pro-
    tective orders filed by Andersen and presently
    pending before the Court, discovery has not gone
    forward.  Plaintiffs appear to seek to take dis-
    covery in this action for use in such other action
    against Andersen, which constitutes a misuse of
    the discovery process.

4.  The documents sought by the subpoena contain or
    reflect various trade secrets, proprietary or
    confidential information, or other material which
    should not be disclosed without restrictions on
    its use.  Therefore, the documents sought should
    not be produced in the absence of an appropriate
    protective order limiting their use to purposes
    of this action.

5.  The documents sought are subject to claims against
    production by Andersen's clients based on, inter
    alia, section 7609 of the Internal Revenue Code and
    the accountant-client privilege.  Production should
    not be made absent consent by said clients.

- 3 -

6.  Certain of the documents sought by the subpoena
    are not within Andersen's possession, custody or
    control but are in the possession, custody or
    control of separate partnerships abroad using
    the Arthur Andersen & Co. name.  Accordingly,
    Andersen cannot be required to produce such
    documents.

7.  Many of the documents sought by the subpoena
    are located at Andersen's offices in cities in
    the United States other than Detroit.  Requiring
    production of such documents in Detroit would be
    unduly burdensome and oppressive.

Plaintiffs' Exhibit 3.


Andersen's response to plaintiffs' motion indicates that
it has withdrawn its Objection No. 5 set out above because "those
persons presently controlling the affairs of Andersen's audit clients --
the liquidators and/or bankruptcy trustees of the various DeLorean
companies -- appear to have waived any accountant-client privilege
and have not asserted objection to production of the documents."
(Memorandum of Arthur Andersen & Co. in Opposition to Motions to Compel
at 16).  Consequently, the discussion which follows will not address
this abandoned objection.

As to Andersen's first objection, plaintiffs point out that
Andersen served as the auditors and financial advisors to DMC and
each of its related entities since the inception of the DMC venture
in 1975.  In view of plaintiffs' position that each of these entities
played a part in the fraud allegedly perpetrated against them, the
information plaintiffs seek appears reasonably calculated to lead to
the discovery of admissible evidence and the Court is thus satisfied

- 4 -

that the documents at issue are discoverable.  Further, Andersen's first objection on the grounds of overbreadth would be more proper coming from the defendants in this action, but even then such an argument could not prevail.

Plaintiffs' and Andersen's discussion of Andersen's second objection has generated much heat, but little light.  The Court is prepared to cut through all the invective, however, and conclude that this objection does not require the denial of plaintiffs' motion. Andersen's insistence that it had an agreement with plaintiffs such that production of the DRLP audit files would satisfy its obligations under the October 17, 1983 subpoena is not established conclusively in the record before the Court.  It is true that Andersen's attorney, James J. Sabella, wrote to Peter J. Yanowitch, plaintiffs' counsel, on November 9, 1983 and stated that he was enclosing "copies of Arthur Andersen & Co.'s audit files for the DeLorean Research Limited Partnership, numbered 00000 through 01526, production of which we have agreed will satisfy Andersen's obligations under the subpoena . . . ." (Affidavit of James J. Sabella, Exhibit 1 (emphasis added)).  However, it also appears that Yanowitch responded by letter of November 9, 1983 and, after referring to the documents mentioned in Sabella's November 9 letter, stated:  "I would also appreciate your providing me with copies of the other documents requested at your earliest convenience, . . ." (Plaintiffs' Exhibit 8).  While this particular paper trail ends with a November 14, 1983 letter from Sabella repeating his conviction that "we do not feel that Andersen has further responsibilities under the

- 5 -

subpoena," (Plaintiffs' Exhibit 9), the Court is not persuaded that Andersen "[h]aving bought its peace . . . should be permitted . . . to be left alone." Dart Industries Company, Inc. v. Westwood Chemical Company, Inc., 649 F.2d 646, 650 (9th Cir. 1980). Even dismissing for the moment this Court's conviction that the dissent in Dart is correct, Andersen's reliance on that case is not persuasive. While there was some ambiguity to the release at issue in Dart, at least there was a writing signed by the party to be charged with having given up the right to discovery. In this case, there is a letter from Andersen, a denial by plaintiffs and a further claim from Andersen that it has fulfilled its obligations under the subpoena. In the absence of an unequivocal agreement between the parties, this Court is not inclined to thwart the spirit of the Federal Rules of Civil Procedure by artificially curtailing any party's right to discovery.

