# UNITED STATES DISTRICT COURT

## DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Movant,<br><br>          v.<br><br>DELOITTE & TOUCHE USA LLP,<br><br>     Respondent. | )<br>)<br>)<br>)<br>)  Case No.: 1:08-mc-00411-RJL<br>)  Judge Leon<br>)<br>)<br>)<br>)<br>)<br>) |

## <u>UNOPPOSED MOTION TO INTERVENE AS OF RIGHT</u>

Pursuant to Federal Rule of Civil Procedure 24(a), Chemtech Royalty Associates, L.P. ("Chemtech I"), by Dow Europe, S.A. as Tax Matters Partner and Chemtech II, L.P. ("Chemtech II"), by IFCO, Inc., as Tax Matters Partner ("Intervenors"), with a principal place of business in Plaquemine, Louisiana, by and through counsel, seek leave of this Court to intervene as of right in the above-captioned case for the purpose of opposing United States' Motion to Compel Deloitte & Touche USA LLP ("D&T") to Produce Documents ("Motion to Compel"), filed in this Court on June 30, 2008. In the alternative, pursuant to Federal Rule of Civil Procedure 24(b), Intervenors seek leave of this Court to grant permissive intervention. Neither Movant nor Respondent opposes Intervenors' Motion to Intervene as of Right ("Motion"). Intervenors seek intervention for the purpose of protecting their privileged and confidential information that is directly relevant to ongoing litigation in the District Court for the Middle District of Louisiana.

Intervenors also attach to this Motion a Memorandum in Opposition to United States'
Motion to Compel ("Opposition"). (Intervenors' Ex. A). This Opposition is intended to satisfy
the pleading requirement in Local Civil Rule 7(j) and Federal Rule of Civil Procedure 24(c) in
this miscellaneous proceeding. If this Motion is granted, Intervenors request that this Court
accept the Opposition for filing in the above-captioned matter.

In support of their Motion, Intervenors state as follows:

1.      The above captioned action directly relates to a civil tax dispute in the District
Court for the Middle District of Louisiana before the Honorable Ralph E. Tyson. The Motion to
Compel attaches the required Notice of Designation of Related Civil Cases Pending in this or
any other United States Court. (Intervenors' Ex. B). The caption for this related case is
Chemtech Royalty Associates, L.P., by Dow Europe, S.A. as Tax Matters Partner v. United
States of America, Civ. No. 05-944-RET-DLD, consolidated with, Civ. No. 06-258-RET-DLD
and 07-405-RET-DLD.

2.      On September 20, 2007, Movant served a subpoena duces tecum on Respondent
at its Washington, D.C. offices located at 555 12th Street NW, Suite 500, Washington, D.C.
20004-1207. (Intervenors' Ex. C). The subpoena sought documents relating to communications
with Intervenors or documents relating to the Chemtech partnerships that are the subject of the
civil tax dispute referred to above.

3.      On September 28, 2007, Respondent objected to the subpoena on various grounds
and requested additional time to respond. (Intervenors' Ex. D).

4.      On December 21, 2007, Respondent produced responsive documents, noting that
certain documents in its possession but not produced were covered by applicable privileges
belonging to Intervenors. (Intervenors' Ex. E).

5.      On January 11, 2007, Respondent provided Movant with a privilege log prepared by Intervenors' counsel identifying three documents subject to the attorney-client privilege and the attorney work-product doctrine.  Additionally, one of these three documents is subject to the 26 U.S.C. § 7525 tax practitioner privilege.  (Intervenors Ex. F).

6.      One of these documents was authored by Dow's outside counsel and provided legal advice relating to the Chemtech II transaction; one of the documents was authored by Dow employees and reflected legal advice and work product relating to the Chemtech II transaction; and one of the documents was authored by D&T but recorded the thoughts and impressions of outside counsel relating to the Chemtech I transaction.

7.      Intervenors seek to intervene in this case for the purpose of opposing the Motion to Compel as it relates to the documents identified on Respondent's privilege log.

8.      Intervenors, as holders of applicable privileges, have defenses to Movant's claims, and Intervenors' defenses are related to the "transaction that is the subject of this action." Fed. R. Civ. P. 24(a)(2).

9.      Intervenors' defenses present questions of law and fact that are common to this action.  Fed. R. Civ. P. 24(b)(1)(B).

10.     Intervenors submit the attached Memorandum of Law in support of this Motion.


WHEREFORE, pursuant to Federal Rule of Civil Procedure 24(a)(1), Intervenors respectfully request that this Court issue an Order permitting it to intervene as of right, or alternatively, pursuant to Federal Rule of Civil Procedure 24(b), issue an Order granting permissive intervention, in the above-captioned matter.

Respectfully submitted this 25th day of August, 2008.

> CHEMTECH ROYALTY ASSOCIATES, L.P., by
> DOW EUROPE, S.A., as Tax Matters Partner and
> CHEMTECH II, L.P., BY IFCO, INC., as Tax Matters
> Partner
>
>
> _(signature)_
> John B. Magee (D.C. Bar No. 931139)
> Hartman E. Blanchard, Jr. (D.C. Bar No. 451559)
> Christopher P. Murphy (D.C. Bar No. 500886)
> MCKEE NELSON LLP
> 1919 M Street, N.W., Suite 200
> Washington, D.C. 20036
> Telephone: (202) 775-1880
> Facsimile: (202) 775-8586
> jmagee@mckeenelson.com
> hblanchard@mckeenelson.com
> cmurphy@mckeenelson.com

## UNITED STATES DISTRICT COURT

## DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Movant,<br><br>       v.<br><br>DELOITTE & TOUCHE USA LLP,<br><br>       Respondent. | )<br>)<br>)<br>)<br>)   Case No.: 1:08-mc-00411-RJL<br>)   Judge Leon<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OF LAW IN SUPPORT OF
## <u>UNOPPOSED MOTION TO INTERVENE AS OF RIGHT</u>

Chemtech Royalty Associates, L.P. ("Chemtech I"), by Dow Europe, S.A. as Tax Matters

Partner and Chemtech II, L.P. ("Chemtech II"), by IFCO, Inc., as Tax Matters Partner

("Intervenors") seek to intervene in this case pursuant to Federal Rule of Civil Procedure 24.  On

June 30, 2008, Movant filed United States' Motion to Compel Deloitte & Touche USA LLP to

Produce Documents ("Motion to Compel").  Intervenors seek to intervene in this matter for

purposes of opposing this Motion to Compel as it relates to Intervenors' privileged and

confidential materials.  Intervenors have an interest relating to the transaction that is the subject

of the above captioned case and have defenses to the Motion to Compel that share a common

question of law and fact with this miscellaneous proceeding.  <u>See</u> Fed. R. Civ. P. 24(a)(2),

(b)(1)(B).

## SUMMARY OF FACTS AND PROCEDURAL HISTORY

The above captioned case relates to a subpoena duces tecum served on Deloitte & Touche USA LLP ("D&T") on September 20, 2007. The subpoena seeks certain documents and writings from D&T related to the Chemtech I partnership, entered into in 1993, and the restructuring of the Chemtech I partnership into the Chemtech II partnership in 1998. On September 28, 2007, D&T objected to the subpoena on various grounds and sought an extension. This extension was granted, and on December 21, 2007, D&T produced documents to the government but noted that certain documents in its possession were covered by various privileges, including the attorney-client privilege, attorney work-product, and the tax practitioner privilege set forth in 26 U.S.C. § 7525. On January 11, 2007, D&T provided the government with a privilege log prepared by Intervenors' counsel identifying three documents subject to the privileges described above. (Intervenors' Ex. F).

The Dow Chemical Corporation, Intervenors' parent company, is the holder of the privileges applicable to these three documents and retains control of such privileges, including: (1) the attorney-client privilege, see In re Subpoenas Duces Tecum, 738 F.2d 1367, 1369 (D.C. Cir. 1984) (stating that "the privilege is held by clients as a means of encouraging their candor in discussing their circumstances with their chosen legal representatives") (citing Upjohn Co. v. United States, 449 U.S. 383 (1981)); (2) the § 7525 tax practitioners privilege, see I.R.C. § 7525(a)(1) (stating that "the same common law protections of confidentiality which apply to a communication between a taxpayer and an attorney shall also apply to a communication between a taxpayer and any federally authorized tax practitioner"); and (3) the work-product doctrine, see In re Special September 1978 Grand Jury, 640 F.2d 49, 62 (7th Cir. 1980) ("A client may

2

generally invoke the work product doctrine because, like the attorney-client privilege, it protects

his interests by preventing disclosures about his case.").

## ARGUMENT

I.    The Court Should Grant Intervention as of Right.

Intervenors are entitled to intervene as a matter of right.  The D.C. Circuit has interpreted

Federal Rule of Civil Procedure 24(a) as turning on 4 factors:

> (1) the timeliness of the motion; (2) whether the applicant "claims an interest
> relating to the property or transaction which is the subject of the action," Fed. R.
> Civ. P. 24(a); (3) whether "the applicant is so situated that the disposition of the
> action may as a practical matter impair or impede the applicant's ability to protect
> that interest," id.; and (4) whether "the applicant's interest is adequately
> represented by existing parties."  Id.

Mova Pharmaceutical Corp. v. Shalala, 140 F.3d 1060, 1074 (D.C. Cir. 1998) (citing

Massachusetts School of Law at Andover, Inc. v. United States, 118 F.3d 776, 779-80 (D.C. Cir.

1997)).

In this case, Intervenors satisfy all four factors:

Factor (1).  Intervenors' Unopposed Motion to Intervene as of Right ("Motion") is

timely.  On July 11, 2008, this Court issued a Minute Order granting D&T's Unopposed Motion

for Extension of Time providing that "Deloitte & Touche USA LLP and plaintiffs in the

underlying litigation have up to and including 7/28/2008 to file any response to the motion to

compel."  On July 25, 2008, the Court issued a Minute Order granting D&T's Second Motion for

Extension of Time, requiring a response on or before August 11, 2008.  On August 8, 2008, the

Court issued a Minute Order granting D&T's Third Unopposed Motion for Extension of Time

requiring a response on or before August 25, 2008.  Intervenors are filing their Motion

accompanying this Memorandum of Law on August 25, 2008, thus complying with the Court-

established deadline.

Factor (2). As detailed in the Motion, the government's Motion to Compel concerns a subpoena relating directly to the pending civil tax dispute in the Middle District of Louisiana in which Intervenors are the Plaintiffs. The government seeks to discover documents that it claims are potentially relevant to that dispute. Moreover, Intervenors are seeking to preserve claims of privilege that belong to them and not to D&T. Because of Intervenors' assertion of privilege over documents sought by the government in this related litigation, Intervenors clearly have an "interest" in the transaction that is the subject to the above-captioned action. The D.C. Circuit has held that privilege issues "satisfy [the] definition of legal interest . . . . Without the right to intervene in discovery proceedings, a third party with a claim of privilege in otherwise discoverable materials could suffer 'the obvious injustice of having his claim erased or impaired by the court's adjudication without ever being heard.'" United States v. American Tel. and Tel. Co., 642 F.2d 1285, 1292 (D.C. Cir. 1980) (citing Cascade Natural Gas Corp. v. El Paso Natural Gas Co., 386 U.S. 129, 145 (1967) (Stewart, J., dissenting)). In fact, "courts typically permit parties to intervene to preserve claims of privilege." Alexander v. F.B.I., 186 F.R.D. 21, 30 (D.D.C. 1998); see Allied Irish Banks, p.l.c. v. Bank of America, N.A., No. 03-3748, 2008 WL 783544, at *11-13 (S.D.N.Y. March 26, 2008) (allowing PwC-US, a third party, to intervene to assert work-product privilege with respect to certain documents).

In Cascade Natural Gas Corp. v. El Paso Natural Gas Co., the Supreme Court stated that "[i]f an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene." 386 U.S. 129, 134 n.3 (1967) (emphasis added). Clearly in this instance, Intervenors have a "legal interest relating to the transaction that is the subject of this action," and granting discovery over the privileged

4

documents would "substantially affect[]" Intervenors in a "practical sense" as it would directly impact the pending litigation in the Middle District of Louisiana.

Factor (3). The Intervenors' "interest" with respect to this action is in protecting its privileges with respect to the three documents on Respondent's privilege log. These documents reflect confidential legal advice provided by Intervenors' attorneys and reflect thoughts and impressions related to the merits of Intervenors' case in the underlying litigation. Intervenors are certainly "so situated" that a disposition resulting in the discovery of these three documents would clearly "impede [Intervenors'] ability to protect that interest."

Factor (4). Although Intervenors have directed Respondent to maintain their privileges, the only way for Intervenors to fully protect their privileges with respect to these three documents is to make their own arguments directly to the Court. D&T intends to follow the direction of Intervenors to withhold the documents in the absence of a judicial order to the contrary; however, Intervenors, not D&T, are best situated to make appropriate arguments to "adequately support" their privilege claims. In Allied Irish Banks, the court noted that two PwC entities, PwC-US and PwCIL, while related, were independent and could not adequately assert privileges on behalf of the other. 2008 WL 783544, at *11. In this instance, Intervenors and D&T are unrelated entities; thus, Intervenors should be permitted to assert the applicable privileges with respect to the three documents at issue. Additionally, although disclosure of the three documents would directly affect Intervenors, it would have no significant impact on D&T.

Because all four factors of the test for intervention as of right are satisfied, Intervenors' Motion should be granted.

5

II.     In the Alternative, Intervenors should be Granted Permissive Intervention.

In the alternative, Intervenors should be granted permissive intervention under Federal

Rule of Civil Procedure 24(b). Permissive intervention may be granted under Rule 24(b) when

(1) the motion is timely; (2) the applicant's claim or defense has a question of law or fact in

common; and (3) there is an independent ground for jurisdiction. See E.E.O.C. v. National

Children's Center, Inc., 146 F.3d 1042, 1046 (D.C. Cir. 1998). "The requirements for

permissive intervention are to be construed liberally, 'with all doubts resolved in favor of

permitting intervention.'" In re Vitamins Antitrust Litigation, No. MISC. 99-197, 2001 WL

34088808, *3 (D.D.C. March 19, 2001). In this case, Intervenors satisfy each of the factors for

permissive intervention.

Factor (1). As detailed above, Intervenors' Motion is timely.

Factor (2). In this action, the government is seeking to discover privileged materials over

which Intervenors control the privilege. Intervenors have instructed D&T to maintain

Intervenors' privileges over the three documents on D&T's privilege log. Accordingly, the legal

claims with respect to privilege in the government's Motion to Compel present questions of law

that relate exclusively to Intervenors' privilege claims over the documents at issue.

Factor (3). Although this Circuit's cases refer to the need for a permissive intervenor to

show "independent grounds for jurisdiction," that requirement does not apply in this

circumstance because this case is brought under federal question jurisdiction and Intervenors

raise no additional arguments or counterclaims against the government. The need to show

independent grounds for jurisdiction arises "because the typical movant asks the district court to

adjudicate an additional claim on the merits," see, e.g., National Children's Center, Inc., 146

F.3d at 1046, and "is almost entirely a problem of diversity litigation," see Charles A. Wright,

6

Arthur R. Miller, and Mary Kay Kane, 7C Federal Practice and Procedure § 1917 (1986). "In federal-question cases there should be no problem of jurisdiction with regard to an intervening defendant . . . ." <u>Id.</u> In this case, Intervenors are not asking the Court to adjudicate a new claim, and jurisdiction does not rest on diversity between the parties. Moreover, even if an independent jurisdictional ground were necessary, Intervenors are entitled to defend against the government's Motion to Compel for the same reasons that the Court has jurisdiction to hear the government's case in the first instance.

Because Intervenors meet the test for permissive intervention, if this Court does not grant intervention as of right, this Court sould grant permissive intervention.

## CONCLUSION

For the reasons stated above and in their Motion, Intervenors respectfully request that this Court grant the Motion pursuant to Federal Rule of Civil Procedure 24(a), or in the alternative, Rule 24(b).

7

Respectfully submitted this 25th day of August, 2008.

> CHEMTECH ROYALTY ASSOCIATES, L.P., by
> DOW EUROPE, S.A., as Tax Matters Partner and
> CHEMTECH II, L.P., BY IFCO, INC., as Tax Matters
> Partner
>
>
> John B. Magee (D.C. Bar No. 931139)
> Hartman E. Blanchard, Jr. (D.C. Bar No. 451559)
> Christopher P. Murphy (D.C. Bar No. 500886)
> MCKEE NELSON LLP
> 1919 M Street, N.W., Suite 200
> Washington, D.C.  20036
> Telephone:  (202) 775-1880
> Facsimile:  (202) 775-8586
> jmagee@mckeenelson.com
> hblanchard@mckeenelson.com
> cmurphy@mckeenelson.com

8

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of August, 2008, the foregoing UNOPPOSED

MOTION TO INTERVENE AS OF RIGHT, MEMORANDUM OF LAW IN SUPPORT OF

UNOPPOSED MOTION TO INTERVENE AS OF RIGHT and [PROPOSED] ORDER, with

attached OPPOSITION TO UNITED STATES' MOTION TO COMPEL DELOITTE &

TOUCHE USA LLP TO PRODUCE DOCUMENTS were served, by overnight mail, on

> Thomas F. Koelbl
> Trial Attorney, Tax Division
> U.S. Department of Justice
> 555 Fourth Street, N.W.
> Washington, D.C. 20001
>
> Eric P. Witiw
> Deloitte & Touche USA LLP
> Suite 500
> 555 12th Street NW
> Washington, DC 20004
>
> Michael D. Warden
> Sidley Austin LLP
> 1501 K Street, N.W.
> Washington, D.C. 20005-1401

Hartman E. Blanchard, Jr., (D.C. Bar No. 451559)

# INTERVENORS' EXHIBIT

# A

# UNITED STATES DISTRICT COURT

## DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Movant,<br><br>v.<br><br>DELOITTE & TOUCHE USA LLP,<br><br>Respondant. | )<br>)<br>)<br>)<br>)  Case No.: 1:08-mc-00411-RJL<br>)  Judge Leon<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM IN OPPOSITION
## TO MOTION TO COMPEL

### INTRODUCTION

On June 30, 2008, the Government filed this action to compel Deloitte and Touche's ("D&T") production of three documents (the "Disputed Documents") withheld from a government subpoena on privilege grounds. The privileges at issue belong to The Dow Chemical Company ("Dow"), which seeks intervention through its majority-owned partnerships, Chemtech Royalty Associates, L.P. ("Chemtech I") and Chemtech II L.P. ("Chemtech II") (collectively, Chemtech I and Chemtech II shall sometimes be referred to herein as the "Chemtech Partnership"). The subpoena arises out of tax litigation in the Middle District of Louisiana in which the Chemtech Partnership has petitioned for the readjustment of IRS reallocations of partnership items. The Disputed Documents represent or contain legal and tax advice received by Dow related to its participation in the Chemtech Partnership.

Dow has asserted three different privileges over the Disputed Documents: the attorney-client privilege, the work product doctrine, and the privilege under 26 U.S.C. § 7525 (the "7525 privilege"). Dow claimed the attorney-client privilege and work product doctrine over a tax opinion from Dow's outside counsel, McKee Nelson LLP, to Dow's Tax Director, William L. Curry, dated June 20, 2005 ("Document 1"). Dow claimed the attorney-client privilege, the 7525 privilege, and the work product doctrine over an internal file memorandum dated September 15, 1998, written by Michael Cone, an in-house accountant for Dow, and Craig Jones, an in-house attorney for Dow ("Document 2"). The final document over which Dow has asserted privilege is an internal D&T memorandum that reflects work product communications with Dow's attorneys ("Document 3").[1] See infra pp. 27-29 for a more detailed discussion of these three documents.

The government's only argument in support of its Motion to Compel is that D&T's mere possession of the Disputed Documents resulted in a waiver of all applicable privileges. The government supports this argument through selective citation of authority and omission of key distinguishing facts in the authorities on which it does rely. In fact, the authorities make clear that the Disputed Documents retain their privileged character:

(1)    Numerous courts recently have considered whether work product protection is waived when a disclosure occurs to a public auditor. Virtually all of these courts have found no waiver in such circumstances. The government fails to cite any of these cases. Instead, the government relies solely on MIT v. United States, 129 F.3d 681 (1st Cir. 1997). The government makes that case appear more relevant than it is, because the government's discussion

---

[1]    The D&T privilege log also asserted the attorney-client privilege over Document 3. This assertion was incorrect, and Dow is withdrawing that claim. Dow has not asserted the 7525 privilege over Document 3 because the 7525 privilege did not exist when Document 3 was created. Dow continues to assert work product protection over Document 3.

omits the key fact that the disclosure in <u>MIT</u> was to a <u>government</u> auditor (and potential litigation opponent), not a financial auditor.

(2)     The attorney-client and 7525 privileges were not waived because Dow's relationship with D&T was itself protected by the 7525 privilege. Privilege is not waived when a disclosure occurs in the context of another privilege. Although the law is less clear on this issue, the statutory language and purpose of the 7525 privilege mandate this result.

Particularly in light of the fact that the parties are litigating some of the very same legal questions at issue in the Disputed Documents, granting the government's motion would be highly prejudicial to Dow and would cause precisely the sort of harm to the adversarial process that the work product doctrine, the attorney-client privilege, and the 7525 privilege are intended to prevent.

(3)     As indicated, the government does not argue that the Disputed Documents are discoverable in the absence of a privilege waiver. Indeed, it is clear that the documents at issue were protected by the claimed privileges in the absence of a waiver.

## BACKGROUND

### I.     Overview Of The Chemtech Litigation

The Louisiana litigation concerns Dow's participation in a series of transactions, first in 1993 and again in 1998, known as the Chemtech Partnership. Dow formed Chemtech I with five foreign banks in 1993 as a means of raising minority equity capital without adversely affecting its credit ratings or its balance sheet. Dow is a capital-intensive company for which ready access to capital is critical. Its business is cyclical in nature. Historically, Dow has followed a strategy of investing in new facilities during the "trough" years of the business cycle, when cash flow is

3

low or even negative. In the early 1990s, Dow was undergoing a period of difficult business conditions and reduced earnings.

Dow's ability to raise capital at a reasonable cost depends upon Dow maintaining its credit ratings with ratings agencies. In order to minimize the risk of a credit downgrade, Dow decided to meet its funding requirements in part through Chemtech I. At the time Chemtech I was formed in 1993, the partnership vehicle enabled Dow to monetize valuable patent assets and to obtain $200 million in third-party capital that was treated for financial accounting purposes as minority equity on Dow's consolidated U.S. GAAP financial statements. As a result, Dow raised equity capital without impairing its credit ratios.

Dow subsidiaries contributed to the Chemtech Partnership patent assets valued at approximately $883 million and approximately $10 million in cash; the foreign banks contributed an aggregate of $200 million for limited partnership interests, which Dow was able to access by way of loans from a partnership subsidiary. The Chemtech Partnership generated income primarily from royalties paid by Dow for the use of the patents. The foreign banks received a preferred return on their investments paid solely out of partnership profits and participated in profits and gains over and above the amount of the priority return. The foreign banks also would have participated in any losses in the partnership, and as limited partners, the entire amount of their contributed capital was subject to risk of loss.

In 1998, Dow exercised its option to purchase the partnership interests of the foreign banks due to changes in U.S. withholding tax laws that might have required Dow to indemnify the banks for U.S. withholding taxes. Following the purchase, Dow contributed its Plaquemine, Louisiana chemical plant to the partnership, Chemtech I distributed the patents and other assets to Dow partners, and the partnership's name was changed to Chemtech II, L.P. A U.S.

4

subsidiary of Rabobank, RBDC, subsequently invested $200 million in the partnership. This investment enabled Dow to replace the $200 million in minority equity financing previously provided by the five foreign banks.

