# INTERVENORS' EXHIBIT

# A

# UNITED STATES DISTRICT COURT

## DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br><br> Movant, ) <br><br> v. ) <br><br> DELOITTE & TOUCHE USA LLP, ) <br><br> Respondant. ) | Case No.: 1:08-mc-00411-RJL <br> Judge Leon |

## MEMORANDUM IN OPPOSITION TO MOTION TO COMPEL

### INTRODUCTION

On June 30, 2008, the Government filed this action to compel Deloitte and Touche's ("D&T") production of three documents (the "Disputed Documents") withheld from a government subpoena on privilege grounds. The privileges at issue belong to The Dow Chemical Company ("Dow"), which seeks intervention through its majority-owned partnerships, Chemtech Royalty Associates, L.P. ("Chemtech I") and Chemtech II L.P. ("Chemtech II") (collectively, Chemtech I and Chemtech II shall sometimes be referred to herein as the "Chemtech Partnership"). The subpoena arises out of tax litigation in the Middle District of Louisiana in which the Chemtech Partnership has petitioned for the readjustment of IRS reallocations of partnership items. The Disputed Documents represent or contain legal and tax advice received by Dow related to its participation in the Chemtech Partnership.

Dow has asserted three different privileges over the Disputed Documents: the attorney-client privilege, the work product doctrine, and the privilege under 26 U.S.C. § 7525 (the "7525 privilege"). Dow claimed the attorney-client privilege and work product doctrine over a tax opinion from Dow's outside counsel, McKee Nelson LLP, to Dow's Tax Director, William L. Curry, dated June 20, 2005 ("Document 1"). Dow claimed the attorney-client privilege, the 7525 privilege, and the work product doctrine over an internal file memorandum dated September 15, 1998, written by Michael Cone, an in-house accountant for Dow, and Craig Jones, an in-house attorney for Dow ("Document 2"). The final document over which Dow has asserted privilege is an internal D&T memorandum that reflects work product communications with Dow's attorneys ("Document 3").[1] See infra pp. 27-29 for a more detailed discussion of these three documents.

The government's only argument in support of its Motion to Compel is that D&T's mere possession of the Disputed Documents resulted in a waiver of all applicable privileges. The government supports this argument through selective citation of authority and omission of key distinguishing facts in the authorities on which it does rely. In fact, the authorities make clear that the Disputed Documents retain their privileged character:

(1)     Numerous courts recently have considered whether work product protection is waived when a disclosure occurs to a public auditor. Virtually all of these courts have found no waiver in such circumstances. The government fails to cite any of these cases. Instead, the government relies solely on MIT v. United States, 129 F.3d 681 (1st Cir. 1997). The government makes that case appear more relevant than it is, because the government's discussion

---

[1]   The D&T privilege log also asserted the attorney-client privilege over Document 3. This assertion was incorrect, and Dow is withdrawing that claim. Dow has not asserted the 7525 privilege over Document 3 because the 7525 privilege did not exist when Document 3 was created. Dow continues to assert work product protection over Document 3.

2

omits the key fact that the disclosure in <u>MIT</u> was to a <u>government</u> auditor (and potential litigation opponent), not a financial auditor.

(2)     The attorney-client and 7525 privileges were not waived because Dow's relationship with D&T was itself protected by the 7525 privilege. Privilege is not waived when a disclosure occurs in the context of another privilege. Although the law is less clear on this issue, the statutory language and purpose of the 7525 privilege mandate this result.

Particularly in light of the fact that the parties are litigating some of the very same legal questions at issue in the Disputed Documents, granting the government's motion would be highly prejudicial to Dow and would cause precisely the sort of harm to the adversarial process that the work product doctrine, the attorney-client privilege, and the 7525 privilege are intended to prevent.

(3)     As indicated, the government does not argue that the Disputed Documents are discoverable in the absence of a privilege waiver. Indeed, it is clear that the documents at issue were protected by the claimed privileges in the absence of a waiver.

## BACKGROUND

### I.     Overview Of The Chemtech Litigation

The Louisiana litigation concerns Dow's participation in a series of transactions, first in 1993 and again in 1998, known as the Chemtech Partnership. Dow formed Chemtech I with five foreign banks in 1993 as a means of raising minority equity capital without adversely affecting its credit ratings or its balance sheet. Dow is a capital-intensive company for which ready access to capital is critical. Its business is cyclical in nature. Historically, Dow has followed a strategy of investing in new facilities during the "trough" years of the business cycle, when cash flow is

low or even negative. In the early 1990s, Dow was undergoing a period of difficult business conditions and reduced earnings.

Dow's ability to raise capital at a reasonable cost depends upon Dow maintaining its credit ratings with ratings agencies. In order to minimize the risk of a credit downgrade, Dow decided to meet its funding requirements in part through Chemtech I. At the time Chemtech I was formed in 1993, the partnership vehicle enabled Dow to monetize valuable patent assets and to obtain $200 million in third-party capital that was treated for financial accounting purposes as minority equity on Dow's consolidated U.S. GAAP financial statements. As a result, Dow raised equity capital without impairing its credit ratios.

Dow subsidiaries contributed to the Chemtech Partnership patent assets valued at approximately $883 million and approximately $10 million in cash; the foreign banks contributed an aggregate of $200 million for limited partnership interests, which Dow was able to access by way of loans from a partnership subsidiary. The Chemtech Partnership generated income primarily from royalties paid by Dow for the use of the patents. The foreign banks received a preferred return on their investments paid solely out of partnership profits and participated in profits and gains over and above the amount of the priority return. The foreign banks also would have participated in any losses in the partnership, and as limited partners, the entire amount of their contributed capital was subject to risk of loss.

In 1998, Dow exercised its option to purchase the partnership interests of the foreign banks due to changes in U.S. withholding tax laws that might have required Dow to indemnify the banks for U.S. withholding taxes. Following the purchase, Dow contributed its Plaquemine, Louisiana chemical plant to the partnership, Chemtech I distributed the patents and other assets to Dow partners, and the partnership's name was changed to Chemtech II, L.P. A U.S.

4

subsidiary of Rabobank, RBDC, subsequently invested $200 million in the partnership. This investment enabled Dow to replace the $200 million in minority equity financing previously provided by the five foreign banks.

The government found objectionable certain tax consequences mandated by the Internal Revenue Code's partnership provisions that were favorable to Dow. Accordingly, it reallocated the partnership items of the Chemtech Partnership on multiple theories, including that the partnership was not valid for federal tax purposes.