Andersen's third objection provides no grounds for the outright denial of these motions to compel either. The argument that "federal courts have in countless cases ordered that materials produced in discovery be used only in connection with the action in which they are produced and not for some ulterior purpose" overlooks the fact that most such orders were issued to protect the recipient of a discovery request from having such discovery shared with other potential plaintiffs or competitors. See, e.g., National Utility Services, Inc. v. Wisconsin Centrifrugal Foundry, Inc., 49 F.R.D. 30, 32 (E.D. Wisc. 1970). The restrictions Andersen seeks in this case would amount to requiring plaintiffs to sign a covenant not to sue in the event such discovery

- 6 -

discloses any actionable misconduct on the part of Andersen. The
Court is not persuaded that such a restriction need be applied here.

Andersen is on much firmer ground in its fourth objection,
however. As it stated in its memorandum:

> Andersen's Objection No. 4 has nothing to do with the
> [abandoned] accountant-client privilege [objection].
> On the contrary, Objection No. 4 states that the docu-
> ments demanded contain trade secrets and proprietary
> or confidential information belonging to Andersen
> itself. This objection has not been waived, and can
> only be obviated by an appropriate protective order
> barring disclosure of confidential information by
> plaintiffs.
>
> That the documents contain information confidential
> as to Andersen is evident from the very nature of the
> documents demanded. Plaintiffs seek audit files and
> workpapers. Necessarily, such files and workpapers
> expose the standards used by Andersen in conducting
> audits, the organization of and distribution of re-
> sponsibility within an Andersen audit team, and other
> proprietary information concerning Andersen's pro-
> fessional practice. Disclosure of this information
> to third parties in the accounting/auditing field
> would place Andersen at a serious competitive dis-
> advantage.

Memorandum of Arthur Andersen & Co. in Opposition to Motions to Compel
at 16-17 (emphasis in original).

The Court agrees that Andersen's compliance with earlier court
orders to produce has not extinguished the element of confidentiality
and further agrees that some sort of protective order is appropriate.
Accordingly, this Court will limit the use of the documents produced
in response to this order to the purposes of DeLorean Motor Company
related litigation. In setting out the terms of such protective order

- 7 -

n broad fashion, the Court is aware that further fine-tuning might become necessary, a task which the Court will assume upon application by the parties.

The Court also finds merit to Andersen's sixth objection. From the affidavits of James J. Sabella, Jon N. Ekdahl and Frank P. Henderson, submitted in Andersen's response to these motions to compel, the Court is persuaded that plaintiffs are incorrect in characterizing Andersen as a "single worldwide partnership." The Court thus agrees that ordering the production of documents by Arthur Andersen & Co. in the United Kingdom or Ireland would circumvent the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, 28 U.S.C. §§1781 et seq., and thus this order will only require the production of documents by entities using the Arthur Andersen & Co. name in the United States.

Finally, the Court agrees with Andersen that there is no need to depart from the general rule that the documents at issue should be examined at the places they are kept.

For these reasons, IT IS HEREBY ORDERED that plaintiffs' and defendant Oppenheimer & Co.'s Motions to Compel are hereby GRANTED IN PART and DENIED IN PART. Accordingly, these parties are entitled to the production of documents by entities using the Arthur Andersen & Co. name in the United States only, subject to the restriction that such documents shall not be disclosed to persons or organizations not parties to DeLorean Motor Company related litigation. Any disclosure

- 8 -

to parties beyond plaintiffs and defendant Oppenheimer & Co. shall not be made until such time as Andersen has been allowed to petition this Court for whatever further restrictions it deems necessary. Production of the documents at issue shall otherwise proceed in accordance with customary practice and procedure and shall be made at the places of their storage.

So ordered.

GEORGE E. WOODS
UNITED STATES DISTRICT JUDGE.

- 9 -

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| v. | ) | No. 1:08-mc-00411-RJL |
| | ) | |
| DELOITTE & TOUCHE USA LLP, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

**[PROPOSED] ORDER**

Upon consideration of the United States' Motion To Compel Deloitte & Touche USA

LLP To Produce Documents, the Motion is DENIED.

IT IS SO ORDERED on this _____ day of _____, 2008.


_____
RICHARD J. LEON
UNITED STATES DISTRICT JUDGE