The government found objectionable certain tax consequences mandated by the Internal Revenue Code's partnership provisions that were favorable to Dow. Accordingly, it reallocated the partnership items of the Chemtech Partnership on multiple theories, including that the partnership was not valid for federal tax purposes.

## II.    Dow's Anticipation Of Litigation Over The Chemtech Partnership

Throughout Dow's participation in the Chemtech Partnership, Dow anticipated that the IRS might challenge its treatment of the Chemtech Partnership for tax purposes. (Curry Decl. ¶¶ 8-9) (Exhibit 1). Indeed, statements contained in Document 3 clearly indicate that Dow was anticipating a potential dispute with the IRS even before the five foreign banks joined the partnership in August 1993. (Curry Decl. ¶ 10). Although confident in its legal position, Dow sought early legal advice on the merits of its case should it be litigated and regularly updated its legal position as circumstances changed. Dow engaged outside tax counsel prior to entering the transactions and tasked its in-house lawyers and accountants with reviewing the tax issues on an ongoing basis. Dow did not undertake this sort of legal analysis for every tax position on its return, or even every position that it thought might arise in an audit.

Dow had good reason to suspect that the IRS might want to litigate the tax consequences of the Chemtech transactions. As a large corporate taxpayer, Dow's tax returns are subject to year-round audit by an IRS exam team that resides at Dow's headquarters in Midland, Michigan. (Curry Decl. ¶ 7). In the years leading up to the Chemtech II transaction, the IRS already had started issuing Information Document Requests ("IDRs") for Chemtech I. (Curry Decl. ¶ 9(c)).

5

The Chemtech Partnership resulted in significant tax benefits and arose in an area of the tax law that was in a state of flux at the time of its initial formation. Proposed regulations modifying the operation of one relevant provision, the so-called "ceiling rule," were generating substantial discussion among the tax bar.[2] Uncertainty over the application of the finalized regulations persisted after the formation of Chemtech I and leading up to the restructuring into Chemtech II with the advent of the partnership anti-abuse rule.[3]

In the Louisiana litigation, the government has challenged Dow's treatment of the Chemtech transaction for tax purposes under theories of economic substance, sham, and debt versus equity. The application of these so-called "soft doctrines" involves a facts and circumstances analysis that is notoriously difficult to predict. As evidenced by the Disputed Documents themselves, Dow was aware of the IRS focus on section 704(c) during the period of the Chemtech Partnership, predicted the likely IRS challenge of the tax treatment mandated by the Code, and prepared early on for a potential dispute.

The reasonableness of Dow's anticipation of litigation has been confirmed in hindsight. By early 1997, Dow's IRS audit team had begun reviewing the Chemtech I transaction. By March 1997, the first of at least 33 IDRs related to Chemtech I had been issued. On October 29, 1999, the IRS exam team issued a form 5701 report asserting substantial deficiencies against

---

[2]  Commenting on the proposed regulations, an I.R.S. official was quoted as saying "'certainly, starting out, there is going to be a lack of . . . precedent on what is considered reasonable.'" Juliann Avakian-Martin, IRS May Issue Rulings On Built-In Gain Regs Before They Are Final, Says Official, *in* Tax Notes Today, Feb. 5, 1993, LEXIS, 93 TNT 27-4 (quoting David Enquist, Office of Assistant Chief Counsel). The same official added that the government "might be concerned about a shift of income to a noncontributing partner that has net operating losses or that is exempt from tax." Id.

[3]  See Laura E. Cunningham, Use and Abuse of Section 704(c), *in* Tax Notes Today, June 27, 1996, LEXIS, 96 TNT 129-23 ("The regulations appear to create clear and concise rules for taxpayers to follow in planning contribution transactions. However, those rules are qualified by an anti-abuse rule which, if broadly construed, could largely obscure the clarity of the main rules.")

Dow relating to Chemtech I and detailing many of the positions that Dow had anticipated during the pre-transaction period. See Exhibit 2.

As is apparent from this timetable, Dow's belief in the likelihood of a dispute with the IRS grew over time. By the time Dow made the decision to restructure the Chemtech Partnership into Chemtech II, the IRS had confirmed its intention to challenge Chemtech I. Although confident its tax treatment of the Chemtech II transaction was proper, Dow also believed that the IRS would challenge that treatment. Beginning in 1997, Dow obtained similar legal advice from outside and in-house counsel regarding the tax issues raised by the restructuring of the Chemtech Partnership. The advice was provided on an on-going basis and memorialized in a tax opinion issued by outside counsel in June 2005. Dow filed the Louisiana suit less than a month later. That opinion is one of the documents that the government seeks.

### III.    Dow's Disclosure Of The Disputed Documents To D&T

Like every other public company, Dow maintains reserve accounts reflecting contingent tax liabilities. Each year, Dow's in-house attorneys, with the assistance of outside counsel, analyze the merits of any uncertain tax positions. A reserve amount is calculated factoring in the likelihood of success on the merits (i.e., a hazards of litigation assessment). Acting in a similar role, Dow's auditor, D&T, is required to review and approve the amount Dow has established as a reserve before D&T will attest to the soundness of Dow's financial statements. Where D&T disagrees with Dow concerning its treatment of a certain transaction or its reserve amount, D&T informs Dow of its disagreement, and Dow takes D&T's opinions under advisement, often times leading Dow to change its position.

Prior to the collapse of Enron, the enactment of Sarbanes-Oxley, and the creation of the Public Company Accounting Oversight Board, auditors often would meet with a corporation's

7

counsel to discuss the merits of any uncertain tax positions and agree upon the appropriateness of

a given reserve amount. New rules now require auditors to review any legal opinions or analyses

obtained by a corporation related to each tax uncertainty. As a result, D&T required Dow to

disclose Documents 1 and 2 to D&T. Dow disclosed these documents with the expectation that

D&T would maintain their confidentiality. <u>See</u> (Curry Decl. ¶ 12); (Biddix Decl. ¶ 4) (Exhibit

3).


## <u>ARGUMENT</u>

The Government's Motion to Compel does not challenge the initial application of the

attorney-client privilege and work product doctrine to the Disputed Documents. <u>See</u>

Memorandum in Support of Motion to Compel ("Government's Memorandum" or "Gov.

Mem.") at 9 (arguing that the disclosure to D&T "waived any attorney-client privilege that might

have applied"), 9-10 (arguing that the disclosure to D&T "waived work-product protection over

those documents . . . [a]ssuming the withheld documents were protected by the work-product

doctrine"). Although it does challenge the application of the 7525 privilege to Document 2, the

government's argument is premised on an analysis of the wrong practitioner. <u>See</u> Gov. Mem. at

11-12 (analyzing the applicability of the tax practitioner's privilege as if Document 2 was

authored by D&T, rather than Dow employee Mike Cone). The government's argument for

production of Dow's privileged documents rests on an assertion that Dow has waived all

privileges by disclosing the Disputed Documents to its auditor, D&T. For the government to

prevail, the Court would have to find waiver of all three privileges.

Dow did not waive any of the asserted privileges. Although the Government's

Memorandum ignores its existence, a substantial body of caselaw has developed establishing that

work product is not waived by disclosure of a protected document to an independent auditor. As

8

for the attorney-client and 7525 privileges, the law, though less settled, strongly supports the

existence of a 7525 privilege between Dow and D&T.  Because Dow's relationship with D&T

was itself protected by a privilege, disclosure of attorney-client communications to D&T does

not constitute a waiver.

I.    **None Of The Asserted Privileges Were Waived By Sharing The Disputed Documents With D&T.**

The government's sole argument for disclosure of Dow's privileged documents is that

D&T's "very possession of the documents" destroys confidentiality and operates as a complete

waiver of privilege.  The government premises its position on an incomplete description of the

applicable caselaw and is incorrect.

A.    **Basic Rules Governing Waiver Of Privileges**

Disclosure of attorney-client privileged information to a third-party outside the privilege

circle waives the privilege.  When a disclosure of privileged information is made in the context

of another privileged relationship, however, no waiver occurs.  See e.g., Solomon Scientific v.

Scientific American, Inc., 125 F.R.D. 34 (S.D.N.Y. 1988) (no waiver upon disclosure of

privileged memorandum to client's wife and client's other attorney) (citing Supreme Court

Standard (Rejected) Rule 511 to Fed. R. Civ. Proc. ("waiver not applicable if 'disclosure is itself

privileged'")).  This is because a voluntary disclosure of privileged information results in a

waiver only when the disclosure is inconsistent with the confidential nature of the attorney-client

relationship.  See Permian Corp. v. United States, 665 F.2d 1214, 1219 (D.C. Cir. 1981).

Work product is less susceptible to waiver than the attorney-client and 7525 privileges.

"[W]hile the mere showing of a voluntary disclosure to a third person will generally suffice to

show waiver of the attorney-client privilege, it should not suffice in itself for waiver of the work

product privilege." Id. (quoting United States v. AT&T, 642 F.2d 1285, 1299 (D.C. Cir. 1980)).

Work product is waived only where "such disclosure, under the circumstances, is inconsistent

with the maintenance of secrecy from the disclosing party's adversary." AT&T, 642 F.2d at

1299. As a result, work product is waived only upon disclosure of material to an adversary, or

where a party "had no reasonable basis for believing that the disclosed materials would be kept

confidential by the [third party]." In re Subpoenas Duces Tecum, 738 F.2d 1367, 1372 (D.C.

Cir. 1984).

Since work product provides an independent basis to deny the government's motion, if

the Court finds that Dow's disclosure of the Disputed Documents to D&T did not waive their

work product protection, the Court should deny the Motion to Compel without further analysis.

**B.    Disclosure Of The Disputed Documents To D&T Did Not Waive The Work Product Protection.**

The government argues that Dow's sharing of the Disputed Documents with its public

auditor, D&T, waived work product protection. Although the Government's Memorandum does

not cite any of the decisions, an overwhelming number of courts to have considered this precise

question have held that work product is not waived by disclosure to a public auditor. The

government's waiver argument was most recently rejected in Regions Financial Corp. v. United

States, No. 2:06-00895, 2008 U.S. Dist. LEXIS 41940, slip op. (N.D. Ala. 2008) and United

States v. Textron Inc., 507 F. Supp. 2d 138 (D.R.I. 2007), both of which involved the same

disclosures at issue in this case—disclosures for the purpose of allowing an auditor to review tax

reserve accounts. Regions and Textron followed a growing body of similar decisions. See

Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc., 237 F.R.D. 176, 183 (N.D. Ill. 2006)

(stating that "the fact that an independent auditor must remain independent from the company it

audits does not establish that the auditor also has an adversarial relationship with the client as

contemplated by the work product doctrine.  Disclosing documents to an auditor does not

substantially increase the opportunity for potential adversaries to obtain the information."); In re

JDS Uniphase Corp. Sec. Litig., No. 02-1486, 2006 U.S. Dist. LEXIS 76169, at *11 (N.D. Cal.

Oct. 5, 2006) (holding that disclosure of redacted board minutes to outside auditors did not waive

work product); Am. S.S. Owners Mut. Protection and Indem. Ass'n v. Alcoa S.S. Co., No. 04-

4309, 2006 U.S. Dist. LEXIS 4265, at *10-12 (S.D.N.Y. Feb. 2, 2006) (refusing to find that

disclosure of legal opinions to public auditor constitutes disclosure to adversary resulting in

waiver of work product); Frank Betz Assocs. v. Jim Walter Homes, Inc., 226 F.R.D. 533, 535

(D.S.C. 2005) (finding that disclosure of privileged litigation reserve numbers to outside auditors

did not waive work production protection); Merrill Lynch & Co. v. Allegheny Energy, Inc., 229

F.R.D. 441, 445-448 (S.D.N.Y. 2004) (holding that disclosure of report generated at request of

counsel to outside auditor not "inconsistent with maintaining secrecy from possible

adversaries"); In re Raytheon Secs. Litig., 218 F.R.D. 354, 360 (D. Mass. 2003) (holding that

"there is no evidence that materials disclosed to an independent auditor are likely to be turned

over to the company's adversaries except to the extent that the securities laws and/or accounting

standards mandate public disclosure"); Gutter v. E.I. DuPont de Nemours & Co., No. 95-2152,

1998 U.S. Dist. LEXIS 23207, at *13 (S.D. Fla. May 15, 1998) ("Transmittal of documents to a

company's outside auditors does not waive the work product privilege because such a

disclosure 'cannot be said to have posed a substantial danger at the time that the document would

be disclosed to plaintiffs.'") (citations omitted).  But see Medinol Ltd. v. Boston Sci. Corp., 214

F.R.D. 113 (S.D.N.Y. 2002);[4] <u>S.E.C. v. R.J. Reynolds Tobacco Holdings, Inc.</u>, No. 03-1651,

2004 U.S. Dist. LEXIS 24545 (D.D.C. June 29, 2004).[5]

The courts finding non-waiver have relied on the obvious proposition that an auditor is

not a "potential adversary or acting on behalf of a potential adversary" of its client. <u>Textron</u>, 507

F. Supp. 2d at 138. As the court in <u>Regions Financial</u> stated, there is "no conceivable scenario in

which [the public auditor] would file a lawsuit against Regions because of something [the public

auditor] learned from Regions' disclosures." 2008 U.S. Dist. LEXIS 41940, at *27-28.

Similarly, the court in <u>Textron</u> noted that the auditor "had no obligation to the IRS to determine

whether Textron's tax return was correct and no authority to challenge the return." 507 F. Supp.

2d at 154; <u>see also</u> <u>Lawrence E. Jaffe Pension Plan</u>, 237 F.R.D. at 183 ("The fact that an

independent auditor must remain independent from the company it audits does not establish that

---

[4]  <u>Medinol</u> appears to be the only court to date to have concluded, after analyzing the issue, that work product is
waived when protected material is disclosed to a public auditor. Several courts have criticized the <u>Medinol</u>
decision, and one went so far as to suggest that it is contrary to controlling Second Circuit precedent. <u>See, e.g.</u>,
<u>American S.S. Owners Mut. Protection & Indem. Ass'n</u>, 2006 U.S. Dist. LEXIS 4265, at *10 (refusing to
follow <u>Medinol</u> and stating that the holding was in direct opposition to the decision in <u>United States v. Adlman</u>,
134 F.3d 1194 (2d Cir. 1998). In <u>Adlman</u>, the Second Circuit noted that work product should apply where
"[t]he company's independent auditor requests a memorandum prepared by the company's attorneys estimating
the likelihood of success in litigation and an accompanying analysis of the company's legal strategies and
options to assist it in estimating what should be reserved for litigation losses." 134 F.3d at 1200. Moreover, the
basis for the decision in <u>Medinol</u> is unclear, as the court admitted that a disclosure to an auditor does not
substantially increase the risk that work product will fall into the hands of an adversary. <u>Medinol</u>, 214 F.R.D. at
116.

[5]  The <u>R.J. Reynolds</u> case, which notes only in passing that disclosure to an auditor waives work product, has no
value as precedent. First, as far as Intervenor has been able to determine, the work product waiver issue was not
briefed by the parties, nor did the court analyze the issue. <u>See</u> <u>United States v. Crawley</u>, 837 F.2d 291, 292-93
(7th Cir. 1988) (stating that a court may refuse to "giv[e] weight to a passage found in a previous opinion"
when the relevant issue was neither "presented" nor "refined by the fires of adversary presentation"); <u>United
States v. Daniels</u>, 902 F.2d 1238, 1241 (7th Cir. 1990) ("Judicial assumptions concerning, judicial allusions to,
and judicial discussions of issues that are not contested are not holdings."). Second, citing <u>Couch v. United
States</u>, 409 U.S. 322 (1973), the court based its statement regarding waiver of work product on the absence of a
federal accountant-client privilege. <u>R.J. Reynolds</u>, 2004 U.S. Dist. LEXIS 24545 at *25, n.9. The existence of
a parallel privilege with an auditor is not the legal standard for testing whether work product has been waived.
The proper standard—whether the disclosure is to an adversary or a conduit to an adversary—was not cited or
considered by the court. In fact, the court did not cite a single case dealing with waiver of work product in its
entire opinion. Third, the court already had decided that the SEC had demonstrated substantial need to
overcome work product protection, making the court's statement regarding waiver pure dicta.

the auditor also has an adversarial relationship with the client as contemplated by the work product doctrine.").

The government's assertion that "D&T USA has a duty to independently and objectively assess the accuracy of Chemtech's financial statements" is beside the point. Independence and objectivity alone do not constitute the type of "tangible adversarial relationship" with the proponent of the privilege that is required to effectuate a waiver of work product. Merrill Lynch, 229 F.R.D. at 445-448 ("Any tension between an auditor and a corporation that arises from an auditor's need to scrutinize and investigate a corporation's records and book-keeping practices simply is not the equivalent of an adversarial relationship contemplated by the work product doctrine."). Nor was there anything about D&T's relationship with Dow that resulted in an adversarial dynamic.

The Government's Memorandum does not cite any of the above-listed authorities supporting non-waiver. Instead, the government relies exclusively on the First Circuit's decision in United States v. MIT, 129 F.3d 681 (1st Cir. 1997), for the proposition that "a party's disclosure to an audit agency is a disclosure to a potential adversary, and waives work product." Gov. Mem. at 10. The government's discussion of MIT omits the key distinguishing fact that the "audit agency" in MIT was a division of the Department of Defense, whose job it was to review the expense submissions of MIT in its role as a DOD contractor. 129 F.3d at 687. This relationship was such that litigation between the parties was a real possibility. As the MIT court noted, "MIT doubtless hoped that there would be no actual controversy between it and the Department of Defense, but the potential for dispute and even litigation was certainly there." Id. (emphasis added). Other courts have found that this distinguishing fact renders MIT irrelevant in the public auditor context. See Regions Financial, 2008 U.S. Dist. LEXIS 41940, at *27 (noting

13

that "[t]he decisive factor" in MIT was that the auditor <u>was a branch of the Department of Defense</u>); <u>Textron</u>, 507 F. Supp. 2d at 153-54 ("The difference between this case and <u>MIT</u> is that, in <u>MIT</u>, DOD was MIT's potential litigation adversary and DCAA, as DOD's audit agency, had both an obligation to DOD to determine whether the amounts charged by MIT to DOD were correct, and the authority to sue MIT in order to recover any overcharges."); <u>Merrill Lynch</u>, 229 F.R.D. at 446 ("The First Circuit found that the audit agency—which was responsible for preventing an overcharge for services—was a potential adversary because a review of MIT's billing statements could result in a dispute or even litigation."). Ultimately, <u>MIT</u> stands only for the proposition that disclosure to a <u>government agency that is a potential adversary</u> likely waives work product protection. <u>Cf. In re Subpoenas Duces Tecum</u>, 738 F.2d 1367 (D.C. Cir. 1984) (finding waiver of work product where material voluntarily submitted to SEC); <u>In re Sealed Case</u>, 676 F.2d 793 (D.C. Cir. 1982) (finding waiver of work product where material was submitted to SEC under voluntary disclosure program).

Nor can the government argue that it was unreasonable for Dow to expect D&T to maintain the confidentiality of the Disputed Documents. There, too, the caselaw overwhelmingly supports Dow's position. <u>See, e.g.</u>, <u>Textron</u>, 507 F. Supp. 2d at 153; <u>Gutter</u>, No. 95-2152, 1998 U.S. Dist. LEXIS 23207, at *13 (holding that disclosure of material protected by work product to outside accountants not a waiver "since the accountants are not considered a conduit to a potential adversary"); <u>Lawrence E. Jaffe Pension Plan</u>, 237 F.R.D. at 183 ("Disclosing documents to an auditor does not substantially increase the opportunity for potential adversaries to obtain the information."). The IRS exercises no authority over D&T and cannot force it to produce material gathered pursuant to its audit of Dow entities in the face of a valid claim of privilege. Moreover, "[u]nder AICPA Code of Professional Conduct Section 301

14

<u>Confidential Client Information</u>, [auditors] ha[ve] a professional obligation 'not [to] disclos[e] any confidential client information without the specific consent of the client.'"[6] <u>Textron</u>, 507 F. Supp. 2d at 153. In addition to D&T's professional obligation generally to maintain confidentiality, Dow also had D&T's assurance that it would maintain confidentiality over any material provided in the context of the audit. <u>See</u> (Curry Decl. ¶ 12); (Biddix Decl. ¶ 4); <u>see also</u> <u>Textron</u>, 507 F. Supp. 2d at 153 ("Even if the AICPA Code coupled with E&Y's promise did not establish an absolute guarantee of confidentiality, they made it very unlikely that E&Y would provide Textron's 'tax accrual workpapers' to the IRS and they negate any inference that Textron waived the work product privilege.").

Finally, this dispute itself validates the reasonableness of Dow's expectation that D&T would maintain confidentiality over the Disputed Documents. In the face of a government subpoena, D&T has undertaken to defend against disclosure of Dow's confidential information.

## C.    Dow Did Not Waive The Attorney-Client Or Tax Practitioner Privileges.

Disclosure of the Disputed Documents to D&T did not waive the attorney-client or 7525 privileges because the disclosures were made for the purpose of allowing D&T to assess and advise on the adequacy of Dow's tax contingency accounts, and in that respect Dow enjoyed an independent 7525 privilege with D&T.

Dow acknowledges that there is caselaw holding that disclosure of confidential attorney communications to its outside auditor waives the attorney client privilege. Most of these cases, however, were premised on the notion that there was no confidential accountant-client privilege at the time they were decided. For example, in <u>United States v. El Paso Co.</u>, the Fifth Circuit

---

[6]    AICPA Code of Professional Conduct Section 301, <u>available at</u> http://www.aicpa.org/about/code/et_300.html. Copies of all cited sections of the AICPA Code and related accounting materials are attached hereto as Exhibit 4.

explained that "[n]o such [accountant-client] privilege exists under federal law . . . . In the

absence of a contrary rule established by law, we cannot view El Paso's discussions with its

auditors as confidential. The attorney-client privilege is, therefore, waived." 682 F.2d 530, 541

(5th Cir. 1982); see also MIT, 129 F.3d at 684-85; In re Pfizer, No. 90-1260, 1993 U.S. Dist.

LEXIS 18215, at *22 (S.D.N.Y. Dec. 22, 1993). The implication of these 1982 and 1993

decisions, which predate the 7525 privilege, is that the enactment the 7525 privilege supports the

opposite result.

The government asserts that an independent auditor does not provide "tax advice" within

the meaning of section 7525. Although the court in Textron, 507 F. Supp. 2d at 151-52, so

concluded, Dow respectfully asserts that that conclusion is incorrect. Dow disclosed the

Disputed Documents to D&T so that D&T could review the adequacy of Dow's tax contingency

accounts and advise on whether the merits of Dow's tax positions supported the reserve levels

maintained by the company. In that capacity, D&T was doing quintessentially the work of an

accountant providing tax analysis and advice.  In United States v. Arthur Young & Co., 465

U.S. 805 (1984), the Supreme Court described the auditor's job as similar to that of a tax

practitioner:

> The independent auditor draws upon many sources in evaluating the sufficiency
> of the corporation's tax accrual account. Initially, the corporation's books,
> records, and tax returns must be analyzed in light of the relevant Code provisions,
> Treasury Regulations, Revenue Rulings, and case law. The auditor will also
> obtain and assess the opinions, speculations, and projections of management with
> regard to unclear, aggressive, or questionable tax positions that may have been
> taken on prior tax returns . . . . The auditor's tax accrual workpapers record this
> process of examination and analysis.