## II.    Dow's Anticipation Of Litigation Over The Chemtech Partnership

Throughout Dow's participation in the Chemtech Partnership, Dow anticipated that the IRS might challenge its treatment of the Chemtech Partnership for tax purposes. (Curry Decl. ¶¶ 8-9) (Exhibit 1). Indeed, statements contained in Document 3 clearly indicate that Dow was anticipating a potential dispute with the IRS even before the five foreign banks joined the partnership in August 1993. (Curry Decl. ¶ 10). Although confident in its legal position, Dow sought early legal advice on the merits of its case should it be litigated and regularly updated its legal position as circumstances changed. Dow engaged outside tax counsel prior to entering the transactions and tasked its in-house lawyers and accountants with reviewing the tax issues on an ongoing basis. Dow did not undertake this sort of legal analysis for every tax position on its return, or even every position that it thought might arise in an audit.

Dow had good reason to suspect that the IRS might want to litigate the tax consequences of the Chemtech transactions. As a large corporate taxpayer, Dow's tax returns are subject to year-round audit by an IRS exam team that resides at Dow's headquarters in Midland, Michigan. (Curry Decl. ¶ 7). In the years leading up to the Chemtech II transaction, the IRS already had started issuing Information Document Requests ("IDRs") for Chemtech I. (Curry Decl. ¶ 9(c)).

5

The Chemtech Partnership resulted in significant tax benefits and arose in an area of the tax law that was in a state of flux at the time of its initial formation.  Proposed regulations modifying the operation of one relevant provision, the so-called "ceiling rule," were generating substantial discussion among the tax bar.[2]  Uncertainty over the application of the finalized regulations persisted after the formation of Chemtech I and leading up to the restructuring into Chemtech II with the advent of the partnership anti-abuse rule.[3]

In the Louisiana litigation, the government has challenged Dow's treatment of the Chemtech transaction for tax purposes under theories of economic substance, sham, and debt versus equity.  The application of these so-called "soft doctrines" involves a facts and circumstances analysis that is notoriously difficult to predict.  As evidenced by the Disputed Documents themselves, Dow was aware of the IRS focus on section 704(c) during the period of the Chemtech Partnership, predicted the likely IRS challenge of the tax treatment mandated by the Code, and prepared early on for a potential dispute.

The reasonableness of Dow's anticipation of litigation has been confirmed in hindsight.  By early 1997, Dow's IRS audit team had begun reviewing the Chemtech I transaction.  By March 1997, the first of at least 33 IDRs related to Chemtech I had been issued.  On October 29, 1999, the IRS exam team issued a form 5701 report asserting substantial deficiencies against

---

[2]  Commenting on the proposed regulations, an I.R.S. official was quoted as saying "'certainly, starting out, there is going to be a lack of . . . precedent on what is considered reasonable.'"  Juliann Avakian-Martin, IRS May Issue Rulings On Built-In Gain Regs Before They Are Final, Says Official, *in* Tax Notes Today, Feb. 5, 1993, LEXIS, 93 TNT 27-4 (quoting David Enquist, Office of Assistant Chief Counsel).  The same official added that the government "might be concerned about a shift of income to a noncontributing partner that has net operating losses or that is exempt from tax."  Id.

[3]  See Laura E. Cunningham, Use and Abuse of Section 704(c), *in* Tax Notes Today, June 27, 1996, LEXIS, 96 TNT 129-23 ("The regulations appear to create clear and concise rules for taxpayers to follow in planning contribution transactions.  However, those rules are qualified by an anti-abuse rule which, if broadly construed, could largely obscure the clarity of the main rules.")

Dow relating to Chemtech I and detailing many of the positions that Dow had anticipated during the pre-transaction period. See Exhibit 2.

As is apparent from this timetable, Dow's belief in the likelihood of a dispute with the IRS grew over time. By the time Dow made the decision to restructure the Chemtech Partnership into Chemtech II, the IRS had confirmed its intention to challenge Chemtech I. Although confident its tax treatment of the Chemtech II transaction was proper, Dow also believed that the IRS would challenge that treatment. Beginning in 1997, Dow obtained similar legal advice from outside and in-house counsel regarding the tax issues raised by the restructuring of the Chemtech Partnership. The advice was provided on an on-going basis and memorialized in a tax opinion issued by outside counsel in June 2005. Dow filed the Louisiana suit less than a month later. That opinion is one of the documents that the government seeks.

### III.    Dow's Disclosure Of The Disputed Documents To D&T

Like every other public company, Dow maintains reserve accounts reflecting contingent tax liabilities. Each year, Dow's in-house attorneys, with the assistance of outside counsel, analyze the merits of any uncertain tax positions. A reserve amount is calculated factoring in the likelihood of success on the merits (i.e., a hazards of litigation assessment). Acting in a similar role, Dow's auditor, D&T, is required to review and approve the amount Dow has established as a reserve before D&T will attest to the soundness of Dow's financial statements. Where D&T disagrees with Dow concerning its treatment of a certain transaction or its reserve amount, D&T informs Dow of its disagreement, and Dow takes D&T's opinions under advisement, often times leading Dow to change its position.

Prior to the collapse of Enron, the enactment of Sarbanes-Oxley, and the creation of the Public Company Accounting Oversight Board, auditors often would meet with a corporation's

7

counsel to discuss the merits of any uncertain tax positions and agree upon the appropriateness of a given reserve amount. New rules now require auditors to review any legal opinions or analyses obtained by a corporation related to each tax uncertainty. As a result, D&T required Dow to disclose Documents 1 and 2 to D&T. Dow disclosed these documents with the expectation that D&T would maintain their confidentiality. See (Curry Decl. ¶ 12); (Biddix Decl. ¶ 4) (Exhibit 3).

## ARGUMENT

The Government's Motion to Compel does not challenge the initial application of the attorney-client privilege and work product doctrine to the Disputed Documents. See Memorandum in Support of Motion to Compel ("Government's Memorandum" or "Gov. Mem.") at 9 (arguing that the disclosure to D&T "waived any attorney-client privilege that might have applied"), 9-10 (arguing that the disclosure to D&T "waived work-product protection over those documents . . . [a]ssuming the withheld documents were protected by the work-product doctrine"). Although it does challenge the application of the 7525 privilege to Document 2, the government's argument is premised on an analysis of the wrong practitioner. See Gov. Mem. at 11-12 (analyzing the applicability of the tax practitioner's privilege as if Document 2 was authored by D&T, rather than Dow employee Mike Cone). The government's argument for production of Dow's privileged documents rests on an assertion that Dow has waived all privileges by disclosing the Disputed Documents to its auditor, D&T. For the government to prevail, the Court would have to find waiver of all three privileges.

Dow did not waive any of the asserted privileges. Although the Government's Memorandum ignores its existence, a substantial body of caselaw has developed establishing that work product is not waived by disclosure of a protected document to an independent auditor. As

8

for the attorney-client and 7525 privileges, the law, though less settled, strongly supports the existence of a 7525 privilege between Dow and D&T. Because Dow's relationship with D&T was itself protected by a privilege, disclosure of attorney-client communications to D&T does not constitute a waiver.