465 U.S. at 812-13.

The American Institute of Certified Professional Accountants ("AICPA") rules governing

the auditor's work support the characterization of the auditor's role set forth in Arthur Young &

<u>Co.</u> For example, AU 9326 – Auditing Interpretations of Section 326, ¶ .18, describes an "auditor's education, training, and experience," which "enable him or her to be knowledgeable concerning income tax matters."[7] The auditor must draw on his or her "tax expertise" and "formulate his or her own conclusion" regarding the merits of the client's tax positions and the adequacy of the corresponding reserve accounts. AU 9326, ¶¶ .19, .22.

As part of the process of reviewing Dow's tax reserve accounts, the auditor shared his or her views on particular issues. Acting on those discussions, Dow may have adjusted upward or downward its reserve positions. Nothing in the text or legislative history of 26 U.S.C. § 7525 suggests that this sort of work should be treated in a way other than what it clearly is: accountants providing tax advice to an audit client.

The fact that the auditor ultimately answers to the public at large has no bearing on whether its work on tax reserves is subject to the 7525 privilege. Under AICPA rules, all accountants owe a duty to the public:

> A distinguishing mark of a profession is acceptance of its responsibility to the public. The accounting profession's public consists of clients, credit grantors, governments, employers, investors, the business and financial community, and others who rely on the objectivity and integrity of certified public accountants to maintain the orderly functioning of commerce. This reliance imposes a public interest responsibility on certified public accountants. The public interest is defined as the collective well-being of the community of people and institutions the profession serves.

AICPA Code of Professional Conduct 53.01.[8] If the duty to the public were to defeat the 7525 privilege, no accountant's advice would be subject to protection.

---

[7]    <u>Available at</u> http://www.pcaobus.org/standards/interim_standards/auditing_standards/au_9326.html. Also attached hereto as part of Exhibit 4.

[8]    <u>Available at</u> http://www.aicpa.org/about/code/et_section_53__article_ii_the_public_interest.html. Also attached hereto as part of Exhibit 4.

Finding that the attorney-client and 7525 privileges survive disclosure to an independent auditor also furthers important public policies. Although the recent developments in public disclosure related to corporate transparency (e.g., Sarbanes-Oxley) are important and laudable for protection of the public, they have put increasing strain on the doctrines of privilege. Accounting firms, fearing that they have not reviewed all available information or may have missed important issues, insist upon disclosure of confidential communications. AU 9326 – Auditing Interpretations of Section 326, ¶¶ .20-.22 ("If the client's support for the tax accrual . . . is based upon an opinion issued by an outside advisor with respect to a potentially material matter, the auditor should obtain access to the opinion, notwithstanding potential concerns regarding attorney-client or other forms of privilege.").[9] Although AICPA ethical rules classify the company-accounting firm relationship as confidential, see AICPA Code of Professional Conduct Section 301 Confidential Client Information, the government is urging the waiver issue to take advantage of one public policy to completely undermine the longstanding public policy behind privilege. See, e.g., Upjohn Co. v. United States, 449 U.S. 383, 389 (1981) (the attorney-client privilege facilitates "full and frank communication between attorneys and their clients and thereby promote[s] broader public interests in the observance of law and the administration of justice."). There should be no waiver in these circumstances.

---

[9] Available at http://www.pcaobus.org/standards/interim_standards/auditing_standards/au_9326.html. Also attached hereto as part of Exhibit 4.

II.     **The Government Does Not, Nor Could It, Assert Any Other Argument Challenging Dow's Claims Of Privilege.**

As discussed above, the government sensibly has elected to put up only a token fight against threshold applicability of work product,[10] and no fight at all over threshold applicability of the attorney-client[11] and 7525 privileges.[12] As discussed below, each Disputed Document is clearly covered by the privileges asserted over it.

A.     **D.C. Circuit Privilege Law**

1.     **The Attorney-Client And 7525 Privileges**

The attorney-client privilege is a foundational principal of our legal system, and "one of the oldest recognized privileges for confidential communications." Swidler Berlin v. United States, 524 U.S. 399, 403 (1998). The Supreme Court long has recognized a corporation's right to assert the attorney-client privilege. Id. The privilege protects communications both to and from a corporation's attorney, where the purpose of the communication is to seek or render legal advice. See id. at 390 ("[T]he privilege exists to protect not only the giving of professional

---

[10] The government asserts only that "neither Chemtech nor D&T has made any showing whatsoever that the documents in question were prepared in anticipation of litigation." This assertion ignores information provided on the face of the privilege log or otherwise known to the government. For example, the government is aware that Document 1 is dated June 20, 2005, less than a month before Chemtech initially filed suit against the government in the underlying litigation. See Exhibit 5.

[11] The government cannot claim that it does not know enough about the Disputed Documents to substantively challenge the bases for their withholding. The day after filing the present motion, the government filed a motion to compel in the underlying Louisiana litigation, arguing against application of privilege on numerous, albeit specious, grounds. The government relied on deposition testimony and other contemporaneous evidence to support its challenges. The privilege log at issue in the Louisiana litigation is identical in format to the log before this Court. If the government had sufficient information to make substantive arguments against threshold applicability of privilege in the underlying litigation, its failure to do so here should be viewed as a concession that the stated privileges apply absent waiver.

[12] The government mistakenly assumes that Dow bases its assertion of the 7525 privilege with respect to Document 2 on D&T's role as a "tax practitioner." Dow in fact bases this assertion on the role of Michael Cone, the accountant-author of Document 2, who was an in-house accountant for Dow. The government's mistaken assumption invalidates its argument against threshold application of the 7525 privilege to Document 2.

advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice.").

The 7525 privilege extends "the same common law protections of confidentiality which apply to a communication between a taxpayer and an attorney" to communications "between a taxpayer and any federally authorized tax practitioner" for statements made after July 22, 1998. 26 U.S.C. § 7525(a)(1). The privilege applies to "tax advice," which is defined as "any matter within the scope an individual's authority to practice before the IRS." 26 U.S.C. § 7525(a)(3)(B). See 31 C.F.R. § 10.2(a)(4) (defining practice before the IRS to include "rendering written advice with respect to any entity, transaction, plan or arrangement, or other plan or arrangement having a potential for tax avoidance or evasion"). The term "federally authorized tax practitioner" is defined as any individual authorized under the applicable regulations to practice before the IRS. 26 U.S.C. § 7525(a)(3)(A). Under the applicable regulations, any certified public accountant is licensed to practice before the IRS and, therefore, can engage in 7525-protected communications with its clients. 31 C.F.R. § 10.3(b).

The 7525 privilege is largely co-extensive with the attorney-client privilege. See United States v. BDO Seidman, 337 F.3d 802, 810 (7th Cir. 2003) ("[W]e must look to the body of common law interpreting the attorney-client privilege to interpret the § 7525 privilege."). For example, like the attorney-client privilege, the 7525 privilege fully applies to the work of in-house accountants. See United States v. Textron Inc., 507 F. Supp. 2d at 148. Although the statute contains a few exceptions that cause the 7525 privilege to operate more narrowly than the attorney-client privilege under specific circumstances mandated by Congress, none of those exceptions apply in this case. See, e.g., 26 U.S.C. § 7525(a)(2)(A) (privilege does not apply in criminal matters).

20

## 2.    The Work Product Doctrine

The work product doctrine prohibits discovery of materials prepared in anticipation of litigation.  See Fed. R. Civ. P. 26(b)(3); Hickman v. Taylor, 329 U.S. 495 (1947).  The doctrine advances the "strong public policy" of ensuring that a "lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." United States v. Nobles, 422 U.S. 225, 236-37 (1975) (citations omitted).  As the D.C. Circuit has observed, "[a]lthough it would certainly be easier for [a party to view the work product of its opponent], the work product privilege's very purpose is to prevent a party from 'performing its functions . . . on wits borrowed from the adversary.'" E.E.O.C. v. Lutheran Soc. Servs., 186 F.3d 959, 969 (D.C. Cir. 1999) (citing Hickman, 329 U.S. at 516).  The D.C. Circuit often has discussed the importance of the work product doctrine, most recently by citing the following passage from the Supreme Court's Hickman decision:

> Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing.  And the interests of the clients and the cause of justice would be poorly served.

In re Sealed Case, 146 F.3d 881, 884 (D.C. Cir. 1998) (citing Hickman, 329 U.S. at 511).

Though work product is a qualified privilege that can be overcome upon an opponent's showing of need, courts are especially mindful to protect the "'opinions, judgments, and thought processes of counsel,'" which constitute opinion work product and "receive[] almost absolute protection from discovery." In re Vitamins Antitrust Litig., 211 F.R.D. 1, 4 (D.D.C. 2002) (citation omitted).  Work product applies to material prepared for litigation, as well as for administrative disputes. See Gen. Elec. v. Johnson, No. 00-2855, 2006 U.S. Dist. LEXIS 64907,

21

at *34-36 (D.D.C. Sept. 12, 2006) (slip op.) (materials prepared in anticipation of "litigation" include materials prepared in anticipation of judicial proceedings, administrative matters, settlement negotiations, and the avoidance of anticipated litigation); Pub. Citizen, Inc. v. U.S. Dep't of State, 100 F. Supp. 2d 10, 30-31 (D.D.C. 2000) (in anticipation of "litigation" includes administrative matters; work product doctrine protects documents prepared because of the prospect of litigation), overruled in part on other grounds, 276 F.3d 634 (D.C. Cir. 2002).

The D.C. Circuit applies the "because of" test for determining when a document was prepared in the anticipation of the litigation. In re Sealed Case, 146 F.3d at 884. The "'testing question' for the work-product privilege . . . is 'whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.'" Id. (emphasis added) (citations omitted). "For a document to meet this standard, the lawyer must at least have had a subjective belief that litigation was a real possibility, and that belief must have been objectively reasonable." Id. Work product may apply "regardless of whether the anticipated litigation ever occurs." Id. at 888.

This is particularly true in the D.C. Circuit, where the Circuit court has strongly protected an attorney's legal analysis of potential claims against its client, even before the events leading to a dispute occur. In In re Sealed Case, the Court noted that "[i]t is often prior to the emergence of specific claims that lawyers are best equipped either to help clients avoid litigation or to strengthen available defenses should litigation occur." 146 F.3d at 886. Describing how a "contrary ruling would undermine lawyer effectiveness at a particularly critical stage of a legal representation," the court cautioned as follows:

22

> If lawyers had to wait for specific claims to arise before their writings could enjoy work-product protection, they would not likely risk taking notes about such matters or communicating in writing with colleagues, thus severely limiting their ability to advise clients effectively . . . . [A]sked by a client to evaluate the antitrust implications of a proposed merger and advised that no specific claim had yet surfaced, a lawyer knowing that work product is unprotected would not likely risk preparing an internal legal memorandum assessing the merger's weaknesses . . . . Discouraging lawyers from engaging in the writing, note-taking, and communications so critical to effective legal thinking would, in <u>Hickman</u>'s words, "demoraliz[e]" the legal profession, and "the interests of the clients and the cause of justice would be poorly served."

<u>Id.</u> at 886-87.

The D.C. Circuit's decision in <u>In re Sealed Case</u>, 146 F.3d 881, was based in part on its earlier holding in <u>Delany, Migdail & Young v. Commissioner</u>, 826 F.2d 124 (D.C. Cir. 1987). In <u>Delaney</u>, the IRS sought work product protection for a memorandum assessing the legality of a proposed new approach to auditing large taxpayers. That is, the purpose of the memorandum was to inform the IRS on whether to implement the new program, not to defend against any specific claim that had arisen. A law firm sought the memorandum under FOIA, and the IRS claimed work product. The D.C. Circuit rejected the law firm's argument that work product required "that a specific claim had arisen, was disputed . . . and was being discussed in the memorandum." <u>Id.</u> at 126-27. To the contrary, the court reasoned that the IRS's pre-implementation legal analysis of a program that might spur litigation was quintessentially work product protected. <u>Id.</u>

Courts consistently have applied the "because of" test for work product to protect as work product legal advice regarding the tax consequences of a corporate transaction. <u>See</u> <u>United States v. Roxworthy</u>, 457 F.3d 590 (6th Cir. 2006); <u>Adlman</u>, 134 F.3d at 1195; <u>Long Term Capital Holdings v. United States</u>, 2003-1 U.S.T.C. ¶ 50,304, 91 A.F.T.R.2d 2003-1139 (D.

23

Conn. 2003) (tax opinion is work product); <u>Black and Decker Corp. v. United States</u>, 219 F.R.D.

87 (D. Md. 2003) (documents and communications underlying disclosed short and long-form tax

opinions qualify for work product protection).[13]  In <u>Adlman</u>, a corporation entered into a merger

that had the effect of generating "an enormous loss and tax refund." <u>Id.</u> at 1195.  Prior to

finalizing the transaction, Arthur Andersen provided a tax opinion, which the court described as:

> a 58-page detailed legal analysis of likely IRS challenges to the reorganization
> and the resulting tax refund claim; it contained discussion of statutory provisions,
> IRS regulations, legislative history, and prior judicial and IRS rulings relevant to
> the claim.  It proposed possible legal theories or strategies for [the client] to adopt
> in response, recommended preferred methods of structuring the transaction, and
> made predictions about the likely outcome of litigation.

<u>Id.</u>  Four years later, when the IRS audited the corporation and scrutinized the tax consequences

of the transaction, it requested production of the opinion.  The district court rejected the

corporation's work product claim.  Relying in part on the D.C. Circuit's opinion in <u>Delaney</u>, the

Second Circuit vacated the district court's decision, noting that "there [was] little doubt [that the

corporation] had the prospect of litigation in mind" when it hired Andersen.  <u>Adlman</u>, 134 F.3d

---

[13]  Dow brings to the Court's attention <u>United States v. KPMG</u>, 237 F. Supp. 2d 35 (D.D.C. 2002), in which the court held that a tax opinion was not work product under the facts of that case.  The court was conducting a preliminary review of KPMG's privilege assertions based upon random sampling prior to referring the matter to a special master for comprehensive review.  The government does not cite this case, nor any other case to rebut the assertions of work product on D&T's privilege log.

In any event, <u>KPMG</u> is a unique case with no relevance for present purposes.  The matter involved a series of privilege decisions in which the Court grew increasingly frustrated with "KPMG's privilege log since it has been shown to be inaccurate, incomplete, and even misleading regarding a very large percentage of the documents."  <u>United States v. KPMG</u>, 316 F. Supp. 2d 30, 44 (D.D.C. 2004).  The Court cited evidence "suggesting that Brown & Wood [the author of the tax opinions at issue] was not engaged in rendering true legal advice, but was rather a partner with KPMG in its tax shelter marketing strategy."  <u>Id.</u> at 39.  The court admonished KPMG for "misrepresenting its unprivileged tax shelter marketing activities as privileged communications" and ordered production of scores of documents partly on the basis that it "has no confidence that either the attorney-client privilege claims or the attorney work product privilege claims asserted by KPMG are valid."  <u>Id.</u> at 44.

at 1204.[14]  The panel instructed the District Court to uphold the work product claim "if the court

finds the Memorandum would not have been prepared but for the [corporation's] anticipation of

litigation with the IRS." Id. at 1204.  In an example directly applicable here, the court discussed

the policy implications of a work product finding:

> A company contemplating a transaction recognizes that the transaction will result
> in litigation; whether to undertake the transaction and, if so, how to proceed with
> the transaction, may well be influenced by the company's evaluation of the
> likelihood of success in litigation . . . .  We can see no reason under the words or
> policies of the Rule why such a document should not be protected.

Id. at 1199.

In United States v. Roxworthy, 457 F.3d 590 (6th Cir. 2006), the Sixth Circuit applied

Adlman and Delaney to extend work product protection over a tax opinion obtained well before

the IRS commenced an audit of a corporate transaction.  The corporation hired KPMG to prepare

a tax opinion on a series of transactions that generated a tax loss of $112 million.  The opinions

were obtained just after the transactions were executed, and well before any audit had

commenced.  The corporation was concerned that the IRS would object to the tax treatment of

the transaction, particularly in light of the IRS's regular audits of the corporation and the

unsettled area of the law at issue. Id. at 594-95.  The opinion "contain[ed] dense legal analysis

of current tax law, including arguments and counter-arguments in certain areas of law that the

memoranda argue are unsettled" and concluded that "it is more likely than not . . . that the

---

[14]  In fact, the Second Circuit cited extensively from Delaney:

> We note that in Delaney, Migdail & Young, Chartered v. IRS, 826 F.2d 124 (D.C. Cir. 1987), the
> IRS successfully argued against the very position it here advocates . . . .  The documents sought in
> Delaney were prepared by IRS attorneys for a business purpose—to help the IRS decide whether
> to adopt a proposed system of statistical sampling for its corporate audit program for large
> accounts.  However, the study was prepared because of expected litigation which would result
> from adoption of the program; it analyzed expected legal challenges to the use of the proposed
> program, potential defenses available to the agency, and the likely outcome.

Adlman, 134 F.3d at 1201.

following federal tax consequences (among others) will result from the transactions described herein and that such consequences will be supported by 'substantial authority.'" Id. at 594.

Given the fact the courts in both Adlman and Roxworthy relied heavily on Delaney, there is little doubt that the D.C. Circuit would adopt the reasoning set forth in those cases.

**B.    The Government Has Not Meaningfully Challenged Application Of The Asserted Privileges To The Disputed Documents.**

Though the government is correct that the party asserting the privilege carries the burden of proving each element, "once a claim of attorney-client privilege has been made with respect to certain communications, and a prima facie showing has been made that they relate to legal matters, the party seeking to overcome the invocation of the privilege must make some showing that the communications did not involve the giving of legal advice, but rather related to business matters and considerations." Coleman v. Am. Broad. Co., 106 F.R.D. 201, 206 (D.D.C. 1985).

The D&T log establishes each element of the privilege. For each document, the privilege log provided the following information, to the extent available:

- date
- author
- addressee
- copyee
- document type (e.g., letter, memorandum, notes, opinion)
- privilege type (attorney-client, work product, tax practitioner privilege)
- privilege basis (describing the nature of the communication)
- subject matter

The privilege log provided as much information about each document as possible without revealing the privileged substance of the documents themselves. See Fed. R. Civ. P. 26(b)(5) (privilege log should describe the privileged material "without revealing information itself privileged or protected"). See also In re Grand Jury Investigation, 974 F.2d 1068, 1071 (9th Cir. 1992) (party made prima facie showing of privilege with log identifying "(a) the attorney and

26

client involved, (b) the nature of the document, (c) all persons or entities shown on the document

to have received or sent the document, (d) all persons or entities known to have been furnished

the document or informed of its substance, and (e) the date the document was generated,

prepared, or dated").

The government offers not a single substantive argument in rebuttal, except to argue

waiver. A closer look at the Disputed Documents, on a document-by-document basis,

demonstrates the strength of Dow's privilege claims, and explains the government's lack of

meaningful effort to contest them.

### Document 1

Document 1 is a tax opinion from Dow's outside counsel relating to the Chemtech

Partnership. It constitutes a communication from counsel to client pursuant to a request for legal

advice. Document 1 is based upon and discloses confidential communications from Dow. See

Minebea Co. v. Papst, 229 F.R.D. 1, 2-3 (D.D.C. 2005) ("A communication from attorney to

client must not only be made 'in confidence' for the purpose of transmitting legal advice, but it

must also 'rest on confidential information obtained from the client.'" (quoting Tax Analysts v.

IRS, 117 F.3d 607, 618 (D.C. Cir. 1997)). Dow intended and maintained confidentiality over

this document.

Document 1 also is protected by the work product doctrine. Document 1 is dated June

20, 2005, well after Dow's tax position had been audited and challenged by the IRS and less than

a month prior to the filing of the Louisiana litigation. As described above, Dow anticipated that

the IRS would challenge its tax treatment of the Chemtech Partnership and sought ongoing legal

advice regarding expected IRS arguments. See supra pp. 5-7. Document 1 contains precisely the

type of analysis of the "legal challenges likely to be mounted . . . potential defenses available . . .

and the likely outcome" that the D.C. Circuit protected as work product in <u>Delaney</u> and <u>In re</u>
<u>Sealed Case</u>, 146 F.3d 881. Indeed, Dow has an even stronger work product interest in
Document 1 than were at issue in those cases, because the IRS already had asserted a claim
against Dow when Document 1 was created.

### **Document 2**

Document 2 reflects legal and tax analysis provided by an in-house attorney at Dow. As
such, Document 2 is protected by the attorney-client privilege. Document 2 was co-authored by
an in-house accountant at Dow and post-dates enactment of the 7525 privilege. Accordingly, the
7525 privilege also applies to Document 2. Document 2 contains and is based upon confidential
information provided by Dow's management team.

Document 2 likewise is protected by the work product doctrine. Like Document 1,
Document 2 contains an analysis of the tax consequences of certain actions by the Chemtech
Partnership that Dow reasonably expected would invite IRS scrutiny. Though Dow anticipated
litigation from a far earlier point, the IRS had already begun auditing Chemtech I at the time that
Document 2 was created and had issued at least 19 related IDRs. As a result, Dow's work
product claim over Document 2 is even stronger than the claims at issue in <u>Adlman</u> and
<u>Roxworthy</u>, where the IRS was still years away from auditing the transaction. Moreover,
Document 2 was created partly to support Dow's ongoing analysis regarding the adequacy of its
tax reserve for the Chemtech Partnership. Two recent decisions have held that this type of
analysis is protected work product. <u>See</u> <u>Regions Fin.</u>, 2008 U.S. Dist. LEXIS 41940; <u>Textron</u>,
507 F. Supp. 2d at 138.

28

**Document 3**

Document 3 is an internal D&T memorandum.  The statements in Document 3 themselves provide contemporaneous evidence of Dow's anticipation of litigation, dating back to the pre-transaction period, over its tax treatment of the Chemtech Partnership.   Document 3 records the thoughts and impressions of Dow's attorneys relating to Dow's tax position, along with an assessment of where vulnerabilities exist.  In that sense, Document 3 closely resembles the document at issue in Delaney, along with the tax opinions deemed work product in Adlman and Roxworthy.  Like Document 2, Document 3 relates to the setting of a reserve amount for the Chemtech transactions, and is therefore analogous to the material afforded work product protection in Regions Financial, 2008 U.S. Dist. LEXIS 41940 and Textron, 507 F. Supp. 2d at 138.[15]

## CONCLUSION

In upholding the IRS's claim of work product in the Delaney case, the D.C. Circuit, in no uncertain terms, exposed the true motives of the party seeking disclosure:

> Here the IRS memos advise the agency of the types of legal challenges likely to be mounted against a proposed program, potential defenses available to the agency, and the likely outcome. Similarly, plaintiff here is not trying to ascertain the agency's view of the law in order to comply or to advise clients on how to comply; it is seeking the agency's attorneys' assessment of the program's legal vulnerabilities in order to make sure it does not miss anything in crafting its legal case against the program.  This is precisely the type of discovery the Court refused to permit in Hickman v. Taylor, 329 U.S. 495 (1947).

Delaney, 826 F.2d at 127 (emphasis added).

---

[15]  Though, once again, the government does not argue the point, there is no relevance to the fact that Document 3 was created by D&T.  Document 3 records communications from Dow's attorneys and reveals their highly sensitive thoughts and impressions about the merits of Dow's tax positions that are the subject of the Louisiana litigation.  As in Documents 1 and 2, Dow intended the thoughts and impressions reflected in Document 3 to be maintained confidentially.

The Circuit's admonition in <u>Delaney</u> is particularly relevant here, where the shoe is on the other foot, and the government has gone to great lengths to discover the private thoughts of Dow's attorneys. Nowhere in its Motion to Compel does the government provide any alternative explanation for coveting of Dow's sensitive legal analysis beyond its apparent desire to seek Dow's "assessment of . . . legal vulnerabilities in order to make sure it does not miss anything in crafting its legal case" in the underlying tax dispute. This is precisely the result that the attorney-client privilege and work product doctrine are intended to prevent.