**I.      None Of The Asserted Privileges Were Waived By Sharing The Disputed Documents With D&T.**

The government's sole argument for disclosure of Dow's privileged documents is that D&T's "very possession of the documents" destroys confidentiality and operates as a complete waiver of privilege. The government premises its position on an incomplete description of the applicable caselaw and is incorrect.

**A.      Basic Rules Governing Waiver Of Privileges**

Disclosure of attorney-client privileged information to a third-party outside the privilege circle waives the privilege. When a disclosure of privileged information is made in the context of another privileged relationship, however, no waiver occurs. See e.g., Solomon Scientific v. Scientific American, Inc., 125 F.R.D. 34 (S.D.N.Y. 1988) (no waiver upon disclosure of privileged memorandum to client's wife and client's other attorney) (citing Supreme Court Standard (Rejected) Rule 511 to Fed. R. Civ. Proc. ("waiver not applicable if 'disclosure is itself privileged'")). This is because a voluntary disclosure of privileged information results in a waiver only when the disclosure is inconsistent with the confidential nature of the attorney-client relationship. See Permian Corp. v. United States, 665 F.2d 1214, 1219 (D.C. Cir. 1981).

Work product is less susceptible to waiver than the attorney-client and 7525 privileges. "[W]hile the mere showing of a voluntary disclosure to a third person will generally suffice to show waiver of the attorney-client privilege, it should not suffice in itself for waiver of the work

9

product privilege." Id. (quoting United States v. AT&T, 642 F.2d 1285, 1299 (D.C. Cir. 1980)).

Work product is waived only where "such disclosure, under the circumstances, is inconsistent

with the maintenance of secrecy from the disclosing party's adversary." AT&T, 642 F.2d at

1299. As a result, work product is waived only upon disclosure of material to an adversary, or

where a party "had no reasonable basis for believing that the disclosed materials would be kept

confidential by the [third party]." In re Subpoenas Duces Tecum, 738 F.2d 1367, 1372 (D.C.

Cir. 1984).

Since work product provides an independent basis to deny the government's motion, if

the Court finds that Dow's disclosure of the Disputed Documents to D&T did not waive their

work product protection, the Court should deny the Motion to Compel without further analysis.

### B.     Disclosure Of The Disputed Documents To D&T Did Not Waive The Work Product Protection.

The government argues that Dow's sharing of the Disputed Documents with its public

auditor, D&T, waived work product protection. Although the Government's Memorandum does

not cite any of the decisions, an overwhelming number of courts to have considered this precise

question have held that work product is not waived by disclosure to a public auditor. The

government's waiver argument was most recently rejected in Regions Financial Corp. v. United

States, No. 2:06-00895, 2008 U.S. Dist. LEXIS 41940, slip op. (N.D. Ala. 2008) and United

States v. Textron Inc., 507 F. Supp. 2d 138 (D.R.I. 2007), both of which involved the same

disclosures at issue in this case—disclosures for the purpose of allowing an auditor to review tax

reserve accounts. Regions and Textron followed a growing body of similar decisions. See

Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc., 237 F.R.D. 176, 183 (N.D. Ill. 2006)

(stating that "the fact that an independent auditor must remain independent from the company it

audits does not establish that the auditor also has an adversarial relationship with the client as contemplated by the work product doctrine.  Disclosing documents to an auditor does not substantially increase the opportunity for potential adversaries to obtain the information."); In re JDS Uniphase Corp. Sec. Litig., No. 02-1486, 2006 U.S. Dist. LEXIS 76169, at *11 (N.D. Cal. Oct. 5, 2006) (holding that disclosure of redacted board minutes to outside auditors did not waive work product); Am. S.S. Owners Mut. Protection and Indem. Ass'n v. Alcoa S.S. Co., No. 04-4309, 2006 U.S. Dist. LEXIS 4265, at *10-12 (S.D.N.Y. Feb. 2, 2006) (refusing to find that disclosure of legal opinions to public auditor constitutes disclosure to adversary resulting in waiver of work product); Frank Betz Assocs. v. Jim Walter Homes, Inc., 226 F.R.D. 533, 535 (D.S.C. 2005) (finding that disclosure of privileged litigation reserve numbers to outside auditors did not waive work production protection); Merrill Lynch & Co. v. Allegheny Energy, Inc., 229 F.R.D. 441, 445-448 (S.D.N.Y. 2004) (holding that disclosure of report generated at request of counsel to outside auditor not "inconsistent with maintaining secrecy from possible adversaries"); In re Raytheon Secs. Litig., 218 F.R.D. 354, 360 (D. Mass. 2003) (holding that "there is no evidence that materials disclosed to an independent auditor are likely to be turned over to the company's adversaries except to the extent that the securities laws and/or accounting standards mandate public disclosure"); Gutter v. E.I. DuPont de Nemours & Co., No. 95-2152, 1998 U.S. Dist. LEXIS 23207, at *13 (S.D. Fla. May 15, 1998) ("Transmittal of documents to a company's outside auditors does not waive the work product privilege because such a disclosure 'cannot be said to have posed a substantial danger at the time that the document would be disclosed to plaintiffs.'") (citations omitted).  But see Medinol Ltd. v. Boston Sci. Corp., 214

F.R.D. 113 (S.D.N.Y. 2002);[4] S.E.C. v. R.J. Reynolds Tobacco Holdings, Inc., No. 03-1651,

2004 U.S. Dist. LEXIS 24545 (D.D.C. June 29, 2004).[5]

The courts finding non-waiver have relied on the obvious proposition that an auditor is

not a "potential adversary or acting on behalf of a potential adversary" of its client. Textron, 507

F. Supp. 2d at 138. As the court in Regions Financial stated, there is "no conceivable scenario in

which [the public auditor] would file a lawsuit against Regions because of something [the public

auditor] learned from Regions' disclosures." 2008 U.S. Dist. LEXIS 41940, at *27-28.

Similarly, the court in Textron noted that the auditor "had no obligation to the IRS to determine

whether Textron's tax return was correct and no authority to challenge the return." 507 F. Supp.

2d at 154; see also Lawrence E. Jaffe Pension Plan, 237 F.R.D. at 183 ("The fact that an

independent auditor must remain independent from the company it audits does not establish that

---

[4]  Medinol appears to be the only court to date to have concluded, after analyzing the issue, that work product is waived when protected material is disclosed to a public auditor. Several courts have criticized the Medinol decision, and one went so far as to suggest that it is contrary to controlling Second Circuit precedent. See, e.g., American S.S. Owners Mut. Protection & Indem. Ass'n, 2006 U.S. Dist. LEXIS 4265, at *10 (refusing to follow Medinol and stating that the holding was in direct opposition to the decision in United States v. Adlman, 134 F.3d 1194 (2d Cir. 1998). In Adlman, the Second Circuit noted that work product should apply where "[t]he company's independent auditor requests a memorandum prepared by the company's attorneys estimating the likelihood of success in litigation and an accompanying analysis of the company's legal strategies and options to assist it in estimating what should be reserved for litigation losses." 134 F.3d at 1200. Moreover, the basis for the decision in Medinol is unclear, as the court admitted that a disclosure to an auditor does not substantially increase the risk that work product will fall into the hands of an adversary. Medinol, 214 F.R.D. at 116.