Respectfully submitted this 25th day of August, 2008.

> CHEMTECH ROYALTY ASSOCIATES, L.P., by
> DOW EUROPE, S.A., as Tax Matters Partner and
> CHEMTECH II, L.P., BY IFCO, INC., as Tax Matters
> Partner

> John B. Magee (D.C. Bar No. 931139)
> Hartman E. Blanchard, Jr. (D.C. Bar No. 451559)
> Christopher P. Murphy (D.C. Bar No. 500886)
> MCKEE NELSON LLP
> 1919 M Street, N.W., Suite 200
> Washington, D.C. 20036
> Telephone: (202) 775-1880
> Facsimile: (202) 775-8586
> jmagee@mckeenelson.com
> hblanchard@mckeenelson.com
> cmurphy@mckeenelson.com

30

# OPPOSITION EXHIBIT

# 1

# UNITED STATES DISTRICT COURT

## DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Movant, | ) | |
| | ) | |
| v. | ) | Case No.: 1:08-mc-00411-RJL |
| | ) | Judge Leon |
| DELOITTE & TOUCHE USA LLP, | ) | |
| Respondant. | ) | |
| | ) | |
| | ) | |

### Declaration of William Curry

I, William Curry, pursuant to 28 U.S.C. § 1746, declare as follows:

1.    I am Director of Taxes for the Dow Chemical Company ("Dow"). My current business address is Tax Department, 2030 Dow Center, Midland, MI 48674. Since the inception of the transaction related to the above-captioned case, I have been an attorney in Dow's Tax Department.

2.    In 1993, Dow formed the Chemtech Royalty Associates, L.P. ("Chemtech I") with five foreign banks in order to provide minority equity financing related to 73 United States patents. The five foreign banks contributed $200 million for their limited partnership interests in Chemtech I.

3.    In 1998, Dow restructured the partnership, and formed Chemtech II, L.P ("Chemtech II"). As part of the restructuring, the foreign banks' interests were liquidated and a new limited partner, RBDC, Inc., provided $200 million in equity financing related to a chemical plant.

4.    I have worked as an attorney in Dow's tax department since 1990, providing legal advice to Dow on tax matters, including on the Chemtech I and II transactions.

5.    I have knowledge concerning the planning of both transactions from a tax perspective. In my role as attorney, I provided legal advice directly to Dow management, and also worked closely with outside counsel.

6.    I have reviewed the three documents that are the subject of the government's motion to compel in the captioned case. I have personal knowledge of the circumstances surrounding their creation and/or disclosure to Deloitte & Touche ("D&T").

7.    Like other large corporations, Dow's tax positions are under constant review by Dow's IRS exam team. Typically, a substantial number of issues are resolved at the audit level, while Dow takes a number of disputed issues to the IRS Appeals for negotiated settlement. Although the majority of the Appeals issues reach negotiated settlements, Dow has been involved in court disputes regarding unresolved issues for at least the past 8 years in three different forums.

8.    With respect to the Chemtech transactions, Dow management expected from the outset that the transactions would be challenged by the IRS and were likely to result in Appeals negotiations and potential litigation.

9.    This belief was premised on a number of factors:

a.   The transactions were large and involved significant tax benefits.

b.   The transactions arose in an area of the tax law that was in a state of flux at the time of initial formation of the Chemtech partnership, and was subject to numerous subsequent changes in the applicable statutes and regulations.

2

    c. By the time Chemtech II was formed, the IRS had identified and begun to dispute Dow's treatment of Chemtech I for tax purposes.

    d. During the 1990s, the IRS was increasingly aggressive in auditing Dow's tax returns.

10.    During the planning period for Chemtech I, the likelihood of a dispute with the IRS was frequently discussed among Dow's tax counsel and outside legal advisors. As required under applicable financial accounting rules, Dow shared its ongoing belief in the likelihood of litigation with its auditors, D&T. One such discussion regarding Chemtech I was memorialized by D&T in a file memorandum dated July 21, 1993, which summarizes a meeting among Dow employees, Dow's outside counsel and D&T employees. This file memorandum is subject to the current dispute.

11.    The other two documents subject to the government's motion to compel contain legal advice received by Dow that was disclosed to D&T solely to allow D&T to review the adequacy of Dow's tax contingency reserves for the Chemtech transactions. D&T compelled Dow's production of these documents by informing the company that access to these documents was required in order to provide Dow with an unqualified audit opinion for its public financial statements.

12.    Dow furnished these documents to D&T with the expectation that D&T would retain the confidentiality of the two documents. To the best of my knowledge D&T has retained such confidentiality.

3

I declare under the penalty of perjury that the foregoing is true and correct.

Executed in Midland, Michigan this 22 day of August, 2008.

William Curry

4

# OPPOSITION EXHIBIT

# 2

DISK 5701 \457010093.WPF SAIN:410IRCS:701PRA  IDR  FILE-410

| FORM 5701 | Department of the Treasury - Internal Revenue Service |
|---|---|
| | NOTICE OF PROPOSED ADJUSTMENT |

Name of taxpayer

**THE DOW CHEMICAL COMPANY & SUBSIDIARIES**

| | Issue No. |
|---|---|
| | Revised 93 |

Name and title of person to whom delivered
**DORO HOFFMAN**, MANAGER FEDERAL TAX AUDIT

| | Date |
|---|---|
| | October 29, 1999 |

Entity for this proposed adjustment
    DOW CHEMICAL CO. DIV. Log 50243    RFGL 1

Based on the information we now have available and our discussions with you, we believe the proposed adjustment listed below should be included in the revenue agent's report.  However, if you have additional information that would alter or reverse this proposal, please furnish this information as soon as possible.

| Years | Amount | Account or return line |
|---|---|---|
| | **Tax** | |
| 1992 | N/A | |
| 1993 | $40,192,528 | Line 26 Royalty Expense |
| 1994 | 103,379.528 | Line 26 Royalty Expense |
| | **Penalty** | |
| 1993 | (SEE BELOW) | |
| 1994 | | |

The penalty is proposed as 20% of the understatement attributable to the activity, which has met the definition of tax shelter.  It will be determined at the time of closing as the difference between the tax with this adjustment and the tax without this adjustment.  A tentative computation to illustrate the penalty is as follows:

    1993 additional tax attributable to the Chemtech adjustment $14,100,000 X 20% = $2,820,000
    1994 additional tax attributable to the Chemtech adjustment  36,300,000 X 20% =  7,260,000

These amounts are subject to the final RAR position which has not been finalized.

Taxpayer Representative's action:
( ) Agreed     ( ) Agreed in Part    ( ) Disagreed
( ) Have additional information; will submit by:

Case Manager

| Rick Kroeger for Robert Combs | Date |
|---|---|
| | October 29, 1999 |

Form 5701

5701 \45701093.DOCAIN410 Filed:SAIN410

| | EXPLANATION OF ITEMS | | Exhibit |
| --- | --- | --- | --- |
| Name of Taxpayer | | | Year |
| The Dow Chemical Company | | | Ended 12-31-92 12-31-93, 12-31-94 |

### Royalty Expense

| | 1992 | 1993 | 1994 |
| --- | --- | --- | --- |
| PER RETURN CORRECTED | NA NA | 95,622,074 55,429,546 | 143,259,741 39,880,660 |
| INCREASE to TAXABLE INCOME | NA | 40,192,528 | 103,379,081 |

#### Excess Royalties

| | 1993 | 1994 |
| --- | --- | --- |
| Royalties Paid per 1120 | 95,622,074 | 143,259,741 |
| Distributions to Banks | (5,282,614) | (13,905,411) |
| Less Amounts Reported by TDCC | | |
| Ifco Royalties reported | (22,476,635) | N/A |
| DTPC royalties reported | (19,321,241) | (7,222,683) |
| DTPC guaranteed payments | (14,950,214) | (19,758,839) |
| DTPC Ordinary Loss M4-26700 | 3,051,366 | 1,006,273 |
| Ifco Ordinary Loss M4-26700 | 3,549,792 | |
| Total Allowable Royalties | (55,429,546) | (39,880,660) |
| EXCESS ROYALTIES | 40,192,528 | 103,379,081 |

## ISSUE:

Can Dow Chemical deduct the royalties paid to Chemtech Royalty Associates, L.P. as business expense? Do the foreign banks acquire an operating interest in Chemtech or did they actually loan money to The Dow Chemical Company and subsidiaries? Is the Chemtech partnership a tax shelter? Does the substantial understatement penalty apply?

## FACTS:

### Overview:

TDCC and the consolidated members have deducted patent royalty payments to Chemtech Royalty and received loans from Chemtech Portfolio Inc. This is based on assets, which were previously and post–partnership titled to TDCC. They have deducted all of the payments to the partnership as royalties. Dow always owned 81% of the partnership and all of the 1% general partner.

In Note R to their Financial Statements in 1993, Dow disclosed the conditions and terms of Chemtech. "The outside investors will receive a cumulative, annual priority return of approximately 7 percent based upon their investments in Chemtech. The outside investors also participate in residual earnings." Dow disclosed other key features in Note R. "In addition, the Partnership Agreement provides for various wind-up provisions wherein subsidiaries of the Company may purchase at any time the limited partner interest of the outside investors." Upon wind-up, liquidation or termination, the partners' capital accounts will be cashed out at the current fair values." This feature allowed additional cash distributions only at termination.

The partnership formed a wholly owned corporation called Chemtech Portfolio, Inc. (CPI). CPI had to maintain approximately $50 million in securities at all times as part of the partnership agreement. The undistributed partnership

---

5701 \45701093.DOCAIN410 Filed:SAIN410

| | EXPLANATION OF ITEMS | Exhibit |
|---|---|---|
| Name of Taxpayer | | Year |
| The Dow Chemical Company | | Ended 12-31-92<br>12-31-93, 12-31-94 |

funds were contributed to CPI. CPI then loaned the excess over $50 million via two loans to another Dow subsidiary called Dow Chemical International Ltd. (DCIL). The loans were both demand promissory notes. The fixed note dated April 30, 1993 was for $99 million. The second loan was called the grid loan. On June 30, 1993, CPI authorized up to $500 million in loan amounts. Dow made no interest payments on the loan agreements in either 1993 or 1994. The accrued interest increased the principle of the loan as provided under the terms of the loan agreements. The total balance outstanding for both loans at December 31, 1993, was $234,187,608. The balance of both loans at December 31, 1994, was $350,169,805. No cash payments on the loan or interest were made.

## ASSET TRANSFER FORMATION OF LEGAL ENTITIES:

On April 30, 1993, The Dow Chemical Company and Subsidiaries (referred to as TDCC in the rest of this explanation and includes all of the consolidated group members by reference) formed Chemtech Royalty Associates L.P., a Delaware Limited partnership. (See exhibit A - Partnership in the Partnership and exhibit B - Formation of Chronology of Events) TDCC contributed cash and patent assets via three of their subsidiaries. Dow Europe SA, (DESA) a Swiss corporation, was the general partner and it contributed $9.8 million in cash to cover the formation costs. Ifco, Inc., a wholly Dow owned Delaware corporation, joined as the class A limited partner. Ifco contributed cash of $100 million dollars. Diamond Technology Partnership Co., (referred to as DTPC), a wholly owned Delaware corporation, joined as the class B limited partner and contributed the patent assets previously held by TDCC. Arthur D. Little Co. appraised the patents that had a fair market value of $867 million dollars. On August 4, 1993, unrelated parties acquired an interest. Five foreign banks purchased $75 million of Ifco's share and contributed an additional $100 million to the partnership. On October 24, 1993, the partnership redeemed $25 million of Ifco's interest. Foreign investors then contributed $25 million to the partnership in exchange for the partner interest. The foreign investors were all banks. Dow controlled 81% and the foreign banks owned 19% of the partnership. The total invested by the banks was $200 million. (See exhibit C - Overview of Chemtech transaction)

## CONCEPT OF TRANSFER OF PROPERTY:

Goldman Sachs Co. (Goldman) conceived and marketed this concept. The structure of the deal needed Dow patent assets that had little book value and a steady income stream. In addition the foreign banks were effectively non-U. S. taxpaying entities. Goldman presented the partnership idea to Dow, then found the class A limited partners, which were five foreign banks. A second requirement from Goldman was the use of effectively non-U.S. taxpaying partners. It was important to have foreign partners because U.S. tax concepts did not flow to the foreign returns. Allocated royalty payments would not be taxable to the banks. The banks pay tax according to their country of incorporation and pay tax only on the cash distributions they actually received. The banks did not report the allocated royalties. The rate of royalty income to the banks on their invested capital was 93.74 percent in the first two years. A U.S. partner would be required to report the royalties as income. The cash distributions actually make each year equaled the priority return of approximately seven percent. The partnership format was useful because Chemtech Royalty Associates L.P. did not pay tax. The income flows through to only the U.S. partners. The contribution of appreciated property (the patents) to the partnership was another important component of Chemtech Royalty Associates. The patents had virtually no tax basis ($54,000), but Dow was willing to pay $143 million in deductible royalty expenses? Dow assigned the patents to DTPC and then leased them back. DTPC contributed the patents and Dow's lease of them to Chemtech partnership. The patents were "Section 704(c) property" which means there is a difference between tax basis and book basis. Dow now paid for patents and deducted as an expense those payments for patents. Previously, these assets could not create a tax deduction. All of the costs associated with the patents have been deducted as a current cost. The use of the patents had no cost to Dow. Dow had no royalty associated with the patents because they were the owners. The payments for a full year were about $143 million. In exchange the consolidated group received loans of $144 million through Chemtech Portfolio Inc. The net cash flow was de minimus.

TDCC or subsidiaries paid all of the formation costs of the partnership. The total costs were $12 million. The five foreign banks paid nothing of these costs but rather received a total of $3.38 million of the formation costs. The terms used to describe the expenses included; front end fee, co-arranger fee, early participation fee, bridge financing fee, administration fee, out-of-pocket expenses, and tax advisor's fees. These terms are often used when obtaining a loan rather than investing in a partnership. These expenses, when added to the other distributions paid to the banks in 1993, approximate

-----------------------------------------------------------------------

Department of the Treasury - Internal Revenue Service
file name 45701093rev1 092099.

Form 886-A
Page 3

5701 \45701093.DOCAIN410 Filed:SAIN410

| | EXPLANATION OF ITEMS | Exhibit |
|---|---|---|
| ame of Taxpayer | | Year |
| The Dow Chemical Company | | Ended 12-31-92 |
| | | 12-31-93,12-31-94 |

the desired priority return of 7%. This is the stated return that Note R of the annual report indicated the investors would receive. (See copies of Schedule IA-8.4 of the Investment Agreement among Chemtech Royalty Associates, L.P., Ifco, Inc., Dow Europe S.A., Diamond Technology Partnership Co., and the Investors (which were the Class A limited Partners, the banks).

The limited partners can only receive cash. They cannot participate in any decisions regarding the partnership assets. They cannot sell their interest without approval. All patents can be returned only to Dow who will defend the patents in the same manner that they did before the partnership "owned" the patents. At termination, the loss is protected but the gain will be limited as well. A short summary of the partnership agreement is listed in exhibit D.

The loans from CPI allowed Dow to pay for the formation costs and royalty expense to the partnership in 1993 with money left for other purposes. (See exhibit C - Cash flow analysis and capital accounts) The payment of the royalties reduced the companies' tax liability and became part of the "off-balance sheet" financing. TDCC paid royalties to Chemtech who sent the excess to their lower tier. The lower tier loaned the money to TDCC. No payments of interest and principal were made by the subsidiary, but interest was accrued. These loans have more impact than the $200 million investment of the foreign banks. (The Goldman "IF" model included in exhibit I shows the lower tier subsidiary stock to have a value of $750 million at termination in the year 2000) The partnership agreement allows the foreign banks the allocated royalties, which generates no U.S. tax on royalties. In summary, Dow was able to take an expense deduction where none had previously existed. In addition, the cash flow was positive from loans on which no payments were made.

The royalty expense deductions were $95.6 million in 1993 and $143.3 million in 1994. These deductions were for the patents which Dow had previously expensed the cost. Dow used Arthur D. Little to value the patents and determine the royalty rate. Dow was the only licensee during the years under examination. It was necessary to value the patents again in 1993 when Ifco, Inc. sold its partnership interest to determine the capital account balances.

The only deductible costs for the patents to Dow before the partnership took control were the development costs and the costs of defense of use of the technology. These costs include 3-5 percent of Dow's gross sales paid for research as well as the costs of the patent department. Traditionally Dow has retained worldwide rights and costs for patents within the parent's ownership. This is the first exception. Dow deducted the royalty payments once the lease agreement had been transferred to Chemtech. The royalty expense allows Dow to write-off assets previously expensed under the tax code. It also allowed them to "monetize" the patent assets that had a very small tax basis ($54,000) when compared to their fair market value of $866 million.

BUSINESS PURPOSE:

Dow stated their business purpose was to obtain "off balance sheet" minority equity financing. The stated purpose of the partnership is to acquire, manage, protect, and conserve the patent assets. The $200 million they received from the banks represented only 2.0% of the $9.8 billion in total debt that the company had at that time. It was 8.5% of the $2.3 billion in off-balance sheet financing that existed. The banks are in the business of loaning money. As limited partners, they do not manage patents. The agreement does not permit them to participate in the proceeds of sale or other disposition of those assets. Dow has obtained cash via loans from the partnership subsidiary and significant tax savings from the royalty expense deduction. TDCC saved approximately $50 million in tax from this venture during the first two years.

Price Waterhouse has provided key insights into this "stripping transaction". Dow has stripped the income and sent it to the foreign banks, but has taken the deduction. Generally a royalty expense deduction is income to another taxpayer. In this case, the investors escape U.S. tax because they are foreign. The banks were guaranteed 6.947% on their capital invested with a +/- risk of 1% on the patents. The gain or loss on the mark to market value of the net book value of the patents could be computed at termination. The mark to market gain or loss compares the FMV to the amortized book value of the patents. Exhibit F explains the financial terms as attached to the partnership agreement as Exhibit H. It provides the "terms and conditions." The information calls for a maturity date on March 30, 1998. On that date the Class A Limited Partners received $10 million dollars. In addition, on June 30, 2000, the remaining $190 million was to be repaid. This is the exact amount invested by the banks and indicates no risk. The agreement used such terms as maturity date,

----------------------------------------------------------------

5701 \45701093.DOCAIN410 Filed:SAIN410

| | EXPLANATION OF ITEMS | Exhibit |
|---|---|---|
| 'ame of Taxpayer | | Year |
| The Dow Chemical Company | | Ended 12-31-92 |
| | | 12-31-93, 12-31-94 |

fixed rate, aggregate notional amount, floating rate, and priority return, that generally relate to loans.

In July 1993 Dow Europe SA, the General Partner, sought a Cantonal Tax Ruling from Zurich, Switzerland. The purpose was to determine if any of the income of Chemtech's limited partners would be subject to tax. The conclusion of Revisuisse Price Waterhouse (PW), the return preparer, was that no taxes were due. "There are no stamp, transfer or similar taxes payable in Switzerland in connection with the sale, purchase, assignment, transfer or delivery of the limited partnership interests of the Partnership by the Partnership of Ifco Inc. to the Class A Limited Partners." In describing Chemtech's business activities Price Waterhouse stated that "the patents contributed to Chemtech have been leased back to TDCC." Later PW stated that "the CR (Chemtech) partnership agreement is not a typical one. PW went on to say: "The joint property ownership which is typical for 'Kommanditgesellschaften', has been bypassed to a great extent. If investors withdraw they have in principle only the right to the capital originally contributed (with in principle a +/- 1% risk element of the total capital). The priority profit return to the investors mainly consisted of stated return on the capital invested; DESA participates in this respect with 1%. In any additional profit the investors (and DESA) will only have a 1% share.

PARTNERSHIP AGREEMENT:

Partnership Exhibit H (see attached exhibit F lists the terms and conditions on the "aggregate notional amount" of USD 200 million. This exhibit shows the maturity date to be:

    March 30, 1998    USD $ 10,000,000.00
    June 30, 2000     USD $190,000,000.00
                          $200,000,000.00

Exhibit F (referred to as exhibit H in the partnership agreement) also shows the maturity date. In addition to that term it also contained fixed rate, the fixed rate payer, payment dates, the floating rate, and the floating rate payment dates. The agreement guaranteed the return the banks required. In addition, their capital was returned, and the possibility of a small gain on the mark to market book versus FMV of the patents.

The Partnership agreement (PA) states in 3.1(a) that the class A limited partners get their priority return of 6.947%. Section 3.3(I) discusses gains from capital transactions. This section calls for special allocations. The banks did receive 1% of the gain allocated in proportion to their respective percentage interests. Section 3.3(I)(v) covers this gain and is supported by Swiss Cantonal Tax Ruling which states, "If investors withdraw they have in principle on the right to the capital originally contributed (with in principle a +/- 1% risk element of the total capital). The priority profit return to the investors mainly consists in an amount which secures a minimal return on the capital invested;...".

To fully understand the impact of Goldman scheme it is necessary to look at the termination or liquidation of the partnership. Dow agreed to release the subsequent cycle transactions. On February 25, 1998 Dow gave notice to the banks that Diamond Technology Partnership Company (DTPC) would exercise the purchase option in Section 14.3(a) with respect to the Class A Limited Partners. Chemtech paid the first installment on March 27, 1998. Dow exercised its right per the partnership agreement to buy out the banks. The banks protested the appraisal at the payout and challenged appraiser, Arthur D. Little's valuation. The banks felt that the appraised value was low. They were to receive 1% of the mark to market gain or loss in the book value of the patents. When the appraiser's value of the patents increased to $443.9 million the banks agreed. The book value of the patents as of February 25, 1998, was $361.9 million. This resulted in a mark-market gain of $82 million of which the banks would receive approximately $820,000. The banks received the additional amount in the buyout. The three banks' departments who received Dow's final installment on June 24, 1998 were listed respectively as the credit department, global finance-specialized financing, and corporate financial division.

LAW AND ARGUMENT:

-------------------------------------------------------------------------

Department of the Treasury - Internal Revenue Service
file name 45701093rev1 092099.

Form 886-A
Page 5

5701 \45701093.DOCAIN410 Filed:SAIN410

| | EXPLANATION OF ITEMS | Exhibit |
|---|---|---|
| ame of Taxpayer | | |
| | | Year |
| The Dow Chemical Company | | Ended 12-31-92 |
| | | 12-31-93,12-31-94 |

Chemtech

Maintenance of the capital accounts for generally accepted accounting principles (GAAP) books and tax books is essential if the partnership is to have "substantial economic effect." The economic effect test requires three things in the partnership agreement:

1. The determination and maintenance of the partners' capital accounts in accordance with Reg. 1.704-1(b)(2)(iv),

2. Upon liquidation of the partnership, the liquidation is must be made in accordance with the positive account balances

3. If such partners has a deficit balance in his capital account following liquidation...he is unconditionally obligated to restore the balance

Dow has followed the language of the regulations to show that Chemtech met the economic effect test. The partnership agreement calls for all three of the above conditions.