[5]  The R.J. Reynolds case, which notes only in passing that disclosure to an auditor waives work product, has no value as precedent. First, as far as Intervenor has been able to determine, the work product waiver issue was not briefed by the parties, nor did the court analyze the issue. See United States v. Crawley, 837 F.2d 291, 292-93 (7th Cir. 1988) (stating that a court may refuse to "giv[e] weight to a passage found in a previous opinion" when the relevant issue was neither "presented" nor "refined by the fires of adversary presentation"); United States v. Daniels, 902 F.2d 1238, 1241 (7th Cir. 1990) ("Judicial assumptions concerning, judicial allusions to, and judicial discussions of issues that are not contested are not holdings."). Second, citing Couch v. United States, 409 U.S. 322 (1973), the court based its statement regarding waiver of work product on the absence of a federal accountant-client privilege. R.J. Reynolds, 2004 U.S. Dist. LEXIS 24545 at *25, n.9. The existence of a parallel privilege with an auditor is not the legal standard for testing whether work product has been waived. The proper standard—whether the disclosure is to an adversary or a conduit to an adversary—was not cited or considered by the court. In fact, the court did not cite a single case dealing with waiver of work product in its entire opinion. Third, the court already had decided that the SEC had demonstrated substantial need to overcome work product protection, making the court's statement regarding waiver pure dicta.

the auditor also has an adversarial relationship with the client as contemplated by the work product doctrine.").

The government's assertion that "D&T USA has a duty to independently and objectively assess the accuracy of Chemtech's financial statements" is beside the point. Independence and objectivity alone do not constitute the type of "tangible adversarial relationship" with the proponent of the privilege that is required to effectuate a waiver of work product. Merrill Lynch, 229 F.R.D. at 445-448 ("Any tension between an auditor and a corporation that arises from an auditor's need to scrutinize and investigate a corporation's records and book-keeping practices simply is not the equivalent of an adversarial relationship contemplated by the work product doctrine."). Nor was there anything about D&T's relationship with Dow that resulted in an adversarial dynamic.

The Government's Memorandum does not cite any of the above-listed authorities supporting non-waiver. Instead, the government relies exclusively on the First Circuit's decision in United States v. MIT, 129 F.3d 681 (1st Cir. 1997), for the proposition that "a party's disclosure to an audit agency is a disclosure to a potential adversary, and waives work product." Gov. Mem. at 10. The government's discussion of MIT omits the key distinguishing fact that the "audit agency" in MIT was a division of the Department of Defense, whose job it was to review the expense submissions of MIT in its role as a DOD contractor. 129 F.3d at 687. This relationship was such that litigation between the parties was a real possibility. As the MIT court noted, "MIT doubtless hoped that there would be no actual controversy between it and the Department of Defense, but the potential for dispute and even litigation was certainly there." Id. (emphasis added). Other courts have found that this distinguishing fact renders MIT irrelevant in the public auditor context. See Regions Financial, 2008 U.S. Dist. LEXIS 41940, at *27 (noting

that "[t]he decisive factor" in MIT was that the auditor was a branch of the Department of
Defense); Textron, 507 F. Supp. 2d at 153-54 ("The difference between this case and MIT is
that, in MIT, DOD was MIT's potential litigation adversary and DCAA, as DOD's audit agency,
had both an obligation to DOD to determine whether the amounts charged by MIT to DOD were
correct, and the authority to sue MIT in order to recover any overcharges."); Merrill Lynch, 229
F.R.D. at 446 ("The First Circuit found that the audit agency—which was responsible for
preventing an overcharge for services—was a potential adversary because a review of MIT's
billing statements could result in a dispute or even litigation."). Ultimately, MIT stands only for
the proposition that disclosure to a government agency that is a potential adversary likely waives
work product protection. Cf. In re Subpoenas Duces Tecum, 738 F.2d 1367 (D.C. Cir. 1984)
(finding waiver of work product where material voluntarily submitted to SEC); In re Sealed
Case, 676 F.2d 793 (D.C. Cir. 1982) (finding waiver of work product where material was
submitted to SEC under voluntary disclosure program).

       Nor can the government argue that it was unreasonable for Dow to expect D&T to
maintain the confidentiality of the Disputed Documents. There, too, the caselaw
overwhelmingly supports Dow's position. See, e.g., Textron, 507 F. Supp. 2d at 153; Gutter,
No. 95-2152, 1998 U.S. Dist. LEXIS 23207, at *13 (holding that disclosure of material protected
by work product to outside accountants not a waiver "since the accountants are not considered a
conduit to a potential adversary"); Lawrence E. Jaffe Pension Plan, 237 F.R.D. at 183
("Disclosing documents to an auditor does not substantially increase the opportunity for potential
adversaries to obtain the information."). The IRS exercises no authority over D&T and cannot
force it to produce material gathered pursuant to its audit of Dow entities in the face of a valid
claim of privilege. Moreover, "[u]nder AICPA Code of Professional Conduct Section 301

Confidential Client Information, [auditors] ha[ve] a professional obligation 'not [to] disclos[e] any confidential client information without the specific consent of the client.'"[6] Textron, 507 F. Supp. 2d at 153. In addition to D&T's professional obligation generally to maintain confidentiality, Dow also had D&T's assurance that it would maintain confidentiality over any material provided in the context of the audit. See (Curry Decl. ¶ 12); (Biddix Decl. ¶ 4); see also Textron, 507 F. Supp. 2d at 153 ("Even if the AICPA Code coupled with E&Y's promise did not establish an absolute guarantee of confidentiality, they made it very unlikely that E&Y would provide Textron's 'tax accrual workpapers' to the IRS and they negate any inference that Textron waived the work product privilege.").

Finally, this dispute itself validates the reasonableness of Dow's expectation that D&T would maintain confidentiality over the Disputed Documents. In the face of a government subpoena, D&T has undertaken to defend against disclosure of Dow's confidential information.

### C.    Dow Did Not Waive The Attorney-Client Or Tax Practitioner Privileges.

Disclosure of the Disputed Documents to D&T did not waive the attorney-client or 7525 privileges because the disclosures were made for the purpose of allowing D&T to assess and advise on the adequacy of Dow's tax contingency accounts, and in that respect Dow enjoyed an independent 7525 privilege with D&T.