Regulation 1.704-1(b)(2)(iii)(a) states, "the economic effect of an allocation is substantial if there is a reasonable possibility that the allocation will affect substantially the dollar amounts to be received by the partners from the partnership, independent of tax consequences. The following types of allocation may not satisfy the substantiality test:

1) allocations that result in "shifting tax consequences,"
2) "transitory allocations," and
3) allocations that enhance the overall after-tax economic consequences of at least one partner without diminishing such consequences to any other partner.[1]

Regulation 1.704-1(b)(2)(iv)(d) provides that the capital account of a partner must be increased by the FMV of property contributed to the partnership by such partner. Regulation 1.704-1(b)(2)(iv)(f) also permits a revaluation with
1) a contribution of money or other property to the partnership by a new or existing partner as consideration for an interest in the partnership, and
2) a liquidation of the partnership or a distribution of money or other property to a retiring or continuing partner as consideration for an interest in the partnership.[2]

Distributions in liquidation of the partnership must be made in accordance with positive account balances. Thus, restating capital accounts in this manner has very real economic implications. It insures that the new partners will not share in appreciation or depreciation in the value of the partnership's assets before they joined the partnership.[3]

The purpose of the regulations surrounding 704 insures that the banks are not at risk of losing their investment. This is a key factor in proving that what transpired between the Dow subsidiaries and the foreign banks was a loan. The evidence points to a loan arrangement and not a joint venture with shared risks.

In Gregory V. Helvering, the Supreme Court determined the definition of "Sham doctrine". The court said that "if a transaction superficially follows the letter of the law, but is devoid of economic substance and produces tax savings Congress did not intend, it can be considered a sham and disallowed." Recent court cases have supported this doctrine. ASA Investerings Partnership v Commissioner, TCM 1998-305 and ACM Partnership v Commissioner, 157 F.3d 231, 82 AFTR2d 98-6682 (CA-3,1998) The judges in these cases have overturned the partnerships because they lacked economic substance and concluded no partnership had been formed.

* * * *

[1] JTAX 179 (Sept. 1998)
[2] TAX 179 (Sept. 1998)
[3] TAX 180 (Sept. 1998)

---------------------------------------------------------

Department of the Treasury - Internal Revenue Service
file name 45701093rev1 092099.

Form 886-A
Page 6

5701 \45701093.DOCAIN410 Filed:SAIN410

| | EXPLANATION OF ITEMS | Exhibit |
|---|---|---|
| lame of Taxpayer | | |
| The Dow Chemical Company | | Year Ended 12-31-92 12-31-93,12-31-94 |

The IRS' argument is that this partnership lacks economic substance and substantial business purpose. Analysis of Chemtech Partnership shows that the foreign banks are not at risk. The partnership agreement called for sharing in the gain or loss on the mark to market book value of the patents compared to the FMV (fair market value). The extent of the bank's exposure was one percent of such gain or loss. If the patents became worthless on day two, the loss would have been a maximum of $8.67 million (1% of $867 million). The book value is reduced each year as amortization is taken on the books of the partnership. In the first year the banks received $3.38 million dollars from Dow to join the partnership. That payment reduced the possible loss to $5.3 million dollars even if the patents became worthless overnight. In fact the patents were valued in the first quarter of 1998 to have a FMV of $362.2 million by a third party. The partnership carried these patents at a value of $361.9 million. The mark to market gain was $335,000. The banks would have received $3,350 as there 1% of the gain. They challenged the appraisal and the appraiser revalued the patents to $443.9 million. The gain increased to $82 million and the banks shared in 1%, or, $820,000. They did not risk the entire amount of their $200 million investment. In fact, at the time of the buyout, the total of the capital accounts of the banks was $204.3 million. The banks then received their capital account balance from Dow as called for in the partnership agreement. Thus, they were not at risk for the amount they invested as such, only the amount of gain or loss on the value of the patents. At no time did their carrying value drop below the cash that they had contributed and the agreement would require that TDCC make them whole if the assets did have earnings after a loss. The loss never occurred and TDCC continued to use the same patents

The characteristics of Dow Chemical and the foreign banks are contrary to those of a bona fide partnership.
(1) Dow and the banks had divergent, rather than common, interests. They had a debtor creditor relationship. The purpose of the transaction was more akin to a "stripping transaction" in which the five foreign banks received royalty income that was not taxable to them. Dow took a royalty expense deduction which was deductible and more than offset the portion of the income which they reported. IRC Section 482 "permits the IRS to allocate gross income, deductions, credits, or allowances between the parties as appropriate".
(2) Regulation 1.704-1(b)(2)(iv)(f) requires the maintenance of capital accounts with specified rules in order for a partnership's allocations to be respected as having substantial economic effect. Goldman Sachs used the form of these regulations to give the partnership the appearance of economic substance. In reality the regulations insured that the foreign banks would not share in the risk necessary to have a viable partnership.[4]
(3) The bank's departments are not investment oriented but rather look to be the credit departments, which are usually related to financing rather than equity investments.
(4) The banks have been assured their capital will be repaid according to a prearranged schedule unless Dow wanted to buy them out early. At no time would they receive less than their full investment back after the up front fees are considered.
(5) The banks did not manage the assets and could not control even which assets were contributed. The common purpose of partners in business has not been established.
(6) Dow indemnified the banks against all U.S. and Swiss taxes. That appears to be more typical in a financing arrangement. In addition, Dow also retained the responsibility of all of the expenses relating to the maintenance of the patents. In other patent infringement suits, the legal fees have been high and take many years to resolve. The limited partners did not want to remain a party to any litigation and did remain outside any litigation. The lease is a net-net-net lease that minimizes risk to the banks and requires no further cash contributions for other expenses. The above expense may be paid many years after actual use of the patents.

The requirement that capital accounts be maintained under GAAP accounting only confuses the issue. The tax balances reflect the reality that no transfer of the patents exists for tax purposes. When the patents were contributed to the subsidiary, TDCC recognized no gain. In addition, when the patents were contributed and when they were distributed, no gain was recognized. No tax was paid on those transactions. Dow always controlled the patents. No deduction was allowed and no risks were taken because Dow paid all the expenses. The banks were less than passive investors. It is

\* \* \* \*

AX 178 (Sept. 1998) "Exploring the Outer Limits of the 704(c) Partnership Built-In-Gain Rule.

-----------------------------------------------------------------------

Department of the Treasury - Internal Revenue Service
file name 45701093rev1 092099.                              Form 886-A
                                                            Page 7

5701 \45701093.DOCAIN410 Filed:SAIN410

| | EXPLANATION OF ITEMS | | Exhibit |
|---|---|---|---|
| Name of Taxpayer | | | Year |
| The Dow Chemical Company | | | Ended 12-31-92 12-31-93,12-31-94 |

the IRS' position that the banks loaned money to Dow. That is in part supported by the "IF" model (exhibit H) that details the entire investment scenario from beginning to end. It shows the foreign banks as making a guaranteed return of approximately 7% on their capital investment. In addition the model shows them making 1.6% profit on the mark to market gain on the book value of the patents. The model shows no loss on the foreign investor's capital investment. In fact when they were bought out in early 1998 the banks all had positive capital accounts.

The foreign banks did not materially share in the possibility of gain or loss in regard to the patents. The partnership agreement called for a +/- 1% risk element of the capital invested. The priority return has insured the banks of making 6.947% on the capital invested. The non-TDCC partners did not have to pay any defense costs in case the patents were challenged. They could not receive or sell patents from the partnership. In no case, could they maintain a loss. If a loss occurred in one year, no one got paid until the banks received their priority return to make them whole for the current year as well as the prior year. Any later year loss would be offset by the up front fees which Dow and subsidiaries paid for the banks to enter into the partnership such as the origination fees, etc. The IF model also reinforces Dow 's responsibility to pay any and all U.S. taxes. "The liquidation amount will be equal to the sum of
1) the investor's capital in the Partnership
2) any unpaid cumulative yield and
3) a small share of the then value of the Property."

Dow could buy out the partners if U.S. tax is asserted according to the IF model.

The courts have indicated that there is nothing wrong with seeking to reduce one's liability unless that is the primary reason for the transaction. This was made possible by using the partnership format and having partners that would not be taxed on allocated royalties.

The form of the regulations that were in place when the partnership was created has been met. However, the Chemtech entity lacks economic substance.

Dow paid the $3.38 million to obtain a loan of $200 million dollars, not to form a partnership. The partnership was a convenient format by which to deduct the interest and principal payments of the loan. It is the deduction of the principal payments with which the exception is taken. The banks are charging TDCC fees for providing services related to the making of a loan. Generally, no partner (and related entities) pays 5 unrelated partners to join a partnership. No common purpose has been demonstrated.

Please refer to: *ASA Investerings Partnership v. Commissioner* (T .C. Memo. 1998-305); *ACM Partnership, Southampton-Hamilton Company, Tax Matters Partner, v. Commissioner of Internal Revenue*, TCM 1997-115

TAXPAYER'S POSITION:
TDCC's position is that Chemtech is a partnership that has economic substance. Dow's business purpose in forming Chemtech was to create off balance sheet financing. They attempted to follow the letter of the law. The form of operation, a partnership, allows Dow to receive cash, pay royalties, and get a tax deduction for the contribution of appreciated patents. Dow's position is that the banks are at risk for the $200 million invested. Dow believes the transaction has a business purpose (off-balance sheet financing) and that the mechanical tests of leasing and partnership law have been met. Therefore, a bona fide partnership exists.

When the foreign law changed to require Dow to withhold taxes, Dow terminated the partnership with the five foreign banks

CONCLUSION:
The partnership has exceeded the scope of the intent of the law and doctrines of Subchapter K. The partnership should be disregarded. It has achieved tax results that are not commiserate with the shift and sharing of risk. Recent court cases support this conclusion.

-------------------------------------------------------------------

Department of the Treasury - Internal Revenue Service

file name 45701093rev1 092099.

Form 886-A

Page 8

```
5701 \45701093.DOCAIN410 Filed:SAIN410
```

| | EXPLANATION OF ITEMS | | Exhibit |
|---|---|---|---|
| Name of Taxpayer | | | Year |
| The Dow Chemical Company | | | Ended 12-31-92 12-31-93,12-31-94 |

The funds received were loans from the banks. The operation of law that balances income and expenses does not consider non-U.S. tax paying entities. If all of the entities paid U.S. tax, there would be no tax savings. The partners do not share a common purpose. Rather, the maintenance costs of the patents still stayed with TDCC and its subsidiaries. The loaning of money based on intangible assets does not allow Dow to meet the substantial economic requirements of the code to create a viable partnership. Therefore, the payments equivalent to interest have been allowed as part of the "net royalty allowed amounts". The royalty expense taken per return is decreased by the money already included in income on the consolidated return from Chemtech.

Subsequently, regulations and various court cases have disallowed transactions where the steps are correct and the conclusion is not. No legal entity creation can allow deductions that would not be allowed if the reality does not support any transfer of the property. The major purpose of the partnership was to avoid taxes. TDCC already owned the patents. It cost $12 million to create the fiction that TDCC did not control the assets. TDCC did move some assets out of the partnership when prudent business practice required that they do so. They were replaced with other assets. If the banks were concerned these transactions would have been traced. As it was, no one was harmed and only TDCC was inconvenienced. Dow has deducted the developmental costs as current expenses when they were incurred. Now they are attempting to get another deduction by paying cash to a partnership, which they control and receive the proceeds back in the form of loans, which do not have to be repaid.

PENALTIES:

The substantial understatement penalty is being applied to the adjustments being proposed as a result of Dow's use of the Chemtech partnership. Chemtech partnership is a tax shelter. The principal business purpose of the partnership was to avoid tax. The partnership had no potential to make money for Dow from an objective test. They invested $12.6 million in formation costs of the partnership, (including paying $3.38 million to the foreign banks to join) to start paying royalties for patents that they owned and had already expensed for tax purposes. Dow even retained the responsibility to defend the patents against infringement. The return on this investment could never replace the money they spent on royalties. Dow never was able to demonstrate they had projected any profit from the lease agreement with the partnership. The Goldman "IF" model shows a $159.6 million book gain, but this could never be a taxable gain, because the patents could not be distributed outside the consolidated group. The patents could only be distributed back to the consolidated return and therefore no gain is recognized for tax. Therefore, since the partnership is a tax shelter, and Dow and the partnership failed to adequately disclose the nature of the partnership on form 8275 or 8275-R as appropriate, the penalty is applicable. The reasonable cause exception for reliance on the advice of a competent tax advisor must be based on all pertinent facts and circumstances and the law as it relates to the circumstances. These facts include the taxpayer's purpose for entering into a transaction and for structuring the transaction in a certain way. The taxpayer is required to disclose all facts that he or she knows, or should know, that are relevant to the tax treatment of an item. Dow has chosen to claim privilege to memorandum from the attorneys from Goldman Sachs advised them to contact regarding Chemtech. It is the IRS's position that Dow met the form of the law regarding each step of the transaction. They set up the lease to comply with the Frank Lyon case so as to meet the safe harbor rules regarding leases. They put in the partnership agreement the items necessary to create the form of substantial economic effect, but the Dow partners made all the critical decisions of the partnership, they were responsible for any additional costs, such as indemnifying the foreign partners against any taxes. Dow never relinquished control of the patents. Therefore, it is critical to take an overview of the entirety of the Chemtech venture. In this regard Dow has failed to show that it has met the disclosure and reasonable basis standards of IRC Section 6662(d) and the related regulations.

The penalty has some computational steps in its determination, but is essentially 20 percent of the understatement of tax caused by the adjustment. Since the IRS does not know the final tax computations at this time, we cannot make the computation.

---

Department of the Treasury - Internal Revenue Service
file name 45701093rev1 092099.

Form 886-A
Page 9

## Index of Exhibits

### for 5701 on Chemtech

A. Partners in the Partnership and % of ownership:
   A-1. Ownership Chain
   A-2 Overview of CRLP Transaction provided by Dow

B. Chronology of Events for Chemtech Royalty from IDR response 413

C. Cash Flow Analysis and Net Royalties Paid
   C-1 Cash Flow Analysis
   C-1(a) Excess Royalties
   C-2 Chemtech Royalty Distributions
   C-3 1993 Chemtech Royalty Associates L.P. K-1 Reconciliation
   C-4 1994 Chemtech Royalty Associates L.P. K-1 Reconciliation

D. Partnership Agreement Summary - Entire two volumes have been reviewed

E. Required retirements of all bank's investments, Exhibit "E" to the amended partnership agreement

F. Loan Features of the bank's $200,000,000 investment to Chemtech, Exhibit "H" to the amended Partnership Agreement (includes maturity date, return of the full amount of the capital investment

G. Formation cost summary with 5 schedules IA-8.4 for each bank showing the formation cost payments which total $3.07 million paid to the banks for joining the partnership

H. Goldman Sach's "if" model which shows bank capital accounts which never fall below the original contribution as well as no loss on the patents mark-to-market versus fair market value of the patents

I. Letter to Banks on Termination

J. Goldman Sach's Presentation to Dow April 28, 1992

K. Term Sheet (Dow Indemnity on US Taxes and Terms of Liquidation Principal Received in Full)

C:\9294\Chemtech\Index of Exhibits  for 5701 on Chemtech.doc



Chemtech Royalty Associates L. P.
EXHIBIT A-1 Ownership Chain
from 1993 10-K and IDR reply

Dow used the shell of Scotdrill Texas which had retained earnings for Chemtech Portfolio. The IRS reassigned EIN 76-0267883 when the first return was filed. The company carried T-bills of about $50 million. The related notes receivable were $234 million at the end of 1993, $350 million at the end of 1994, $531 million at the end of 1995 and $655 at the end of 1996.

The 5 banks are Kreidbank NV, Rabo Merchant Bank NV, National Westminster Bank PLC, Dresdiner Bank AG, and Bank Brussels Lambert.

EX A-2

# Overview of CRLP Transaction



Craig Jones
8/24/98

5701 \Exhibit B Chemtech 5701.doc SAIN410Filed:SAIN410 Chemtech

| | EXPLANATION OF ITEMS | Exhibit |
|---|---|---|
| me of Taxpayer | | Year |
| The Dow Chemical Company | | Ended 12-31-92<br>12-31-93,12-31-94 |

Exhibit B
Chronology of Events for Chemtech Partnership

4/28/92    Francisco J. Lopez-Balboa, V.P. Investment Banking Division at
Goldman Sachs, met with J. Pedro Reinhard, V.P. and Treasurer at
TDCC, and discussed a Special Limited Investment Partnership
("SLIPS") financing structure for TDCC.  (see attachments L, M, &
N to IDR 413)

5/6/92    Francisco J. Lopez-Balboa follows the meeting with a letter
(attachment A to IDR 413) that discussed structuring fees,
preferred equity placement fees, Dow's "being satisfied that
certain benefits will not be adversely affected by retroactive
change in law", documentation via Andrew & Kurth and their fee,
accounting issues and appraisal fees.

Lopez-Balboa and believes "this partnership financing will
provide Dow with attractive economic benefits..."

Note:  Dow claims privilege to a memo by the law firm of
Andrews & Kurth dated April 27, 1992 and later to
another dated December 18, 1992.  Dow claims under the
attorney work-product doctrine with respect to the above
named memorandum.

6/9/92    Goldman makes a presentation to Dow regarding the use of SLIPS.
(attachments L, M, and N to IDR 413)

6/22/92    David A. Ackert, V. P. Investment Banking Division/Goldman Sachs,
sends a letter to Mr. Pedro Reinhard and Charles J. Hahn,
Assistant Tax Director/TDCC.  The letter discussed and enclosed
a term sheet involving a client with similar assets such as
patents. The  "fixed rate license arrangement may be the
preferred method when mature and valuable patents are being
monetized."  (attachment B to IDR 413)

7/8/92    David A. Ackert (Goldman Sachs) sent a letter to Chuck Hahn
(TDCC) confirming the fixed payment royalty would be the
preferred method for reasons in the attached memorandum.

Note:  No copy of this memorandum was provided.  (attachment C)

7/17/92    Ackert sent a letter to Pedro Reinhard with draft copies of a
confidentiality letter between Goldman Sachs & Co. and Dow
Chemical. (attachment D to IDR 413)

--------------------------------------------------------------------
Department of the Treasury - Internal Revenue Service        Form 886-A
                                                             Page 1

5701 \Exhibit B Chemtech 5701.doc SAIN410Filed:SAIN410 Chemtech

| | EXPLANATION OF ITEMS | | Exhibit |
|---|---|---|---|
| 'e of Taxpayer | | | |
| | | | Year |
| The Dow Chemical Company | | | Ended 12-31-92 |
| | | | 12-31-93,12-31-94 |

Exhibit B
Chronology of Events for Chemtech Partnership

11/12/92 Goldman makes a presentation to Dow regarding SLIPS.

3/13/93  Ackert sent a letter to Reinhard referring to "last Thursdays meeting and last months Kansas City meeting.  Ackert is voicing concern over Dow's request to revise the terms sheet.  Ackert states, "There are two basic challenges to the successful completion of this transaction.  Most important is the signifi-cant time pressure to close before Congressional action. Second, is the added structural complexity created by the proposed changes.

Note:  Ackert went on to state, "Specifically, both Davis Polk and the financial institutions have been adamant that because they do not share in the tax benefits of the structure they will not accept any structural risk. This is not a pricing issue.  No financing premium will justify the potential tax exposure.  (attachment E to IDR 413)

3/15/93  Ackert sends a memorandum to Henry Kahn, TDCC, conveying thoughts with respect to intangible financing for Dow and MMD (Marion Merrill Dow).  A "tax indemnity" would "protect FORCO fully from both Dow/MMD actions and structural flaws in the partnership agreements." Ackert also spoke of the need for a liquidation plan in the event of an optional liquidation being required by FORCO.  Asset valuation protection is also required by the investors. (attachment F IDR 413)

Note:  It is believed that FORCO is an acronym for the foreign banks.

3/17/93  Memorandum from Goldman via Rich Katz, an associate of Ackert regarding the "permitted asset definition".

3/25/93  Reinhard submits a, "Resolution for consideration by the Dow Board of Directors authorizing the formation of a special purpose limited partnership to provide off-balance sheet financing at competitive rates."

4/1/93  Goldman Sachs sends a letter to Dow Europe, S.A., attention: Werner Baur.  The letter is an agreement whereby Goldman is the placement agent for the partnership units of $200 million.  It and Dow Europe S.A. and Chemtech Royalty Associates, L.P..

4/8/93  The certified resolution is also known as the "engagement letter"

------------------------------------------------------------------------

5701 \Exhibit B Chemt ch 5701.doc SAIN410Filed:SAIN410 Chemtech

| | EXPLANATION OF ITEMS | Exhibit |
|---|---|---|
| ne of Taxpayer | | Year |
| The Dow Chemical Company | | Ended 12-31-92<br>12-31-93,12-31-94 |

Exhibit B
Chronology of Events for Chemtech Partnership

between Goldman Sachs to form Diamond Technology Partnership Co. is passed. It also provided funding. (attachment Q to IDR 413)

6/1/93   Globus (see below) sends a letter to Reinhard which encloses a copy of the "IF" model for his review. Globus notes, "This new version, which is being shown to investors, includes an allocation model for the non-operative allocation of profits and losses." (attachment A to IDR 333)

7/2/93   Letter from Alexander Globus, Goldman, Sachs & Co. to William Curry, TDCC regarding depreciation and Chemtech Partnership Model (DOWF20 run # 2) and Asset Model which include specific information on first quarter depreciation. It mentions the $20K discrepancy between the Partnership Agreement FMV of contributed assets and the Asset Modeil's FMV. (attachment J to IDR 413)

11/16/93 Stephen D. Quinn, partner Goldman, Sachs & Co., sends brief letter to Reinhard regarding the billing of TDCC's share of expenses. He indicated, "We appreciate the opportunity to work together on this challenging financing. It was your personal commitment which drove this financing to a successful closing. Hopefully, in the future, we can execute equally attractive deals which are significantly less time consuming!" (attachment K to IDR 413)

2/25/98  DTPC Diamond Technology Partnership Co. notifies the five foreign banks, pursuant to Section 14.3 of the Amended and Restated Agreement of Limited Partnership of Chemtech Partnership that DTPC will exercise its option to purchase the banks interest.

3/27/98  The first installment is due to banks. (response to IDR 2001)

6/24/98  The banks are notified that Ifco, Inc. will pay the final installment on 6/26/98 to purchase the class A limited partner's interest in Chemtech. This notification explains the revaluation by Arthur D. Little, appraiser, of the patent assets. The banks received an additional $817,439. All received their capital accounts in full plus the priority return. (response to IDR 2001)

DISK 5701 \45701094WPF SAIN:703 IRCS:    PRA        IDR  FILE-703

FORM 5701                    Department of the Treasury - Internal Revenue Service
                                   NOTICE OF PROPOSED ADJUSTMENT

Name of taxpayer

**THE DOW CHEMICAL COMPANY & SUBSIDIARIES**                  | Issue No.
                                                            |
                                                            |    94

Name and title of person to whom delivered
**DORO HOFFMAN, MANAGER FEDERAL TAX AUDIT**                  | Date
                                                            | April 9, 1999

Entity for this proposed adjustment
    IFCO, INC.        Div. Log    32

Based on the information we now have available and our discussions with you,
we believe the proposed adjustment listed below should be included in the
revenue agent's report.  However, if you have additional information that
would alter or reverse this proposal, please furnish this information as
soon as possible.

| Years | Amount | Account or return line |
|-------|--------|------------------------|
| 1992  | -0-    |                        |
| 1993  | $9,449,263 | Line 8 Short Term Capital Loss |
| 1994  | -0-    |                        |

ISSUE:
Whether the basis of Ifco Inc. must be adjusted by the disallowed royalties claimed by
the Dow Chemical Company as paid to Chemtech Royalty Assoc. L. P.
Reason for Proposed Adjustment
If the explanation of the adjustment will be longer than the space provided below, the
entire explanation should begin on the Form 886-A (Explanation of Items)
Post Return Adjustments N/A
IDR 241

**PLEASE SEE FORM 886-A ATTACHED**

*Appears that this is
a calculation adj
based on 5701 #93
position.*

Taxpayer Representative's action:
( ) Agreed    ( ) Agreed in Part    ( ) Disagreed
( ) Have additional information; will submit by:
Case Manager

Rick Kroeger for Robert Combs                    | Date
                                                 |
                                                 | April 9, 1999

                                                        Form 5701

Sain 703 Filed: Sain 703

| | EXPLANATION OF ITEMS | Exhibit |
|---|---|---|
| Name of Taxpayer | | |
| The Dow Chemical Company | | Year/Period |
| | | Ended 12-31-92, |
| | | 12-31-93,12-31-94 |

Short Term Capital Loss (Sale of Chemtech Royalty Associates, L.P.)

| | | 1993 | 1994 |
|---|---|---|---|
| PER RETURN | $  N/A | ($16,109,423) | 1994 |
| CORRECTED | N/A | ( 6,660,160) | -0- |
| | --------------- | ------------- | ---------- |
| ADJUSTMENT | $  N/A | $ 9,449,263 | $  -0- |
| | =============== | ============= | ========== |

ISSUE:
Whether the basis of Ifco Inc.'s interest in Chemtech Royalty Associates,
L.P. is correct.  This is a correlative adjustment related to the expense
deductions claimed by TDCC for royalties paid to Chemtech Partnership.