Dow acknowledges that there is caselaw holding that disclosure of confidential attorney communications to its outside auditor waives the attorney client privilege. Most of these cases, however, were premised on the notion that there was no confidential accountant-client privilege at the time they were decided. For example, in United States v. El Paso Co., the Fifth Circuit

---

[6]    AICPA Code of Professional Conduct Section 301, available at http://www.aicpa.org/about/code/et_300.html. Copies of all cited sections of the AICPA Code and related accounting materials are attached hereto as Exhibit 4.

explained that "[n]o such [accountant-client] privilege exists under federal law . . . . In the absence of a contrary rule established by law, we cannot view El Paso's discussions with its auditors as confidential.  The attorney-client privilege is, therefore, waived."  682 F.2d 530, 541 (5th Cir. 1982); see also MIT, 129 F.3d at 684-85; In re Pfizer, No. 90-1260, 1993 U.S. Dist. LEXIS 18215, at *22 (S.D.N.Y. Dec. 22, 1993).  The implication of these 1982 and 1993 decisions, which predate the 7525 privilege, is that the enactment the 7525 privilege supports the opposite result.

The government asserts that an independent auditor does not provide "tax advice" within the meaning of section 7525.  Although the court in Textron, 507 F. Supp. 2d at 151-52, so concluded, Dow respectfully asserts that that conclusion is incorrect.  Dow disclosed the Disputed Documents to D&T so that D&T could review the adequacy of Dow's tax contingency accounts and advise on whether the merits of Dow's tax positions supported the reserve levels maintained by the company.  In that capacity, D&T was doing quintessentially the work of an accountant providing tax analysis and advice.  In United States v. Arthur Young & Co., 465 U.S. 805 (1984), the Supreme Court described the auditor's job as similar to that of a tax practitioner:

> The independent auditor draws upon many sources in evaluating the sufficiency of the corporation's tax accrual account.  Initially, the corporation's books, records, and tax returns must be analyzed in light of the relevant Code provisions, Treasury Regulations, Revenue Rulings, and case law.  The auditor will also obtain and assess the opinions, speculations, and projections of management with regard to unclear, aggressive, or questionable tax positions that may have been taken on prior tax returns . . . .  The auditor's tax accrual workpapers record this process of examination and analysis.

465 U.S. at 812-13.

The American Institute of Certified Professional Accountants ("AICPA") rules governing the auditor's work support the characterization of the auditor's role set forth in Arthur Young &

16

Co. For example, AU 9326 – Auditing Interpretations of Section 326, ¶ .18, describes an "auditor's education, training, and experience," which "enable him or her to be knowledgeable concerning income tax matters."[7] The auditor must draw on his or her "tax expertise" and "formulate his or her own conclusion" regarding the merits of the client's tax positions and the adequacy of the corresponding reserve accounts. AU 9326, ¶¶ .19, .22.

As part of the process of reviewing Dow's tax reserve accounts, the auditor shared his or her views on particular issues. Acting on those discussions, Dow may have adjusted upward or downward its reserve positions. Nothing in the text or legislative history of 26 U.S.C. § 7525 suggests that this sort of work should be treated in a way other than what it clearly is: accountants providing tax advice to an audit client.

The fact that the auditor ultimately answers to the public at large has no bearing on whether its work on tax reserves is subject to the 7525 privilege. Under AICPA rules, all accountants owe a duty to the public:

> A distinguishing mark of a profession is acceptance of its responsibility to the public. The accounting profession's public consists of clients, credit grantors, governments, employers, investors, the business and financial community, and others who rely on the objectivity and integrity of certified public accountants to maintain the orderly functioning of commerce. This reliance imposes a public interest responsibility on certified public accountants. The public interest is defined as the collective well-being of the community of people and institutions the profession serves.

AICPA Code of Professional Conduct 53.01.[8] If the duty to the public were to defeat the 7525 privilege, no accountant's advice would be subject to protection.

---

[7]  Available at http://www.pcaobus.org/standards/interim_standards/auditing_standards/au_9326.html. Also attached hereto as part of Exhibit 4.

[8]  Available at http://www.aicpa.org/about/code/et_section_53__article_ii_the_public_interest.html. Also attached hereto as part of Exhibit 4.

Finding that the attorney-client and 7525 privileges survive disclosure to an independent auditor also furthers important public policies. Although the recent developments in public disclosure related to corporate transparency (e.g., Sarbanes-Oxley) are important and laudable for protection of the public, they have put increasing strain on the doctrines of privilege. Accounting firms, fearing that they have not reviewed all available information or may have missed important issues, insist upon disclosure of confidential communications. AU 9326 – Auditing Interpretations of Section 326, ¶¶ .20-.22 ("If the client's support for the tax accrual . . . is based upon an opinion issued by an outside advisor with respect to a potentially material matter, the auditor should obtain access to the opinion, notwithstanding potential concerns regarding attorney-client or other forms of privilege.").[9] Although AICPA ethical rules classify the company-accounting firm relationship as confidential, see AICPA Code of Professional Conduct Section 301 Confidential Client Information, the government is urging the waiver issue to take advantage of one public policy to completely undermine the longstanding public policy behind privilege. See, e.g., Upjohn Co. v. United States, 449 U.S. 383, 389 (1981) (the attorney-client privilege facilitates "full and frank communication between attorneys and their clients and thereby promote[s] broader public interests in the observance of law and the administration of justice."). There should be no waiver in these circumstances.

---

[9] Available at http://www.pcaobus.org/standards/interim_standards/auditing_standards/au_9326.html. Also attached hereto as part of Exhibit 4.

**II.     The Government Does Not, Nor Could It, Assert Any Other Argument Challenging Dow's Claims Of Privilege.**

As discussed above, the government sensibly has elected to put up only a token fight against threshold applicability of work product,[10] and no fight at all over threshold applicability of the attorney-client[11] and 7525 privileges.[12] As discussed below, each Disputed Document is clearly covered by the privileges asserted over it.

**A.      D.C. Circuit Privilege Law**

**1.      The Attorney-Client And 7525 Privileges**

The attorney-client privilege is a foundational principal of our legal system, and "one of the oldest recognized privileges for confidential communications." Swidler Berlin v. United States, 524 U.S. 399, 403 (1998). The Supreme Court long has recognized a corporation's right to assert the attorney-client privilege. Id. The privilege protects communications both to and from a corporation's attorney, where the purpose of the communication is to seek or render legal advice. See id. at 390 ("[T]he privilege exists to protect not only the giving of professional

---

[10]  The government asserts only that "neither Chemtech nor D&T has made any showing whatsoever that the documents in question were prepared in anticipation of litigation." This assertion ignores information provided on the face of the privilege log or otherwise known to the government. For example, the government is aware that Document 1 is dated June 20, 2005, less than a month before Chemtech initially filed suit against the government in the underlying litigation. See Exhibit 5.

[11]  The government cannot claim that it does not know enough about the Disputed Documents to substantively challenge the bases for their withholding. The day after filing the present motion, the government filed a motion to compel in the underlying Louisiana litigation, arguing against application of privilege on numerous, albeit specious, grounds. The government relied on deposition testimony and other contemporaneous evidence to support its challenges. The privilege log at issue in the Louisiana litigation is identical in format to the log before this Court. If the government had sufficient information to make substantive arguments against threshold applicability of privilege in the underlying litigation, its failure to do so here should be viewed as a concession that the stated privileges apply absent waiver.