FACTS: In 1993 Ifco claimed a capital loss on the sale of its interest in
Chemtech Royalty Associates, L.P. (CR).  This loss was determined to be
accurate based on the return information.  In a related adjustment, to
TDCC, it has been proposed that the royalty expense paid to CR be reduced
by $40,192,528.  In 1993 Ifco reported, as its share of CR's royalties,
$22,476,635 that was 23.51% of the total.  The reduction of royalty income
to CR would result in a reduction to Ifco's basis in the partnership by
23.51% of the reduced royalties. This same amount would have reduced the
short term capital loss claimed by Ifco.

| Excess Royalties | | Ifco's % | | Reduction |
|---|---|---|---|---|
| $40,192,528 | x | 23.51% | = | $9,449,263 |

LAW:  IRC Section 705 determines the adjusted basis of a partner's
interest in a partnership.  The adjusted basis of a partner's interest is
increased by sum of its distributive share for the taxable year.

TAXPAYER'S POSITION: TDCC does not agree with the related reduction to the
royalty expenses paid to Chemtech Partnership.  Therefore, they do not
agree with this adjustment.

CONCLUSION: The related adjustment that decreased the amounts of royalty
expense deduction on TDCC's return makes it necessary to reduce Ifco's
adjusted basis in Chemtech Partnership.  Therefore, it is necessary to
reduce the claimed short term capital loss which Ifco incurred when it
sold its interest in Chemtech Partnership.

---

Department of the Treasury - Internal Revenue Service

Form 886-A
Page

# OPPOSITION EXHIBIT

# 3

# UNITED STATES DISTRICT COURT

# DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Movant, ) | |
| ) | Case No.: 1:08-mc-00411-RJL |
| v. ) | Judge Leon |
| ) | |
| DELOITTE & TOUCHE USA LLP, ) | |
| ) | |
| Respondant. ) | |
| ) | |
| ) | |
| ) | |

## Declaration of Troy Biddix, Deloitte Tax LLP

I, Troy Biddix, pursuant to 28 U.S.C. § 1746, declare as follows:

    1.   I am a partner at Deloitte Tax LLP. My current business address is 600 Renaissance Center, Suite 900, Detroit, Michigan 48243.

    2.   Deloitte & Touche LLP ("D&T") is the independent registered public accounting firm for The Dow Chemical Company and subsidiaries ("Dow").

    3.   I have participated in certain of D&T's audits and interim reviews of Dow's consolidated financial statements for 15 years as a tax specialist. My primary responsibility with respect to such audits and interim reviews has been to participate in the audit or interim review procedures that were performed in relation to Dow's tax accounts. Certain of D&T's audits or interim reviews included performing procedures related to accruals for Chemtech Royalty Associates LLP related tax uncertainties.

    4.   In connection with certain of D&T's audits or interim reviews of Dow, D&T obtained access to certain legal analysis performed by Dow or its outside advisors. The

documents dated September 15, 1998 and June 20, 2005 were provided to D&T by Dow in this context. I have read the June 20, 2005 tax opinion, the September 15, 1998 memo and the July 21, 1993 draft memo, identified in the privilege log filed as an exhibit with the United States' motion to compel. To the best of my knowledge, D&T has maintained those documents in confidence.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed in Detroit, Michigan this 25th day of August, 2008.

Troy Biddix, Deloitte Tax LLP

2

# OPPOSITION
# EXHIBIT

# 4

# AICPA Code of Professional Conduct Section 301

## ET Section 301 - Confidential Client Information

I.    **.01    Rule 301—Confidential client information.**

A member in public practice shall not disclose any confidential client information without the specific consent of the client.

This rule shall not be construed (1) to relieve a member of his or her professional obligations under rules 202 [ET section 202.01] and 203 [ET section 203.01], (2) to affect in any way the member's obligation to comply with a validly issued and enforceable subpoena or summons, or to prohibit a member's compliance with applicable laws and government regulations, (3) to prohibit review of a member's professional practice under AICPA or state CPA society or Board of Accountancy authorization, or (4) to preclude a member from initiating a complaint with, or responding to any inquiry made by, the professional ethics division or trial board of the Institute or a duly constituted investigative or disciplinary body of a state CPA society or Board of Accountancy.

Members of any of the bodies identified in (4) above and members involved with professional practice reviews identified in (3) above shall not use to their own advantage or disclose any member's confidential client information that comes to their attention in carrying out those activities. This prohibition shall not restrict members' exchange of information in connection with the investigative or disciplinary proceedings described in (4) above or the professional practice reviews described in (3) above.

[As amended January 14, 1992.]

II.    **Interpretations Under Rule 301**
III.    **—Confidential Client Information**
IV.    **[.02]    [301-1]—[Deleted]**
V.    **[.03]    [301-2]—[Deleted]**
VI.    **.04    301-3—Confidential information and the purchase, sale, or merger of a practice.**

Rule 301 [ET section 301.01] prohibits a member in public practice from disclosing any confidential client information without the specific consent of the client. The rule provides that it shall not be construed to prohibit the review of a member's professional practice under AICPA or state CPA society authorization.

For purposes of rule 301 [ET section 301.01], a review of a member's professional practice is hereby authorized to include a review in conjunction with a prospective purchase, sale, or merger of all or part of a member's practice. The member must take appropriate precautions (for example, through a written confidentiality agreement) so that the prospective purchaser does not disclose any information obtained in the course of the review, since such information is deemed to be

confidential client information.

Members reviewing a practice in connection with a prospective purchase or merger shall not use to their advantage nor disclose any member's confidential client information that comes to their attention.

[Effective February 28, 1990.]

# AU Section 9326 – Auditing Interpretations of Section 326

# AU Section 9326

## *Evidential Matter: Auditing Interpretations of Section 326*

### 1.  Evidential Matter for an Audit of Interim Financial Statements

**.01**

*Question*—APB Opinion No. 28 [AC section I73] concluded that certain accounting principles and practices followed for annual reporting purposes may require modification at interim report dates. Paragraph 10 of Opinion No. 28 [AC section I73.103] states that the modifications are needed "so that the reported results for the interim period may better relate to the results of operations for the annual period." The modifications introduce a need for estimates to a greater extent than is necessary for annual financial information. Does this imply a relaxation of the third standard of field work, which requires that sufficient competent evidential matter be obtained to afford a reasonable basis for an opinion regarding the financial statements under audit?

**.02**

*Interpretation*—No. The third standard of field work applies to all engagements leading to an expression of opinion on financial statements or financial information.

**.03**

The objective of the independent auditor's engagement is to obtain sufficient competent evidential matter to provide him with a reasonable basis for forming an opinion. The auditor develops specific audit objectives in light of assertions by management that are embodied in financial statement components. Section 326.11 states, "In selecting particular substantive tests to achieve the audit objectives he has developed, an auditor considers, among other things, the risk of material misstatement of the financial statements, including the assessed level of control risk, and the expected effectiveness and efficiency of such tests. His considerations include the nature and materiality of the items being tested, the kinds and competence of available evidential matter, and the nature of the audit objective to be achieved."

**.04**

Evidential matter obtained for an audit of annual financial statements may also be useful in an audit of interim financial statements, and evidential matter obtained for an audit of interim financial statements may also be useful in an audit of annual financial statements. Section 313.02 indicates that "Audit testing at interim dates may permit early consideration of significant matters affecting the year-end financial statements (for example, related party transactions, changed conditions, recent accounting pronouncements, and financial statement items likely to require adjustment)" and that "much of the audit planning, including obtaining an understanding of internal control and assessing control risk, and the application of substantive tests to transactions can be conducted prior to the balance-sheet date." [fn 1] [As amended, August 1983, by

issuance of Statement on Auditing Standards No. 45.] (See section 313.)

**.05**

The introduction by Opinion No. 28 [AC section I73] of a need for additional estimates in measuring certain items for interim financial information may lead to a need for evidence in examining those items that differs from the evidence required in an audit of annual financial information. For example, computing the provision for federal income taxes in interim information involves estimating the effective tax rate expected to be applicable for the full fiscal year, and the auditor should examine evidence as to the basis for estimating that rate. Since the effective tax rate for the full year ordinarily is known at year-end, similar evidence is not usually required in examining annual information.

[Issue Date: February, 1974; Modified: October, 1980.]

## 2. The Effect of an Inability to Obtain Evidential Matter Relating to Income Tax Accruals

**.06**

*Question*—The Internal Revenue Service's audit manual instructs its examiners on how to secure from corporate officials "tax accrual workpapers" or the "tax liability contingency analysis," including, "a memorandum discussing items reflected in the financial statements as income or expense where the ultimate tax treatment is unclear." The audit manual states that the examiner may question or summons a corporate officer or manager concerning the "knowledge of the items that make up the corporation's contingent reserve accounts." It also states that "in unusual circumstances, access may be had to the audit or tax workpapers" of an independent accountant or an accounting firm after attempting to obtain the information from the taxpayer. IRS policy also includes specific procedures to be followed in circumstances involving "Listed Transactions," to help address what the IRS considers to be abusive tax avoidance transactions (Internal Revenue Manual, section 4024.2-.5, 5/14/81, and Internal Revenue Service Announcement 2002-63, 6/17/02).

**.07**

Concern over IRS access to tax accrual working papers might cause some clients to not prepare or maintain appropriate documentation of the calculation or contents of the accrual for income taxes included in the financial statements, or to deny the independent auditor access to such information.

**.08**

What effect does this situation have on the auditor's opinion on the financial statements?

**.09**

*Interpretation*—The client is responsible for its tax accrual, the underlying support for the accrual, and the related disclosures. Limitations on the auditor's access to information considered necessary to audit the tax accrual will affect the auditor's ability to issue an unqualified opinion on the financial statements. Thus, if the client does not have appropriate documentation of the calculation or contents of the accrual for income taxes and denies the auditor access to client personnel responsible for making the judgments and estimates relating to the accrual, the auditor should assess the importance of that inadequacy in the accounting records and the client imposed limitation on his or her ability to form an opinion on the financial statements. Also, if the client has appropriate documentation but denies the auditor access to it and to client personnel who possess the information, the auditor should assess the importance of the client-imposed scope limitation on his or her ability to form an opinion.

.10

The third standard of field work requires the auditor to obtain sufficient competent evidential matter through, among other things, inspection and inquiries to afford a reasonable basis for an opinion on the financial statements. Section 326, *Evidential Matter*, paragraph .25, requires the auditor to obtain sufficient competent evidential matter about assertions in the financial statements of material significance or else to qualify or disclaim his or her opinion on the statements. Section 508, *Reports on Audited Financial Statements*, paragraph .24, states that, "When restrictions that significantly limit the scope of the audit are imposed by the client, ordinarily the auditor should disclaim an opinion on the financial statements." Also, section 333 on *Management Representations* requires the auditor to obtain written representations from management. Section 333.06 states that specific representations should relate to the following matters, "availability of all financial records and related data," and section 333.08 states that a materiality limit does not apply to that representation. Section 333.13 states that "management's refusal to furnish a written representation" constitutes a limitation on the scope of the audit sufficient to preclude an unqualified opinion.

.11

*Question*—A client may allow the auditor to inspect its tax accrual workpapers, but request that copies not be retained for audit documentation, particularly copies of the tax liability contingency analysis. The client also may suggest that the auditor not prepare and maintain similar documentation of his or her own. What should the auditor consider in deciding a response to such a request?

.12

*Interpretation*—Section 339, *Audit Documentation*, states that audit documentation is the principal record of auditing procedures applied, evidence obtained, and conclusions reached by the auditor in the engagement. Audit documentation should include sufficient competent evidential matter to afford a reasonable basis for an opinion. In addition, audit documentation should be sufficient to enable members of the engagement team with supervision and review responsibilities to understand the nature, timing, extent, and results of auditing procedures performed, and the evidence obtained. Section 326, *Evidential Matter*, paragraph .17, states that corroborating information includes information obtained by the auditor from inquiry, observation, inspection, and physical examination. The quantity, type, and content of audit

documentation are matters of the auditor's professional judgment (see section 339.)

**.13**

The auditor's documentation of the results of auditing procedures directed at the tax accounts and related disclosures also should include sufficient competent evidential matter about the significant elements of the client's tax liability contingency analysis. This documentation should include copies of the client's documents, schedules, or analyses (or auditor-prepared summaries thereof) to enable the auditor to support his or her conclusions regarding the appropriateness of the client's accounting and disclosure of significant tax-related contingency matters. The audit documentation should reflect the procedures performed and conclusions reached by the auditor and, for significant matters, include the client's documentary support for its financial statement amounts and disclosures.

**.14**

The audit documentation should include the significant elements of the client's analysis of tax contingencies or reserves, including roll-forward of material changes to such reserves. In addition, the documentation should provide the client's position and support for income tax related disclosures, such as its effective tax rate reconciliation, and support for its intra-period allocation of income tax expense or benefit to continuing operations and to items other than continuing operations. Where applicable, the documentation also should include the client's basis for assessing deferred tax assets and related valuation allowances and its support for applying the "indefinite reversal criteria" in APB Opinion No. 23, *Accounting for Income Taxes—Special Areas*, including its specific plans for reinvestment of undistributed foreign earnings.

**.15**

*Question*—In some situations, a client may furnish its outside legal counsel or in-house legal or tax counsel with information concerning the tax contingencies covered by the accrual for income taxes included in the financial statements and ask counsel to provide the auditor an opinion on the adequacy of the accrual for those contingencies.

**.16**

In such circumstances, rather than inspecting and obtaining documentary evidence of the client's tax liability contingency analysis and making inquiries of the client, may the auditor consider the counsel as a specialist within the meaning of section 336, *Using the Work of a Specialist*, and rely solely on counsel's opinion as an appropriate procedure for obtaining evidential matter to support his or her opinion on the financial statements?

**.17**

*Interpretation*—No. The opinion of legal counsel in this situation would not provide sufficient competent evidential matter to afford a reasonable basis for an opinion on the financial statements.

**.18**

Section 336.01 defines a specialist as "a person (or firm) possessing special skill or knowledge in a particular field other than accounting or auditing." It is intended to apply to situations requiring special knowledge of matters about which the auditor does not have adequate technical training and proficiency. The auditor's education, training, and experience, on the other hand, do enable him or her to be knowledgeable concerning income tax matters and competent to assess their presentation in the financial statements.

**.19**

The opinion of legal counsel on specific tax issues that he or she is asked to address and to which he or she has devoted substantive attention, as contemplated by section 337, *Inquiry of a Client's Lawyer Concerning Litigation, Claims, and Assessments*, can be useful to the auditor in forming his or her own opinion. However, the audit of income tax accounts requires a combination of tax expertise and knowledge about the client's business that is accumulated during all aspects of an audit. Therefore, as stated above, it is not appropriate for the auditor to rely solely on such legal opinion.

**.20**

*Question*—A client may have obtained the advice or opinion of an outside tax adviser related to the tax accrual or matters affecting it, including tax contingencies, and further may attempt to limit the auditor's access to such advice or opinion, or limit the auditor's documentation of such advice or opinion. This limitation on the auditor's access may be proposed on the basis that such information is privileged. Can the auditor rely solely on the conclusions of third party tax advisers? What evidential matter should the auditor obtain and include in the audit documentation?

**.21**

*Interpretation*—As discussed in paragraphs .17 through .19 above, the auditor cannot accept a client's or a third party's analysis or opinion with respect to tax matters without careful consideration and application of the auditor's tax expertise and knowledge about the client's business. As a result of applying such knowledge to the facts, the auditor may encounter situations in which the auditor either disagrees with the position taken by the client, or its advisers, or does not have sufficient competent evidential matter to support his or her opinion.

**.22**

If the client's support for the tax accrual or matters affecting it, including tax contingencies, is based upon an opinion issued by an outside adviser with respect to a potentially material matter, the auditor should obtain access to the opinion, notwithstanding potential concerns regarding attorney-client or other forms of privilege. The audit documentation should include either the actual advice or opinions rendered by an outside adviser, or other sufficient documentation or abstracts supporting both the transactions or facts addressed as well as the analysis and conclusions reached by the client and adviser. Alternatives such as redacted or modified opinions may be considered, but must nonetheless include sufficient content to articulate and document

the client's position so that the auditor can formulate his or her conclusion. Similarly, it may be possible to accept a client's analysis summarizing an outside adviser's opinion, but the client's analysis must provide sufficient competent evidential matter for the auditor to formulate his or her conclusion. In addition, client representations may be obtained stating that the client has not received any advice or opinions that are contradictory to the client's support for the tax accrual.

**.23**

If the auditor is unable to accumulate sufficient competent evidence about whether there is a supported and reasonable basis for the client's position, the auditor should consider the effect of this scope limitation on his or her report.

[Issue Date: March, 1981; Amended: April 9, 2003.]

## 3.    The Auditor's Consideration of the Completeness Assertion

**.24**

*Question*—Section 326, *Evidential Matter*, paragraph .03, identifies five categories of assertions that are embodied in financial statement components. In obtaining audit evidence about four of these categories—existence or occurrence, rights and obligations, valuation or allocation, and presentation and disclosure—the auditor considers transactions and accounts that are included in the financial statements. In contrast, in obtaining audit evidence about the completeness assertion, the auditor considers whether transactions and accounts have been improperly excluded from the financial statements. May management's written representations and the auditor's assessment of control risk constitute sufficient audit evidence about the completeness assertion? [Paragraph renumbered by the amendment to Interpretation No. 2, April 2003.]

**.25**

*Interpretation*—Written representations from management are a part of the evidential matter the auditor obtains in an audit performed in accordance with generally accepted auditing standards. Management's representations about the completeness assertion, whether considered alone or in combination with the auditor's assessment of control risk, do not constitute sufficient audit evidence to support that assertion. Obtaining such representations complements but does not replace other auditing procedures that the auditor should perform. [Paragraph renumbered by the amendment to Interpretation No. 2, April 2003.]

**.26**

In planning audit procedures to obtain evidence about the completeness assertion, the auditor should consider the inherent risk that transactions and accounts have been improperly omitted from the financial statements. When the auditor assesses the inherent risk of omission for a particular account balance or class of transactions to be such that he believes omissions could exist that might be material when aggregated with errors in other balances or classes, he should restrict the audit risk of omission by performing substantive tests designed to obtain evidence about the completeness assertion. Substantive tests designed primarily to obtain evidence about

the completeness assertion include analytical procedures and tests of details of *related populations*. [fn 2] [Paragraph renumbered by the amendment to Interpretation No. 2, April 2003.]

**.27**

The extent of substantive tests of completeness may properly vary in relation to the assessed level of control risk. Because of the unique nature of the completeness assertion, an assessed level of control risk below the maximum may be an effective means for the auditor to obtain evidence about that assertion. Although an assessed level of control risk below the maximum is not required to satisfy the auditor's objectives with respect to the completeness assertion, the auditor should consider that for some transactions (e.g., revenues that are received primarily in cash, such as those of a casino or of some charitable organizations) it may be difficult to limit audit risk for those assertions to an acceptable level without an assessed level of control risk below the maximum. [Paragraph renumbered by the amendment to Interpretation No. 2, April 2003.]

[Issue Date: April, 1986.]

**4. Applying Auditing Procedures to Segment Disclosures in Financial Statements**

**.28**

*Introduction*—Financial Accounting Standards Board (FASB) Statement No. 131, *Disclosures about Segments of an Enterprise and Related Information* [AC section S30], establishes standards for the way that public business enterprises [fn 3] disclose information about segments in annual financial statements and in condensed financial statements of interim periods issued to shareholders. FASB Statement No. 131 [AC section S30] does not apply to nonpublic entities or to not-for-profit organizations, although those entities are encouraged to provide the disclosures described therein. FASB Statement No. 131 [AC section S30] is effective for fiscal years beginning after December 15, 1997. [Paragraph renumbered by the amendment to Interpretation No. 2, April 2003.]

**.29**

FASB Statement No. 131 [AC section S30] requires that public business enterprises report financial and descriptive information about their reportable operating segments including factors used to identify reportable segments; a measure of profit or loss, certain revenue and expense items, and assets of reportable operating segments and the basis of measurement of these items; and reconciliations of these measures and any other significant operating segment items to enterprise totals. FASB Statement No. 131 [AC section S30] requires that the management approach be used to identify operating segments and to measure the financial information disclosed about operating segments. The management approach focuses on the financial information that an entity's chief operating decision maker (chief executive officer, chief operating officer or other individual or group exercising similar decision-making authority) uses internally to evaluate the performance of, and to allocate resources to, segments. FASB Statement No. 131 [AC section S30] also requires that public business enterprises report certain information about products and services, geographic areas, and major customers regardless of

whether that information is used by management in assessing segment performance. [Paragraph renumbered by the amendment to Interpretation No. 2, April 2003.]

**.30**

*Question*—What is the auditor's objective when applying auditing procedures to segment disclosures in an entity's financial statements? [Paragraph renumbered by the amendment to Interpretation No. 2, April 2003.]

**.31**

*Interpretation*—The auditor performing an audit of financial statements in accordance with generally accepted auditing standards considers segment disclosures, as other informative disclosures, in relation to the financial statements taken as a whole. Accordingly, the auditor is not required to apply procedures as extensive as would be necessary to express an opinion on the segment information taken by itself. [Paragraph renumbered by the amendment to Interpretation No. 2, April 2003.]

**.32**

*Question*—What should the auditor consider with respect to segment disclosures in planning the audit? [Paragraph renumbered by the amendment to Interpretation No. 2, April 2003.]

**.33**

*Interpretation*—The auditor should obtain an understanding of who performs the function of the chief operating decision maker (CODM), and how management organizes the entity into operating segments for internal reporting purposes. The auditor also should consider the nature and extent of differences, if any, between the information systems used to generate data that the CODM uses to allocate resources to, and evaluate results of, the operating segments and the information systems that generate data for external reporting purposes. When a different system is used to generate the data underlying segment disclosures, the auditor needs to obtain only a general understanding of that system. Consistent with the management approach to accounting for segments, auditing procedures primarily are directed at obtaining sufficient competent evidential matter to support conclusions that the segment information disclosed is the same information that is used by the CODM; that the basis on which the information was prepared is the basis disclosed and the disclosures are adequate; that aggregation criteria have been appropriately applied, if applicable; and that all significant segment items are reconciled to consolidated totals in the financial statements. The types of procedures needed to obtain such evidence are described in paragraphs .35 and .37 of this Interpretation. [Paragraph renumbered by the amendment to Interpretation No. 2, April 2003.]

**.34**

*Question*—What procedures should the auditor consider performing to evaluate whether the entity appropriately identified its reportable operating segments in accordance with FASB Statement No. 131 [AC section S30]? [Paragraph renumbered by the amendment to

Interpretation No. 2, April 2003.]