[12]  The government mistakenly assumes that Dow bases its assertion of the 7525 privilege with respect to Document 2 on D&T's role as a "tax practitioner." Dow in fact bases this assertion on the role of Michael Cone, the accountant-author of Document 2, who was an in-house accountant for Dow. The government's mistaken assumption invalidates its argument against threshold application of the 7525 privilege to Document 2.

advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice.").

The 7525 privilege extends "the same common law protections of confidentiality which apply to a communication between a taxpayer and an attorney" to communications "between a taxpayer and any federally authorized tax practitioner" for statements made after July 22, 1998. 26 U.S.C. § 7525(a)(1).  The privilege applies to "tax advice," which is defined as "any matter within the scope an individual's authority to practice before the IRS."  26 U.S.C. § 7525(a)(3)(B). See 31 C.F.R. § 10.2(a)(4) (defining practice before the IRS to include "rendering written advice with respect to any entity, transaction, plan or arrangement, or other plan or arrangement having a potential for tax avoidance or evasion").  The term "federally authorized tax practitioner" is defined as any individual authorized under the applicable regulations to practice before the IRS. 26 U.S.C. § 7525(a)(3)(A).  Under the applicable regulations, any certified public accountant is licensed to practice before the IRS and, therefore, can engage in 7525-protected communications with its clients.  31 C.F.R. § 10.3(b).

The 7525 privilege is largely co-extensive with the attorney-client privilege.  See United States v. BDO Seidman, 337 F.3d 802, 810 (7th Cir. 2003) ("[W]e must look to the body of common law interpreting the attorney-client privilege to interpret the § 7525 privilege.").  For example, like the attorney-client privilege, the 7525 privilege fully applies to the work of in-house accountants.  See United States v. Textron Inc., 507 F. Supp. 2d at 148.  Although the statute contains a few exceptions that cause the 7525 privilege to operate more narrowly than the attorney-client privilege under specific circumstances mandated by Congress, none of those exceptions apply in this case.  See, e.g., 26 U.S.C. § 7525(a)(2)(A) (privilege does not apply in criminal matters).

20

2.    **The Work Product Doctrine**

The work product doctrine prohibits discovery of materials prepared in anticipation of

litigation. See Fed. R. Civ. P. 26(b)(3); Hickman v. Taylor, 329 U.S. 495 (1947). The doctrine

advances the "strong public policy" of ensuring that a "lawyer work with a certain degree of

privacy, free from unnecessary intrusion by opposing parties and their counsel." United States v.

Nobles, 422 U.S. 225, 236-37 (1975) (citations omitted). As the D.C. Circuit has observed,

"[a]lthough it would certainly be easier for [a party to view the work product of its opponent], the

work product privilege's very purpose is to prevent a party from 'performing its functions . . . on

wits borrowed from the adversary.'" E.E.O.C. v. Lutheran Soc. Servs., 186 F.3d 959, 969 (D.C.

Cir. 1999) (citing Hickman, 329 U.S. at 516). The D.C. Circuit often has discussed the

importance of the work product doctrine, most recently by citing the following passage from the

Supreme Court's Hickman decision:

> Were such materials open to opposing counsel on mere demand, much of what is
> now put down in writing would remain unwritten. An attorney's thoughts,
> heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp
> practices would inevitably develop in the giving of legal advice and in the
> preparation of cases for trial. The effect on the legal profession would be
> demoralizing. And the interests of the clients and the cause of justice would be
> poorly served.

In re Sealed Case, 146 F.3d 881, 884 (D.C. Cir. 1998) (citing Hickman, 329 U.S. at 511).

Though work product is a qualified privilege that can be overcome upon an opponent's

showing of need, courts are especially mindful to protect the "'opinions, judgments, and thought

processes of counsel,'" which constitute opinion work product and "receive[] almost absolute

protection from discovery." In re Vitamins Antitrust Litig., 211 F.R.D. 1, 4 (D.D.C. 2002)

(citation omitted). Work product applies to material prepared for litigation, as well as for

administrative disputes. See Gen. Elec. v. Johnson, No. 00-2855, 2006 U.S. Dist. LEXIS 64907,

21

at *34-36 (D.D.C. Sept. 12, 2006) (slip op.) (materials prepared in anticipation of "litigation" include materials prepared in anticipation of judicial proceedings, administrative matters, settlement negotiations, and the avoidance of anticipated litigation); Pub. Citizen, Inc. v. U.S. Dep't of State, 100 F. Supp. 2d 10, 30-31 (D.D.C. 2000) (in anticipation of "litigation" includes administrative matters; work product doctrine protects documents prepared because of the prospect of litigation), overruled in part on other grounds, 276 F.3d 634 (D.C. Cir. 2002).

The D.C. Circuit applies the "because of" test for determining when a document was prepared in the anticipation of the litigation. In re Sealed Case, 146 F.3d at 884. The "'testing question' for the work-product privilege . . . is 'whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.'" Id. (emphasis added) (citations omitted). "For a document to meet this standard, the lawyer must at least have had a subjective belief that litigation was a real possibility, and that belief must have been objectively reasonable." Id. Work product may apply "regardless of whether the anticipated litigation ever occurs." Id. at 888.

This is particularly true in the D.C. Circuit, where the Circuit court has strongly protected an attorney's legal analysis of potential claims against its client, even before the events leading to a dispute occur. In In re Sealed Case, the Court noted that "[i]t is often prior to the emergence of specific claims that lawyers are best equipped either to help clients avoid litigation or to strengthen available defenses should litigation occur." 146 F.3d at 886. Describing how a "contrary ruling would undermine lawyer effectiveness at a particularly critical stage of a legal representation," the court cautioned as follows:

> If lawyers had to wait for specific claims to arise before their writings could enjoy work-product protection, they would not likely risk taking notes about such matters or communicating in writing with colleagues, thus severely limiting their ability to advise clients effectively . . . . [A]sked by a client to evaluate the antitrust implications of a proposed merger and advised that no specific claim had yet surfaced, a lawyer knowing that work product is unprotected would not likely risk preparing an internal legal memorandum assessing the merger's weaknesses . . . . Discouraging lawyers from engaging in the writing, note-taking, and communications so critical to effective legal thinking would, in <u>Hickman</u>'s words, "demoraliz[e]" the legal profession, and "the interests of the clients and the cause of justice would be poorly served."

<u>Id.</u> at 886-87.