**.35**

*Interpretation*—Procedures that the auditor should consider performing to evaluate whether the entity appropriately identified its reportable operating segments in accordance with FASB Statement No. 131 [AC section S30] include the following:

  *a.* Inquire of management concerning its methods of identifying operating segments, and consider the reasonableness of those methods in light of the characteristics of operating segments described in FASB Statement No. 131, paragraph 10 [AC section S30.109].

  *b.* Review corroborating evidence, such as information that the CODM uses to assess performance and allocate resources, material presented to the board of directors, minutes from the meetings of the board of directors, and information that management provides in management's discussion and analysis (MD&A), to financial analysts, and in the chairman's letter to shareholders, for consistency with financial statement disclosures.

  *c.* If the CODM uses more than one set of segment information for analyzing results of operations, consider whether management's identification of operating segments is in accordance with FASB Statement No. 131, paragraphs 13 through 15 [AC section S30.112-114].

  *d.* Assess whether the entity has applied aggregation criteria, if applicable, and quantitative thresholds described in FASB Statement No. 131, paragraphs 17 through 24 [AC section S30.116-123], appropriately to determine its reportable operating segments.

  *e.* Obtain management's written representation that operating segments are appropriately identified and disclosed in accordance with FASB Statement No. 131 [AC section S30].

[Paragraph renumbered by the amendment to Interpretation No. 2, April 2003.]

**.36**

*Question*—What procedures should the auditor consider performing to evaluate the adequacy and completeness of management's disclosures about reportable operating segments and about products and services, geographic areas, and major customers? [Paragraph renumbered by the amendment to Interpretation No. 2, April 2003.]

**.37**

*Interpretation*—The tests of underlying accounting records normally applied in an audit of financial statements may provide evidence about management's disclosures of information about products and services, geographic areas, and major customers, as well as how management allocates the entity's revenue, expenses, and assets among operating segments. The auditor should consider applying the following procedures to obtain additional evidence about segment disclosures:

*a.* Perform analytical procedures on the information about segments to identify and provide a basis for inquiry about relationships and individual items that appear to be unusual and may indicate misstatements. Analytical procedures, for purposes of this Interpretation, consist of comparison of the segment information with comparable information for the immediately preceding year and comparison of the segment information with any available related budgeted information for the current year. In applying these procedures, the auditor should consider the types of matters that in the preceding year have required accounting adjustments of segment information.

*b.* Evaluate the adequacy of disclosures with regard to (i) general information; (ii) information about reported segment profit or loss, segment assets, and the basis of measurement; and (iii) reconciliations of the totals of segment revenues, reported profit or loss, assets and other significant items to corresponding enterprise amounts, as required in FASB Statement No. 131, paragraphs 26 through 32 [AC section S30.125-131].

*c.* Review the reconciliations (including supporting schedules) of the totals of segment revenues, reported profit or loss, assets, and other significant items to consolidated totals to assess whether significant items are properly disclosed.

*d.* If the composition of an entity's reportable segments changes as a result of an entity's reorganization of its internal structure, assess whether segment information for prior periods has been restated, if practicable, in accordance with FASB Statement No. 131, paragraph 34 [AC section S30.133]. If restatement is not practicable, assess whether the segment information for the current period is stated under both the old basis and the new basis of segmentation in the year in which the change occurs, if practicable, in accordance with FASB Statement No. 131, paragraph 35 [AC section S30.134].

[Paragraph renumbered by the amendment to Interpretation No. 2, April 2003.]

**.38**

*Question*—What are the implications related to segment information for the auditor's report on the financial statements? [Paragraph renumbered by the amendment to Interpretation No. 2, April 2003.]

**.39**

*Interpretation*—The auditor's standard report on financial statements prepared in conformity with generally accepted accounting principles implicitly applies to segment information included in those statements in the same manner that it applies to other informative disclosures in the financial statements. The auditor's standard report would not refer to segment information unless the audit revealed a misstatement or omission relating to the segment information that is material in relation to the financial statements taken as a whole or the auditor was unable to apply the auditing procedures that he or she considered necessary in the circumstances. The auditor should consider qualitative as well as quantitative factors in evaluating whether such a matter is material to the financial statements taken as a whole. The significance of a matter to a particular entity (for example, a misstatement of the revenue and operating profit of a relatively small segment that is represented by management to be important to the future profitability of the entity), the

pervasiveness of a matter (for example, whether it affects the amounts and presentation of numerous items in the segment information), and the impact of a matter (for example, whether it distorts the trends reflected in the segment information) should all be considered in judging whether a matter relating to segment information is material to the financial statements taken as a whole. Accordingly, situations may arise in practice where the auditor will conclude that a matter relating to segment information is qualitatively material even though, in his or her judgment, it is quantitatively immaterial to the financial statements taken as a whole. [Paragraph renumbered by the amendment to Interpretation No. 2, April 2003.]

**.40**

If the auditor concludes that an omission or misstatement of segment information is material to the financial statements taken as a whole, he or she should consider the reporting guidance in section 508, *Reports on Audited Financial Statements*, paragraphs .35 through .42, relating to departures from generally accepted accounting principles. If the auditor has been unable to perform auditing procedures on segment information that he or she considers necessary, the auditor should consider the reporting guidance in section 508.22 through .26 relating to scope limitations. [Paragraph renumbered by the amendment to Interpretation No. 2, April 2003.]

**.41**

Auditors are not required to refer in their audit reports (*a*) to changes required by the implementation of FASB Statement No. 131 [AC section S30] or (*b*) to subsequent changes in operating segments, provided that the financial statements clearly disclose that the information presented in segment disclosures for earlier periods has been restated, where applicable. Such disclosure would be similar to that for reclassification of prior-year financial information made for comparative purposes. In financial statements where segment information for earlier periods has not been restated, auditors are not required to refer in their audit reports to the variance in disclosure between the comparative periods, provided the financial statements clearly disclose why the earlier periods have not been restated. [Paragraph renumbered by the amendment to Interpretation No. 2, April 2003.]

[Issue Date: August, 1998; Revised: April, 2003.]

---

**Footnotes (AU Section 9326 — Evidential Matter: Auditing Interpretations of Section 326):**

fn 1 See section 313, *Substantive Tests Prior to the Balance-Sheet Date* for guidance on the auditor's considerations before applying substantive tests to the details of asset or liability accounts at interim dates, including the relationship between the assessed level of control risk and such tests, and on extending the audit conclusions from such tests to the balance-sheet date. [Footnote added, August 1983, by issuance of Statement on Auditing Standards No. 45.]

fn 2 For purposes of this interpretation, a related population is a population other than the recorded account balance or class of transactions being audited that would be expected to contain evidence of whether all accounts or transactions that should be presented in that balance or class are so included.

fn 3 FASB Statement No. 131, paragraph 9 [AC section S30.108], states: "Public business enterprises are those business enterprises that have issued debt or equity securities that are traded in a public market (a domestic or foreign stock exchange

or an over-the-counter market, including local or regional markets), that are required to file financial statements with the
Securities and Exchange Commission, or that provide financial statements for the purpose of issuing any class of securities in
a public market."

Copyright © 2003, 2004, American Institute of Certified Public Accountants, Inc.

# AICPA Code of Professional Conduct Section 53

AICPA Code of Professional Conduct · Section 50 - Principles of Professional Conduct · ET Section 53

## ET Section 53 - Article II—The Public Interest

*Members should accept the obligation to act in a way that
will serve the public interest, honor the public trust, and
demonstrate commitment to professionalism.*

I.    **.01**

A distinguishing mark of a profession is acceptance of its responsibility to the public.
The accounting profession's public consists of clients, credit grantors, governments,
employers, investors, the business and financial community, and others who rely on
the objectivity and integrity of certified public accountants to maintain the orderly
functioning of commerce. This reliance imposes a public interest responsibility on
certified public accountants. The public interest is defined as the collective well-being
of the community of people and institutions the profession serves.

II.    **.02**

In discharging their professional responsibilities, members may encounter conflicting
pressures from among each of those groups. In resolving those conflicts, members
should act with integrity, guided by the precept that when members fulfill their
responsibility to the public, clients' and employers' interests are best served.

III.    **.03**

Those who rely on certified public accountants expect them to discharge their
responsibilities with integrity, objectivity, due professional care, and a genuine
interest in serving the public. They are expected to provide quality services, enter into
fee arrangements, and offer a range of services—all in a manner that demonstrates a
level of professionalism consistent with these Principles of the Code of Professional
Conduct.

IV.    **.04**

All who accept membership in the American Institute of Certified Public Accountants
commit themselves to honor the public trust. In return for the faith that the public
reposes in them, members should seek continually to demonstrate their dedication to
professional excellence.

# OPPOSITION EXHIBIT

# 5

# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

|  |  |
|---|---|
| CHEMTECH ROYALTY ASSOCIATES, L.P., by DOW EUROPE, S.A., as Tax Matters Partner )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES OF AMERICA, )<br><br>Defendant. ) | Case No.: 05-944-C-M 3 |

## COMPLAINT

Plaintiff, CHEMTECH ROYALTY ASSOCIATES, L.P., by DOW EUROPE, S.A., as Tax Matters Partner ("DESA" or "Plaintiff"), by and through its attorneys, pursuant to 26 U.S.C. § 6226, hereby complains against Defendant, United States of America, as follows:

## NATURE OF THE ACTION

1.    In this action Plaintiff challenges the proposed adjustments by the Internal Revenue Service ("IRS") of partnership items of a partnership, Chemtech Royalty Associates, L.P. ("Chemtech" or the "Partnership"),[1] on its federal partnership income tax returns for 1993 and 1994. The IRS's adjustments to Chemtech's federal partnership

---

[1] In 1998, the Partnership changed its name to Chemtech II, L.P. Chemtech currently owns and manages a chemical plant located in Plaquemine, Louisiana.

income tax returns, which seek to ignore the existence of Chemtech as a partnership, are erroneous.

2.    DESA was one of several partners in Chemtech, the only general partner, and the designated Tax Matters Partner. During 1993 and 1994, Chemtech properly was classified as a partnership, and its partners properly were treated as partners, for federal income tax purposes. The formation and operation of Chemtech had business purpose and economic substance, and the allocations of partnership items by Chemtech to its partners complied with the requirements of the Internal Revenue Code and applicable regulations.

3.    This action is a petition for readjustment of partnership items pursuant to section 6226 of the Internal Revenue Code of 1986, as amended (26 U.S.C. § 6226). Congress enacted section 6226 as part of a set of comprehensive rules for the audit and litigation of partnership tax issues in the Tax Equity and Fiscal Responsibility Act of 1982, codified at 26 U.S.C. §§ 6221 et seq. (the "TEFRA rules"). The TEFRA rules govern the treatment and litigation of federal partnership tax items. Although the adjustment of partnership items has tax consequences, a tax liability is not placed directly at issue in a TEFRA proceeding. At issue in this case is whether the IRS incorrectly adjusted certain partnership items, as defined by 26 U.S.C. § 6231(a)(3), of Chemtech for 1993 and 1994.

## PROCEDURAL BACKGROUND

4.    Prior to directly challenging Chemtech's partnership return under the TEFRA rules, the IRS challenged the Chemtech partnership in its audit of The Dow Chemical Company ("Dow"). Dow or its wholly-owned subsidiaries owned 100 percent

2

of DESA during Dow's 1993 and 1994 tax years.  Dow partners owned the majority of the capital interests in Chemtech during 1993 and 1994.

5.   As discussed further below, Dow paid arm's length royalties to Chemtech for the use of patents owned by Chemtech.  The IRS has never challenged the amount of these royalties.  Dow properly deducted such royalty payments on its 1993 and 1994 tax returns as ordinary and necessary business expenses under 26 U.S.C. § 162.

6.   In the course of the audit of Dow's 1993 and 1994 tax years, the IRS proposed disallowing most of Dow's deductions for royalty payments made to Chemtech for the use of Chemtech's patents.  The IRS argued, among other things, that the formation of Chemtech lacked economic substance or that, alternatively, the formation of Chemtech was in substance a loan transaction rather than the formation of a partnership.

7.   Under the TEFRA rules, whether a partnership-level transaction should be respected for tax purposes constitutes a "partnership item" that must be resolved at the partnership level through a TEFRA proceeding.  Where a tax liability is predicated on an adjustment to partnership items, those partnership items must first be determined at the partnership level through a TEFRA proceeding.

8.   If the adjustments in the FPAA are sustained, the IRS may seek to disallow Dow's royalty expense deductions corresponding to disallowed partnership items of income.  If the IRS were to disallow these royalty deductions, Dow's income would be increased in an amount approximately corresponding to such deductions, and its tax liability would be increased accordingly.

3

## PARTIES

9.    Plaintiff DESA is incorporated in the Canton of Zurich, Switzerland, and is headquartered at Bachtobelstrasse 3, CH-8810, Horgen, Switzerland. For federal income tax purposes, DESA was a controlled foreign corporation ("CFC") of Dow during 1993 and 1994 because it was organized under the laws of a foreign country and Dow owned (directly or indirectly) 100% of DESA. See 26 U.S.C. § 957(a). DESA was the sole general partner of Chemtech during 1993 and 1994 and held a 1.06% capital interest therein.

10.    DESA is the Tax Matters Partner ("TMP") of Chemtech for each of the years at issue within the meaning of 26 U.S.C. § 6231(a)(7). DESA was properly designated as TMP in accordance with 26 U.S.C. § 6231(a)(7) and the partnership agreement. As the sole general partner, DESA was the only partner eligible to be designated as TMP. See 26 C.F.R. § 301.6231(a)(7)-1(b)(1).

11.    The TEFRA rules give DESA, as TMP, certain rights and responsibilities in the TEFRA proceedings including acting in a representative capacity. In its capacity as the TMP of Chemtech, DESA is the authorized and proper party to bring this action under 26 U.S.C. § 6226(a).

12.    Defendant is the United States of America.

## JURISDICTION AND VENUE

13.    Jurisdiction is proper in this Court pursuant to 26 U.S.C. § 6226(a) and 28 U.S.C. § 1346(e).

14.    The principal place of business of Chemtech is located in Plaquemine, Louisiana. Venue thus is proper in this Court pursuant to 26 U.S.C. § 6226(a)(2).

15.     Chemtech timely filed its U.S. Returns of Partnership Income (Form 1065) with the IRS for 1993 and 1994 (the "Partnership Tax Returns").

16.     On April 15, 2005, the IRS hand-delivered a package of materials including a Notice of Final Partnership Administrative Adjustment ("FPAA") to Dow. A copy of this package is attached as Exhibit A.

17.     On April 29, 2005, the IRS mailed a package of materials including an amended schedule (Form 4605-A) to Plaintiff in its capacity as the Tax Matters Partner for Chemtech for 1993 and 1994. On April 29, 2005, the IRS also mailed a copy of this package to the Partnership in Plaquemine, Louisiana. A copy of this package (as received in Plaquemine) is attached as Exhibit B.

18.     The IRS letter accompanying the Form 4605-A states that the summary report on the examination of Chemtech "explains all proposed adjustments including facts, law and conclusion." However, neither the FPAA nor the Form 4605-A in fact alleges any facts or articulates any theories, analysis, rationale, or other explanation supporting the IRS's adjustments of partnership items. As discussed above, the IRS proposes to disallow royalty deductions of Dow for royalties paid during 1993 and 1994 by Dow to Chemtech on various theories, including that the Chemtech transaction should not be respected for federal income tax purposes. Because Dow's royalty deductions are not partnership items, they are not directly at issue in the present proceeding.

19.     Because the adjustments in the FPAA reduce the Partnership's partnership items to zero, and because the IRS has taken the position in its audit of Dow that Chemtech was not a partnership, Plaintiff assumes for purposes of this Complaint that the IRS based its FPAA adjustment on a theory that the Partnership should not be recognized

for federal income tax purposes. Such a theory, or any other theory that disregards the Chemtech Partnership in whole or in part, is without basis in law or fact, and therefore the adjustments are erroneous.

20.    At all times during Chemtech's 1993 and 1994 tax years, Chemtech properly treated each partner in the Partnership as a partner, both for purposes of Delaware state law and for purposes of the federal income tax laws.

21.    The Partnership's allocations of partnership items conformed with the requirements of subchapter K of the Internal Revenue Code, 26 U.S.C. §§ 701, et seq., applicable to partnerships, and the applicable Treasury Regulations governing the allocation of partnership items.

22.    Plaintiff is timely filing this Complaint pursuant to 26 U.S.C. § 6226(a) within ninety (90) days after the date that the FPAA was issued by the IRS.

23.    Section 6226(e)(1) requires that a partner filing a petition for readjustment of partnership items deposit with the Secretary of the Treasury the amount by which the tax liability of the partner would be increased if the treatment of partnership items on the partner's return were made consistent with the treatment of the items on the partnership return, as adjusted by the FPAA. DESA is not required to make a deposit in this case.

24.    DESA was not subject to U.S. tax on its income from Chemtech and, in any event, the proposed adjustments reduce the amount of Partnership income allocable to DESA. Therefore, if the treatment of partnership items on DESA's return were made consistent with the treatment of partnership items on the partnership return, as adjusted by the FPAA, the U.S. tax liability of DESA would not be increased.

6

25.    As a CFC, DESA is not a "pass-thru partner" as defined in 26 U.S.C. §
6231(a)(9).  See 64 Fed. Reg. 61,499 (Nov. 12, 1999).  Because DESA is not a pass-thru
partner, neither Dow nor DESA is required to deposit the amount by which the tax
liability of Dow would be increased if the treatment of partnership items on the partner's
return were made consistent with the treatment of partnership items on the partnership
return, as adjusted by the FPAA.

26.    Accordingly, Plaintiff determined in good faith that no deposit under
under 26 U.S.C. § 6226(e)(1) is required.

## FACTS COMMON TO ALL CLAIMS

### Business Rationale for the Formation of Chemtech

27.    Dow is a leading science and technology company that provides
innovative chemical, plastic, and agricultural products and services to many essential
consumer markets.  In 2004, Dow had annual sales of approximately $40 billion and
employed approximately 43,000 people.  Dow serves customers in 175 countries and a
wide range of markets that are vital to human progress, including food, transportation,
health and medicine, personal and home care, and building and construction, among
others.  Committed to the principles of sustainable development, Dow and its employees
seek to balance economic, environmental and social responsibilities. The Company has
164 manufacturing sites in 37 countries and supplies more than 3,300 products grouped
within operating segments.

28.    Dow is a capital-intensive company for which ready access to capital is
critical.. Its business is cyclical in nature.  Historically, Dow has followed a strategy of
investing in new plants during the "trough" years of the business cycle, when cash flow is

low or even negative. In the early 1990s, Dow was undergoing a period of difficult business conditions and reduced earnings.

29.    Dow's ability to raise capital at reasonable cost depends upon Dow maintaining its credit ratings with ratings agencies. In order to minimize the risk of a credit downgrade, Dow decided to meet its funding requirements in part through Chemtech. At the time Chemtech was formed, Dow was able to monetize valuable patent assets and to obtain $200 million in third-party capital that was treated for financial accounting purposes as minority equity.

30.    Dow understood that the ratings agencies did not view minority equity as debt for balance sheet purposes, and therefore minority equity did not adversely affect Dow's debt/equity ratios used by the ratings agencies. Thus, minority equity financing enabled Dow to raise capital in an efficient way without impacting Dow's access to capital markets.

31.    The Chemtech transaction was part of Dow's overall financial strategy, which allowed Dow (1) to maintain financial flexibility by avoiding a ratings downgrade, and (2) to raise working capital as well as capital to cover long-term projects that Dow might need to fund in the future.

**Formation and Operation of Chemtech**

32.    In order to achieve these objectives, Dow contributed the patents to a special purpose limited partnership that would attract the capital of investors.

33.    Dow transferred ownership of patents, valued at $866,966,000, to Diamond Technologies Partnership Corporation ("DTPC"), a wholly owned subsidiary, for 100 percent of its stock. Upon DTPC's subsequent contribution of these patents to

8

Chemtech on April 30, 1993, Dow and Chemtech executed a non-exclusive license agreement under which Dow paid to Chemtech on a quarterly basis an annual arm's length royalty for the right to use the patents. The annual royalty consisted of a fixed minimum royalty plus a variable royalty tied to sales. This variable royalty provided significant upside potential for the Partnership.

34. As of the end of 1993, Chemtech's structure consisted of three classes of partnership interests: a general partnership interest owned by DESA, which held approximately a one percent capital interest and was the managing partner; "Class A" limited partnership interests owned by five foreign investors (Kredietbank N.V., National Westminster Bank Plc, Rabo Merchant Bank N.V., Dresdner Bank AG, and Bank Brussels Lambert), which ultimately held approximately a collective 19 percent capital interest; and a "Class B" limited partnership interest, owned by DTPC, which held approximately an 80 percent capital interest.

35. DTPC contributed the patents and 100 percent of the stock of Chemtech Portfolio, Inc. ("CPI"), while the other partners contributed cash. The Class A partners ultimately contributed an aggregate of $200,000,000 in exchange for their partnership interests.

36. After the stock of CPI was contributed to Chemtech, CPI invested and otherwise managed partnership funds as a subsidiary of the partnership.

37. During the years in issue, Chemtech was actively engaged in the management of partnership assets.

38. Chemtech's assets generated material positive cash flows and pre-tax income.

39.   The formation and operation of Chemtech had economic substance, including, without limitation, the joint investment in the material capital contributions of all partners and the sharing of the pre-tax results thereof.

40.   Chemtech's resulting income and losses were shared by the Chemtech partners in accordance with the allocations in the partnership agreement.

41.   The allocation provisions contained in the partnership agreement complied with all applicable provisions of the Internal Revenue Code and the Treasury Regulations, including without limitation 26 U.S.C. §§ 704(b) and 704(c). The amount of Chemtech's partnership items and the distributive share of such partnership items of each Chemtech partner set forth in the Partnership Tax Returns for 1993 and 1994 are correct as a matter of law and fact. These distributive shares of partnership items reflect the application of the allocation provisions of the partnership agreement and the mandatory application of 26 U.S.C. § 704(c).

## COUNT I

### Erroneous Adjustment to Partnership Items for 1993 Tax Year

42.   Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 41 as if fully set forth in this paragraph 42.

43.   The adjustments to the partnership items made by the IRS in the FPAA with respect to the 1993 tax year are erroneous. Such adjustments are based upon the erroneous determination that the Partnership had no partnership items during 1993.

44.   The FPAA is deficient for failing to set forth grounds for the adjustments to partnership items of Chemtech.

10

45.   In any event, no grounds exist to disregard Chemtech or otherwise to reallocate partnership items among the partners for 1993.

46.   Each of the IRS's proposed reallocations of partnership items is erroneous.

## COUNT II

### Erroneous Adjustment to Partnership Items for 1994 Tax Year

47.   Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 41 as if fully set forth in this paragraph 47.

48.   The adjustments to the partnership items made by the IRS in the FPAA with respect to the 1994 tax year are erroneous. Such adjustments are based upon the erroneous determination that the Partnership had no partnership items during 1994.

49.   The FPAA is deficient for failing to set forth grounds for the adjustments to partnership items of Chemtech.

50.   In any event, no grounds exist to disregard Chemtech or otherwise to reallocate partnership items among the partners for 1994.

51.   Each of the IRS's proposed reallocations of partnership items is erroneous.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

1.   That this Court determine that the IRS's adjustments of Chemtech's partnership items for 1993 and 1994 contained in the FPAA are erroneous;

2.   That this Court determine that the partnership items for 1993 and 1994 are reported correctly on Chemtech's Partnership Tax Returns for said years; and

11

3. That this Court grant such other and further relief to which Plaintiff and Chemtech's other partners are entitled as well as any other relief that the Court deems just and appropriate.