The D.C. Circuit's decision in <u>In re Sealed Case</u>, 146 F.3d 881, was based in part on its earlier holding in <u>Delany, Migdail & Young v. Commissioner</u>, 826 F.2d 124 (D.C. Cir. 1987). In <u>Delaney</u>, the IRS sought work product protection for a memorandum assessing the legality of a proposed new approach to auditing large taxpayers. That is, the purpose of the memorandum was to inform the IRS on whether to implement the new program, not to defend against any specific claim that had arisen. A law firm sought the memorandum under FOIA, and the IRS claimed work product. The D.C. Circuit rejected the law firm's argument that work product required "that a specific claim had arisen, was disputed . . . and was being discussed in the memorandum." <u>Id.</u> at 126-27. To the contrary, the court reasoned that the IRS's pre-implementation legal analysis of a program that might spur litigation was quintessentially work product protected. <u>Id.</u>

Courts consistently have applied the "because of" test for work product to protect as work product legal advice regarding the tax consequences of a corporate transaction. <u>See United States v. Roxworthy</u>, 457 F.3d 590 (6th Cir. 2006); <u>Adlman</u>, 134 F.3d at 1195; <u>Long Term Capital Holdings v. United States</u>, 2003-1 U.S.T.C. ¶ 50,304, 91 A.F.T.R.2d 2003-1139 (D.

Conn. 2003) (tax opinion is work product); <u>Black and Decker Corp. v. United States</u>, 219 F.R.D.

87 (D. Md. 2003) (documents and communications underlying disclosed short and long-form tax

opinions qualify for work product protection).[13]  In <u>Adlman</u>, a corporation entered into a merger

that had the effect of generating "an enormous loss and tax refund." <u>Id.</u> at 1195.  Prior to

finalizing the transaction, Arthur Andersen provided a tax opinion, which the court described as:

> a 58-page detailed legal analysis of likely IRS challenges to the reorganization
> and the resulting tax refund claim; it contained discussion of statutory provisions,
> IRS regulations, legislative history, and prior judicial and IRS rulings relevant to
> the claim.  It proposed possible legal theories or strategies for [the client] to adopt
> in response, recommended preferred methods of structuring the transaction, and
> made predictions about the likely outcome of litigation.

<u>Id.</u>  Four years later, when the IRS audited the corporation and scrutinized the tax consequences

of the transaction, it requested production of the opinion.  The district court rejected the

corporation's work product claim.  Relying in part on the D.C. Circuit's opinion in <u>Delaney</u>, the

Second Circuit vacated the district court's decision, noting that "there [was] little doubt [that the

corporation] had the prospect of litigation in mind" when it hired Andersen.  <u>Adlman</u>, 134 F.3d

---

[13]  Dow brings to the Court's attention <u>United States v. KPMG</u>, 237 F. Supp. 2d 35 (D.D.C. 2002), in which the court held that a tax opinion was not work product under the facts of that case.  The court was conducting a preliminary review of KPMG's privilege assertions based upon random sampling prior to referring the matter to a special master for comprehensive review.  The government does not cite this case, nor any other case to rebut the assertions of work product on D&T's privilege log.

In any event, <u>KPMG</u> is a unique case with no relevance for present purposes.  The matter involved a series of privilege decisions in which the Court grew increasingly frustrated with "KPMG's privilege log since it has been shown to be inaccurate, incomplete, and even misleading regarding a very large percentage of the documents." <u>United States v. KPMG</u>, 316 F. Supp. 2d 30, 44 (D.D.C. 2004).  The Court cited evidence "suggesting that Brown & Wood [the author of the tax opinions at issue] was not engaged in rendering true legal advice, but was rather a partner with KPMG in its tax shelter marketing strategy." <u>Id.</u> at 39.  The court admonished KPMG for "misrepresenting its unprivileged tax shelter marketing activities as privileged communications" and ordered production of scores of documents partly on the basis that it "has no confidence that either the attorney-client privilege claims or the attorney work product privilege claims asserted by KPMG are valid." <u>Id.</u> at 44.

at 1204.[14]  The panel instructed the District Court to uphold the work product claim "if the court

finds the Memorandum would not have been prepared but for the [corporation's] anticipation of

litigation with the IRS."  Id. at 1204.  In an example directly applicable here, the court discussed

the policy implications of a work product finding:

> A company contemplating a transaction recognizes that the transaction will result
> in litigation; whether to undertake the transaction and, if so, how to proceed with
> the transaction, may well be influenced by the company's evaluation of the
> likelihood of success in litigation . . . .  We can see no reason under the words or
> policies of the Rule why such a document should not be protected.

Id. at 1199.

        In United States v. Roxworthy, 457 F.3d 590 (6th Cir. 2006), the Sixth Circuit applied

Adlman and Delaney to extend work product protection over a tax opinion obtained well before

the IRS commenced an audit of a corporate transaction.  The corporation hired KPMG to prepare

a tax opinion on a series of transactions that generated a tax loss of $112 million.  The opinions

were obtained just after the transactions were executed, and well before any audit had

commenced.  The corporation was concerned that the IRS would object to the tax treatment of

the transaction, particularly in light of the IRS's regular audits of the corporation and the

unsettled area of the law at issue.  Id. at 594-95.  The opinion "contain[ed] dense legal analysis

of current tax law, including arguments and counter-arguments in certain areas of law that the

memoranda argue are unsettled" and concluded that "it is more likely than not . . . that the

---

14   In fact, the Second Circuit cited extensively from Delaney:

> We note that in Delaney, Migdail & Young, Chartered v. IRS, 826 F.2d 124 (D.C. Cir. 1987), the
> IRS successfully argued against the very position it here advocates . . . .  The documents sought in
> Delaney were prepared by IRS attorneys for a business purpose—to help the IRS decide whether
> to adopt a proposed system of statistical sampling for its corporate audit program for large
> accounts.  However, the study was prepared because of expected litigation which would result
> from adoption of the program; it analyzed expected legal challenges to the use of the proposed
> program, potential defenses available to the agency, and the likely outcome.

Adlman, 134 F.3d at 1201.

following federal tax consequences (among others) will result from the transactions described herein and that such consequences will be supported by 'substantial authority.'" Id. at 594.

Given the fact the courts in both Adlman and Roxworthy relied heavily on Delaney, there is little doubt that the D.C. Circuit would adopt the reasoning set forth in those cases.

## B.   The Government Has Not Meaningfully Challenged Application Of The Asserted Privileges To The Disputed Documents.

Though the government is correct that the party asserting the privilege carries the burden of proving each element, "once a claim of attorney-client privilege has been made with respect to certain communications, and a prima facie showing has been made that they relate to legal matters, the party seeking to overcome the invocation of the privilege must make some showing that the communications did not involve the giving of legal advice, but rather related to business matters and considerations." Coleman v. Am. Broad. Co., 106 F.R.D. 201, 206 (D.D.C. 1985).