Respectfully submitted this 13th day of July 2005.

PLAINTIFF
CHEMTECH ROYALTY ASSOCIATES, L.P., by
DOW EUROPE, S.A., as Tax Matters Partner

David M. Bienvenu, Jr., No. 20700
Jason M. Decuir, No. 28015
TAYLOR, PORTER, BROOKS & PHILLIPS
Post Office Box 2471
Baton Rouge, LA 70821
Telephone: (225) 387-3221
Facsimile: (225) 346-8049

Dow Europe, S.A.
Bachtobelstrasse 3
CH-8819
Horgen, Switzerland

John B. Magee
David J. Curtin
Raj Madan
Hartman E. Blanchard, Jr.
Ronald L. Buch, Jr.
(applications pro hac vice submitted concurrently)
MCKEE NELSON LLP
1919 M Street, N.W., Suite 800
Washington, D.C. 20036
Telephone: (202) 775-1880
Facsimile: (202) 775-8586

12

# INTERVENORS' EXHIBIT

# B

CLERK=S OFFICE                              CO-932
UNITED STATES DISTRICT COURT                Rev. 4/96
FOR THE DISTRICT OF COLUMBIA

NOTICE OF DESIGNATION OF RELATED CIVIL CASES PENDING
IN THIS OR ANY OTHER UNITED STATES COURT

Civil Action No. _____
(To be supplied by the Clerk)

NOTICE TO PARTIES:

Pursuant to Rule 40.5(b)(2), you are required to prepare and submit this form at the time of filing any civil action which is related to any pending cases or which involves the same parties and relates to the same subject matter of any dismissed related cases. This form must be prepared in sufficient quantity to provide one copy for the Clerk=s records, one copy for the Judge to whom the cases is assigned and one copy for each defendant, so that you must prepare 3 copies for a one defendant case, 4 copies for a two defendant case, etc.

NOTICE TO DEFENDANT:

Rule 405(b)(2) of this Court requires that you serve upon the plaintiff and file with your first responsive pleading or motion any objection you have to the related case designation.

NOTICE TO ALL COUNSEL

Rule 405(b)(3) of this Court requires that as soon as an attorney for a party becomes aware of the existence of a related case or cases, such attorney shall immediately notify, in writing, the Judges on whose calendars the cases appear and shall serve such notice on counsel for all other parties.

_____

The plaintiff, defendant or counsel must complete the following:

1.    RELATIONSHIP OF NEW CASE TO PENDING RELATED CASE(S).

A new case is deemed related to a case pending in this or another U.S. Court if the new case:  [Check appropriate box(es) below.]

  [  ]  (a)    relates to common property

  [  ]  (b)    involves common issues of fact

  [✗]  (c)    grows out of the same event or transaction

  [  ]  (d)    involves the validity or infringement of the same patent

  [  ]  (e)    is filed by the same pro se litigant

2.    RELATIONSHIP OF NEW CASE TO DISMISSED RELATED CASE(ES)

A new case is deemed related to a case dismissed, with or without prejudice, in this or any other U.S. Court, if the new case involves the same parties and same subject matter.

Check box if new case is related to a dismissed case:  [  ]

3.    NAME THE UNITED STATES COURT IN WHICH THE RELATED CASE IS FILED (IF OTHER THAN THIS COURT):

United States District Court, Middle District of Louisiana

4.    CAPTION AND CASE NUMBER OF RELATED CASE(ES). IF MORE ROOM IS NEED PLEASE USE OTHER SIDE.

Chemtech Royalty Associates, L.P.          v.  United States of America          C.A. No.  05-944

June 30, 2008
DATE                                        Signature of Plaintiff/Defendant (or counsel)

# INTERVENORS' EXHIBIT

# C

A 88 (Rev. 11/91) Subpoena in a Civil Case

# United States District Court

DISTRICT OF _____    Columbia

Chemtech Royalty Associates, L.P.,
by Dow Europe, S.A., as Tax Matters Partner

## SUBPOENA IN A CIVIL CASE

PLAINTIFF

v.

United States of America

CASE NUMBERS: **05-944-RET-DLD, 06-258-RET-DLD, and 07-405-RET-DLD** (M.D. La.)

DEFENDANT

TO:    Deloitte & Touche USA, LLP.

555 12th St. N.W., Suite 500
Washington, District Of Columbia 20004-1207

☐ **YOU ARE COMMANDED** to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☒ **YOU ARE COMMANDED** to appear at the place, date, and time specified below at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Tax Division, Department of Justice, 555 4th Street, NW, Suite 6235, Washington, D.C. 20001 | Friday, November 9, 2007 at 9:30 a.m. |

☒ **YOU ARE COMMANDED** to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):
SEE ATTACHMENT

| PLACE | DATE AND TIME |
|---|---|
| By Federal Express (or in person) to: Brian R. Harris, Tax Division, Department of Justice, 555 4th Street, NW, Suite 6235, Washington, D.C. 20001 | Friday, October 5, 2007 at 9:30 a.m. |

☐ **YOU ARE COMMANDED** to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| _(signature)_  (Attorney for Defendant) | September 20, 2007 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER Brian R. Harris, Trial Attorney, Tax Division, Department of Justice, P. O. Box 14198, Ben Franklin Station, Washington, D.C. 20044 -- Telephone: (202) 514-6483

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)



A. 88 (Rev. 11/91) Subpoena in a Civil Case

---

## PROOF OF SERVICE

| DATE | PLACE |
|---|---|

**SERVED**

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

---

## DECLARATION OF SERVICE

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph(d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it
(i) fails to allow reasonable time for compliance;
(ii) require a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transactions business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend

trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or
(iv) subjects a person to undue burden
(B) if a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## DELOITTE SUBPOENA ATTACHMENT

Pursuant to Rule 45 of the Federal Rules of Civil Procedure, the United States requests that Deloitte produce the documents described more fully below.

### Definitions and Instructions

A.      The term "Deloitte" refers to Deloitte Touche Tohmatsu, S.V., its member firms and their respective subsidiaries and affiliates, and includes partners, principals, employees and any other representative.

B.      The term "Dow" refers to The Dow Chemical Company, its subsidiaries, agents, employees, representatives, and/or attorneys.

C.      The term "Chemtech" refers to Chemtech Royalty Associates, L.P. and Chemtech II, L.P., its subsidiaries, related entities, agents, employees, representatives, and/or attorneys.

D.      The term "Chemtech Portfolio" refers to Chemtech Portfolio, Inc., and Chemtech Portfolio II, Inc., its subsidiaries, related entities, agents, employees, representatives, and/or attorneys.

E.      The terms "document" and "writing" are to be liberally construed to include all originals, copies, and non-identical copies (whether by reason of handwritten notations thereon or otherwise), of written and documentary materials, as well as recordings and sound reproductions, including but not limited to correspondence, letters, notes, telecopies, facsimiles, correspondence, agreements, drafts, memoranda, contracts, term sheets, engagement letters, proposals, presentations, promotional materials, offering memoranda, prospectuses, presentations, reports, books, records, journals, ledgers, minutes, telecopier logs or transmission receipts, financial statements, telephone message slips, telephone invoices, computer print-outs, electronic mail messages, worksheets, drawings, specifications, and invoices. "Document" and "writing" shall also include any electronically stored information including but not limited to any file, document, data, electronic mail messages, words or information, in draft or final form, on a computer disk or similar storage device or hard drive or in the memory of a computer network or mainframe or on a file server. Any such document is to be printed and produced on paper, as hard copy, as well as provided in the electronic format in which it is stored.

F.      The term "person" includes a corporation, partnership, or other business association or entity, and unincorporated association, a natural person, or any government or governmental body, commission, board or agency.

G.      The terms "communication" and "correspondence" mean any oral or written utterance, notation or statement of any nature whatsoever, by and to whomsoever.

-1-

07/01/2008 04:43 FAX 202 879 5353     DELOITTE & TOUCHE, LLP     ☒031
Case 1:08-mc-00411-RJL    Document 7-9    Filed 08/25/2008    Page 5 of 7
06/30/08   16:02 FAX            TAX DIVISION           ☒031

H.      Unless otherwise noted, the relevant time period is January 1, 1993 through December 31, 2003 <u>and</u> the period during which Deloitte was performing work for Dow, Chemtech, and/or Chemtech Portfolio for the tax years 1993 through 2003.

<u>Claims of Privilege</u>. If Deloitte declines to produce any document in response to any of the requests set forth below, please provide a privilege log.

## DOCUMENTS REQUESTED

1.    All communications with Dow (in connection with Chemtech), Chemtech, and/or Chemtech Portfolio, including but not limited to management letters, engagement letters, retention letters, and other correspondence. This includes, but is not limited to, communications between Deloitte and the Board of Directors, audit committee, member committee, finance committee and/or any other committees of Dow (in connection with Chemtech), Chemtech, and/or Chemtech Portfolio.

2.    All documents identifying or referring to all Deloitte employees, partners, agents, affiliates, contractors, counsel, advisors or experts, who provided any service to Dow (in connection with Chemtech), Chemtech, and Chemtech Portfolio.

3.    All audit planning materials concerning any audit or review of Dow (in connection with Chemtech), Chemtech, and/or Chemtech Portfolio, including but not limited to audit planning memos, descriptions of the limited partnership arrangement, which may include written memoranda, flowcharts, e-mails, notes, facsimiles or any other documents which portray the nature of the arrangement.

4.    All documents relating to any audit, reviews, workpapers and permanent files, financial statements items, SEC filings and public disclosures during the relevant time period, including all documents relating to all financial statements prepared on a GAAP basis or a Partnership basis (or any other basis that might have been used) with respect to Dow (in connection with Chemtech), Chemtech, and Chemtech Portfolio.

5.    All documents concerning the policies, practices or procedures relating to all formal or informal accounting standards in connection with the limited partnership arrangement and all documents concerning any deviation from the established policies, practices or procedures for the Dow (in connection with Chemtech), Chemtech, and Chemtech Portfolio.

6.    All documents concerning any formal or informal internal control policies, practices or procedures in connection with the limited partnership arrangement and all documents concerning any deviation from the established internal control policies, practices and procedures for the Dow (in connection with Chemtech), Chemtech, and Chemtech Portfolio.

-2-

7.  All documents concerning any revenue recognition policies and procedures of Chemtech, including but not limited to any analyses of Chemtech's royalty income during the relevant time period.

8.  All communications between Deloitte and any national securities exchange, including the SEC, with respect to Dow (in connection with Chemtech), Chemtech, and Chemtech Portfolio.

9.  All documents exchanged between Deloitte and any national securities exchange, including the SEC, with respect to Dow (in connection with Chemtech), Chemtech, and Chemtech Portfolio.

10.  All documents, memoranda and communications concerning compliance with GAAP for Dow (in connection with Chemtech), Chemtech, and Chemtech Portfolio.

11.  All documents concerning any adjustments, changes or revisions to the financial results, on a quarterly and annual basis for the Dow (in connection with Chemtech), Chemtech, and Chemtech Portfolio.

12.  All documents concerning any audit, review, analysis or report concerning compliance with (i) its own internal policies and practice, (ii) state and federal laws for the Dow (in connection with Chemtech), Chemtech, and Chemtech Portfolio.

13.  All documents concerning the accuracy, adequacy, or completeness of the disclosures contained in the financial statements of Dow (in connection with Chemtech), Chemtech, and Chemtech Portfolio.

14.  All documents sufficient to identify all reports generated for internal and external financial reporting purposes for Dow (in connection with Chemtech), Chemtech, and Chemtech Portfolio.

15.  All documents concerning the financial effects to Dow related to its participation in Chemtech, including all documents created and/or used in preparing its financial statements, including but not limited to the following:

   a.  Chart of general ledger accounts with a description for the use of each account for Chemtech and Chemtech Portfolio;

   b.  All books and records reflecting the establishment and subsequent activity in the minority interest account on the books of Dow with respect the outside investors' limited partner interests between 1993 and 2003;

-3-

      c.       All books and records of Dow reflecting the accounting for the assets, liabilities, results of operations and cash flows of Chemtech and Chemtech Portfolio between 1993 and 2003;

      d.       Internal financial statements of Chemtech and Chemtech Portfolio, including top-sided journal entries, general journal and adjusting entry summaries for all quarterly and year-end periods between 1993 and 2003; and

      e.       Year-end trial balances and general ledgers for Chemtech and Chemtech Portfolio between 1993 and 2003.

16.     All other documents not otherwise requested in requests above, concerning any professional services performed for Dow (in connection with Chemtech), Chemtech, and Chemtech Portfolio, including but not limited to: (i) auditing and (ii) consulting.

17.     All documents relating to Dow (in connection with Chemtech), Chemtech, and Chemtech Portfolio, including, without limitation, correspondence files and written communications electronically preserved including but not limited to e-mail and instant messages.

18.     All documents related to or referring to Chemtech or Chemtech Portfolio.

19.     All documents provided to you by Dow (or any other entity) related to an audit, exam or other review of Dow (in connection with Chemtech), Chemtech, and Chemtech Portfolio.

20.     All documents concerning your document destruction, retention and alteration policy from 1993 - present.

-4-

# INTERVENORS' EXHIBIT

# D

07/01/2008 04:46 FAX 202 879 5353   DELOITTE & TOUCHE LLP                    034
06/30/08 16:02 FAX  Case 1:08-mc-00411-RJL   Document 7-10   TAX DIVISION   Filed 08/25/2008   Page 2 of 4   034

SEP-28-2007  12:34        D&T USA LLP NO LEGAL              212 653 3475   P.02/04

# Deloitte.

Deloitte & Touche USA LLP
1633 Broadway
New York, NY 10019-6754
USA

Tel: +1 212 492 4000
Fax: +1 212 492 4201
www.deloitte.com

September 28, 2007

<u>Via Facsimile and US Mail</u>
Brian R. Harris, Trial Attorney
U.S. Department of Justice, Tax Division
Civil Trial Section, Southern Region
P.O. Box 14198, Ben Franklin Station
Washington, D.C. 20044

Re:   *Chemtech Royalty Associates, LP v. USA*
      *Case No. 05-944 (M.D. La.)*
      Subpoena addressed to Deloitte & Touche USA, LLP

Dear Mr. Harris:

I write regarding the subpoena addressed to Deloitte & Touche USA, LLP ("Deloitte & Touche USA") in the above referenced matter. I unsuccessfully attempted to reach you by telephone to discuss this matter. While Deloitte & Touche USA, Deloitte & Touche LLP, Deloitte Tax LLP, Deloitte Consulting LLP and Deloitte Financial Advisory Services LLP (collectively "Deloitte US Firms") are prepared to discuss the scope of the subpoena and other concerns with you, the Deloitte US Firms are objecting pursuant to Federal Rule of Civil Procedure 45 in order to preserve their rights pending such discussions. The Deloitte US Firms' objections to the subpoena are as follows:

1.   The Deloitte US Firms object to the subpoena to the extent that it purports to require the production of documents which are protected by the accountant-client privilege, the attorney-client privilege, the work product doctrine, the privilege of self-critical analysis or any other applicable privilege, rule, or duty of confidentiality which precludes or limits production or disclosure of information therein;

2.   The Deloitte US Firms object to the subpoena to the extent that it seeks the production of tax returns or tax return preparation materials, including workpapers and correspondence, which the Deloitte US Firms are precluded from disclosing under Section 7216 of title 26 of the United States Code or any other information which the Deloitte US Firms are precluded from disclosing under other applicable statutes or regulations;

3.   The Deloitte US Firms, non-parties to this action, object to the subpoena to the extent that it calls for the production of documents



Member of
Deloitte Touche Tohmatsu

which constitute proprietary information, trade secrets and/or other confidential, research, development or commercial information of the Deloitte US Firms. Such documents have been developed at great expense to and effort by the Deloitte US Firms and their disclosure would be competitively harmful to the Deloitte US Firms. No confidentiality stipulation provides adequate protection for their production. Further, such documents are neither relevant to the subject matter of the pending action nor reasonably calculated to lead to the discovery of admissible evidence;

4.      The Deloitte US Firms object to the subpoena to the extent that it purports to require the preservation, review and production of documents and data from legacy data sources, including data sources maintained for disaster-recovery related purposes only, obsolete data, data preserved for matters unrelated to this Request and other non-active data, including data on historic back-up tapes, hard drives and other media in the possession of the Deloitte US Firms which are no longer in use. Generally, such data is not reasonably accessible and likely is duplicative of data available from other active and readily accessible sources. Because of the lack of relevance of such legacy data and the cost associated with searching, preserving and accessing the legacy data sources, the Deloitte US Firms, non-parties to this matter, will not preserve and search legacy data sources in response to this Request;

5.      The Deloitte US Firms object to the scope of the subpoena as overbroad, unduly burdensome and oppressive, and not reasonably calculated to lead to the discovery of admissible evidence to the extent that it purports to require the Deloitte US Firms to search not only their own offices for relevant documents, but also the offices of other entities, including other members of Deloitte Touche Tohmatsu;

6.      The subpoena was not served sufficiently in advance of its return date so as to allow the Deloitte US Firms adequate time to respond.

In making the above objections, the Deloitte US Firms are not suggesting or implying in any way that they have documents responsive to a particular Request.

07/01/2008 04:47 FAX 202 879 5353     DELOITTE & TOUCHE, LLP                    036
Case 1:08-mc-00411-RJL     Document 7-10     Filed 08/25/2008     Page 4 of 4
06/30/08  16:03 FAX                          TAX DIVISION
                                                              212  653 3475    P.04/04

SEP-28-2007  12:35        D&T USA LLP ND LEGAL

The Deloitte US Firms would like to resolve their objections without burdening the court with motion practice. We would appreciate an opportunity to discuss the subpoena, the document requests and the objections with you. I can be reached at (202)879-5662.

Thank you for your anticipated cooperation.

Sincerely,

Eric Winw
Assistant General Counsel

Cc: John Magee

TOTAL P.04

# INTERVENORS' EXHIBIT

# E

# Deloitte.

Deloitte & Touche USA LLP
Suite 500
555 12th Street N.W.
Washington, DC 20004-1207
USA

Tel: +1 202 879 5600
Fax: +1 202 879 5353
www.deloitte.com

December 21, 2007

<u>Via Hand Delivery</u>
Brian R. Harris, Trial Attorney
U.S. Department of Justice, Tax Division
555 4th Street, NW
Suite 6235
Washington, D.C. 20001

Re:     *Chemtech Royalty Associates, LP v. USA*
        *Case No. 05-944 (M.D. La.)*
        Subpoena addressed to Deloitte & Touche USA, LLP

Dear Mr. Harris:

Pursuant to the above referenced subpoena, enclosed are materials numbered DT 1 through DT 2910 that we believe are responsive to the subpoena.

We have been informed by plaintiff's counsel that other materials are subject to a claim of privilege being asserted by the plaintiff. Consequently, those materials have not been produced. I understand that plaintiff's counsel will prepare and produce a privileged log identifying that material.

You can reach me at (202)879-5662 if you have any questions or wish to discuss this matter further.

Very truly yours,

Eric P. Witiw
Assistant General Counsel

Cc: Phil MacWilliams



GOVERNMENT
EXHIBIT
3

Member of
Deloitte Touche Tohmatsu

# INTERVENORS' EXHIBIT

# F

DOW CHEM

# Deloitte.

Deloitte & Touche USA LLP
Suite 500
555 12th Street N.W.
Washington, DC 20004-1207
USA

Tel: +1 202 879 5600
Fax: +1 202 879 5353
www.deloitte.com

January 11, 2008

Brian R. Harris, Trial Attorney
U.S. Department of Justice, Tax Division
555 4th Street, NW
Suite 6235
Washington, D.C. 20001

Re:    *Chemtech Royalty Associates, LP v. USA*
       *Case No. 05-944 (M.D. La.)*
       Subpoena addressed to Deloitte & Touche USA, LLP

Dear Mr. Harris:

Pursuant to our December 21, 2007 letter concerning the above referenced matter, attached is a privileged log prepared by counsel for the plaintiff relating to the information that was not produced and the bases therefore.

You can reach me at (202)879-5662 if you have any questions or wish to discuss this matter further.

Very truly yours,

Eric P. Witiw
Assistant General Counsel

Cc: Phil MacWilliams

GOVERNMENT
EXHIBIT
4

Member of
Deloitte Touche Tohmatsu

Chemtech Royalty Associates, L.P. by Dow Europe S.A. v. United States
Civil Actions Nos. 05-944-C-M3 and 06-258-RET-CN
and
Chemtech II, L.P. by Ifco, Inc. v. United States
Civil Action No. 07-CV-00405-RET-DLD

Privilege Log Related to September 28, 2007 Subpoena to Deloitte & Touche

| Date | Author | Addressee | Document Type | Privilege Type | Privilege Basis | Subject Matter |
|---|---|---|---|---|---|---|
| 6/20/2005 | McKee Nelson LLP | William L. Curry | Tax Opinion | Attorney-Client Privilege and Attorney Work Product | Confidential communication between client and lawyer for purposes of facilitating the rendition of legal services or legal advice to the client; Document prepared in anticipation of litigation | Tax issues related to the Chemtech partnership |
| 9/15/1998 | Michael Cone and Craig Jones | File | Memorandum and Flow Chart | Attorney-Client Privilege, Attorney Work Product, and 7525 Tax Practitioner's Privilege | Confidential communication reflecting client-supplied information between client's lawyers, or from client's lawyers to file, for purposes of facilitating the rendition of legal services or legal | Tax issues related to the Chemtech partnership |

07/01/2008 04:53 FAX 202 879 5353          DELOITTE & TOUCHE, LLP                          ☑003
    06/30/08  16:06 FAX                            TAX DIVISION                              ☑003
Case 1:08-mc-00411-RJL    Document 7-12    Filed 08/25/2008    Page 4 of 4

02/08/2008 04:39 FAX 202 879 5353          DELOITTE & TOUCHE. LLP                           ☑004

| Date | Author | Addressee | Document Type | Privilege Type | Privilege Basis | Subject Matter |
|---|---|---|---|---|---|---|
| 7/21/1993 | Robert V. Valdez | File | Draft Memorandum | Attorney-Client Privilege and Attorney Work Product | advice to the client; Confidential communication between client and federally authorized tax practitioner, or between federally authorized tax practitioners, for purposes of facilitating the rendition of tax advice to the client; Document prepared in anticipation of litigation. Confidential communication between client and lawyer for purposes of facilitating the rendition of legal services or legal advice to the client; Document prepared in anticipation of litigation | Tax issues related to the Chemtech partnership |

2

# UNITED STATES DISTRICT COURT

## DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Movant,<br><br>v.<br><br>DELOITTE & TOUCHE USA LLP,<br><br>Respondent. | )<br>)<br>)<br>)<br>)  Case No.: 1:08-mc-00411-RJL<br>)  Judge Leon<br>)<br>)<br>)<br>)<br>)<br>) |

### [Proposed] Order

The Court, having reviewed the Unopposed Motion to Intervene as of Right and its accompanying Memorandum of Law, and it appearing otherwise proper,

**IT IS ORDERED** that the Unopposed Motion to Intervene as of Right of Chemtech Royalty Associates, L.P., by Dow Europe, S.A. as Tax Matters Partner and Chemtech II, L.P., by IFCO, Inc., as Tax Matters Partner ("Intervenors") be, and hereby is, granted, and Intervenors are permitted to intervene in the above captioned case.

**IT IS FURTHER ORDERED** that Intervenors' Memorandum in Opposition to United States' Motion to Compel Deloitte & Touche USA LLP to Produce Documents be, and hereby is, accepted for filing in this Court.

Signed in Washington, D.C., on _____, 2008.


_____
Honorable Richard J. Leon
United States District Judge