The D&T log establishes each element of the privilege. For each document, the privilege log provided the following information, to the extent available:

- date
- author
- addressee
- copyee
- document type (e.g., letter, memorandum, notes, opinion)
- privilege type (attorney-client, work product, tax practitioner privilege)
- privilege basis (describing the nature of the communication)
- subject matter

The privilege log provided as much information about each document as possible without revealing the privileged substance of the documents themselves. See Fed. R. Civ. P. 26(b)(5) (privilege log should describe the privileged material "without revealing information itself privileged or protected"). See also In re Grand Jury Investigation, 974 F.2d 1068, 1071 (9th Cir. 1992) (party made prima facie showing of privilege with log identifying "(a) the attorney and

client involved, (b) the nature of the document, (c) all persons or entities shown on the document to have received or sent the document, (d) all persons or entities known to have been furnished the document or informed of its substance, and (e) the date the document was generated, prepared, or dated").

The government offers not a single substantive argument in rebuttal, except to argue waiver. A closer look at the Disputed Documents, on a document-by-document basis, demonstrates the strength of Dow's privilege claims, and explains the government's lack of meaningful effort to contest them.

### Document 1

Document 1 is a tax opinion from Dow's outside counsel relating to the Chemtech Partnership. It constitutes a communication from counsel to client pursuant to a request for legal advice. Document 1 is based upon and discloses confidential communications from Dow. See Minebea Co. v. Papst, 229 F.R.D. 1, 2-3 (D.D.C. 2005) ("A communication from attorney to client must not only be made 'in confidence' for the purpose of transmitting legal advice, but it must also 'rest on confidential information obtained from the client.'" (quoting Tax Analysts v. IRS, 117 F.3d 607, 618 (D.C. Cir. 1997)). Dow intended and maintained confidentiality over this document.

Document 1 also is protected by the work product doctrine. Document 1 is dated June 20, 2005, well after Dow's tax position had been audited and challenged by the IRS and less than a month prior to the filing of the Louisiana litigation. As described above, Dow anticipated that the IRS would challenge its tax treatment of the Chemtech Partnership and sought ongoing legal advice regarding expected IRS arguments. See supra pp. 5-7. Document 1 contains precisely the type of analysis of the "legal challenges likely to be mounted . . . potential defenses available . . .

and the likely outcome" that the D.C. Circuit protected as work product in <u>Delaney</u> and <u>In re Sealed Case</u>, 146 F.3d 881.  Indeed, Dow has an even stronger work product interest in Document 1 than were at issue in those cases, because the IRS already had asserted a claim against Dow when Document 1 was created.

### **Document 2**

Document 2 reflects legal and tax analysis provided by an in-house attorney at Dow.  As such, Document 2 is protected by the attorney-client privilege.  Document 2 was co-authored by an in-house accountant at Dow and post-dates enactment of the 7525 privilege.  Accordingly, the 7525 privilege also applies to Document 2.  Document 2 contains and is based upon confidential information provided by Dow's management team.

Document 2 likewise is protected by the work product doctrine.  Like Document 1, Document 2 contains an analysis of the tax consequences of certain actions by the Chemtech Partnership that Dow reasonably expected would invite IRS scrutiny.  Though Dow anticipated litigation from a far earlier point, the IRS had already begun auditing Chemtech I at the time that Document 2 was created and had issued at least 19 related IDRs.  As a result, Dow's work product claim over Document 2 is even stronger than the claims at issue in <u>Adlman</u> and <u>Roxworthy</u>, where the IRS was still years away from auditing the transaction.  Moreover, Document 2 was created partly to support Dow's ongoing analysis regarding the adequacy of its tax reserve for the Chemtech Partnership.  Two recent decisions have held that this type of analysis is protected work product.  <u>See</u>  <u>Regions Fin.</u>, 2008 U.S. Dist. LEXIS 41940; <u>Textron</u>, 507 F. Supp. 2d at 138.

**Document 3**

Document 3 is an internal D&T memorandum.  The statements in Document 3 themselves provide contemporaneous evidence of Dow's anticipation of litigation, dating back to the pre-transaction period, over its tax treatment of the Chemtech Partnership.   Document 3 records the thoughts and impressions of Dow's attorneys relating to Dow's tax position, along with an assessment of where vulnerabilities exist.  In that sense, Document 3 closely resembles the document at issue in Delaney, along with the tax opinions deemed work product in Adlman and Roxworthy.  Like Document 2, Document 3 relates to the setting of a reserve amount for the Chemtech transactions, and is therefore analogous to the material afforded work product protection in Regions Financial, 2008 U.S. Dist. LEXIS 41940 and Textron, 507 F. Supp. 2d at 138.[15]

## CONCLUSION

In upholding the IRS's claim of work product in the Delaney case, the D.C. Circuit, in no uncertain terms, exposed the true motives of the party seeking disclosure:

> Here the IRS memos advise the agency of the types of legal challenges likely to be mounted against a proposed program, potential defenses available to the agency, and the likely outcome. Similarly, plaintiff here is not trying to ascertain the agency's view of the law in order to comply or to advise clients on how to comply; it is seeking the agency's attorneys' assessment of the program's legal vulnerabilities in order to make sure it does not miss anything in crafting its legal case against the program.  This is precisely the type of discovery the Court refused to permit in Hickman v. Taylor, 329 U.S. 495 (1947).

Delaney, 826 F.2d at 127 (emphasis added).

---

[15]  Though, once again, the government does not argue the point, there is no relevance to the fact that Document 3 was created by D&T.  Document 3 records communications from Dow's attorneys and reveals their highly sensitive thoughts and impressions about the merits of Dow's tax positions that are the subject of the Louisiana litigation.  As in Documents 1 and 2, Dow intended the thoughts and impressions reflected in Document 3 to be maintained confidentially.

The Circuit's admonition in <u>Delaney</u> is particularly relevant here, where the shoe is on the other foot, and the government has gone to great lengths to discover the private thoughts of Dow's attorneys.  Nowhere in its Motion to Compel does the government provide any alternative explanation for coveting of Dow's sensitive legal analysis beyond its apparent desire to seek Dow's "assessment of . . . legal vulnerabilities in order to make sure it does not miss anything in crafting its legal case" in the underlying tax dispute.  This is precisely the result that the attorney-client privilege and work product doctrine are intended to prevent.

Respectfully submitted this 25th day of August, 2008.

> CHEMTECH ROYALTY ASSOCIATES, L.P., by
> DOW EUROPE, S.A., as Tax Matters Partner and
> CHEMTECH II, L.P., BY IFCO, INC., as Tax Matters
> Partner

> John B. Magee (D.C. Bar No. 931139)
> Hartman E. Blanchard, Jr. (D.C. Bar No. 451559)
> Christopher P. Murphy (D.C. Bar No. 500886)
> MCKEE NELSON LLP
> 1919 M Street, N.W., Suite 200
> Washington, D.C.  20036
> Telephone:  (202) 775-1880
> Facsimile:  (202) 775-8586
> jmagee@mckeenelson.com
> hblanchard@mckeenelson.com
> cmurphy@mckeenelson.com

30