IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA
Case No. 1:08-mc-00411-RJL

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| | ) | Civil Action No. 05-944-RET-DLD (M.D. LA) |
| v. | ) | |
| | ) | CONSOLIDATED WITH |
| DELOITTE & TOUCHE USA LLP, | ) | |
| | ) | Civil Action No. 07-405-RET-DLD; and |
| | ) | Civil Action No. 06-258-RET-DLD |
| | ) | |
| Respondant. | ) | |
| | ) | |

## <u>UNITED STATES' REPLY</u>

### INTRODUCTION

On June 30, 2008, the United States moved to compel Deloitte & Touche USA LLP ("D&T USA") to produce certain documents in response to a subpoena duces tecum issued by this Court.  In particular, the United States seeks to compel the production of three documents that D&T USA is currently withholding on the basis of privilege (the "withheld documents") and certain documents maintained at D&T USA's Zurich, Switzerland affiliate (the "Zurich Documents") that D&T USA refused to produce.  D&T USA, Chemtech and Chemtech II (collectively "Chemtech"), through their tax matters partners Dow Europe, S.A. and Ifco, Inc., oppose the United States' motion.

Chemtech opposes the motion to compel only as it relates to the withheld documents. Chemtech maintains that the privileges at issue belong to the Dow Chemical Company ("Dow"), a majority owner of Chemtech.  Dow, however, disclosed the withheld documents to D&T USA,

its independent auditor.  Dow's disclosure waived any applicable privilege, and Chemtech has

failed to show that it is entitled to withhold the requested documents under these circumstances.

For its part, D&T USA argues that it lacks the ability to obtain documents from its Zurich

affiliate ("D&T Zurich"), even though the two were jointly responsible for auditing Chemtech's

financial statements and the requested documents were created in connection with that

engagement.  While D&T USA now represents that it cannot obtain the documents from D&T

Zurich, D&T Zurich's refusal to turn over the Zurich documents was in response to a request

made by D&T USA *after* the United States filed its motion to compel, and despite the close

working relationship the affiliates enjoyed during the Chemtech engagement.  As a result, D&T

USA's claim that the withheld documents are beyond its reach rings hollow.

## ARGUMENT

### I.    Chemtech has not established that the withheld documents are protected from disclosure

Chemtech has failed to meet its burden of showing that the three withheld documents are

protected from disclosure.  While it is unclear whether the first two documents, a June 20, 2005

tax opinion from McKeeNelson LLP, to William L. Curry (the "Curry tax opinion") and a

September 15, 1998 memorandum and flow chart from Michael Cone and Craig Jones to "File"

(the "File memo") are entitled to protection under the attorney-client privilege, the tax

practitioner's privilege, or the work-product doctrine, the third document, a July 21, 1993 draft

memorandum from Robert V. Valdez to "File" (the "Valdez memo") is not entitled to any such

protection.  In any event, Dow's disclosure of these documents to D&T USA waived any

privilege that might otherwise apply.  Accordingly, D&T USA must produce all three documents

in response to the United States' subpoena.

A.    <u>The Valdez memo is not protected by the work-product doctrine</u>

Given the information available to it, the United States does not challenge Chemtech's

assertion that the Curry tax opinion and the File memo are protected by the work-product

doctrine.[1]  However, as is clear from Chemtech's opposition brief itself, the Valdez memo is not

protected by the work-product doctrine.  The Valdez memo was created by D&T USA during its

independent audit of Dow's financial statements following an exchange of information "required

under applicable financial accounting rules" for the audit.  (Curry Decl. ¶ 10.)  The Valdez

memo was not prepared by an attorney (or an attorney's agent) but by an accounting firm in its

role as independent auditor of Dow's financial statements for GAAP purposes.  An independent

auditor performs a very different function than a business or tax advisor, and its memoranda are

not created "because of," or "in anticipation of," litigation.  See, e.g., <u>United States v. El Paso

Co.</u>, 682 F.2d 530, 543 (5th Cir. 1982) (finding that a tax pool analysis "does not contemplate

litigation in the sense required to bring it within the work product doctrine")  Consequently, the

fact that the Valdez memo "records the thoughts and impressions of Dow's attorneys" is

irrelevant and the Valdez memo must be produced.

B.    <u>Work-product protection has been waived for the withheld documents</u>

Even if the work-product doctrine initially protected the withheld documents from

disclosure, Dow (as Chemtech's principal owner) waived any work-product protection when it

disclosed the documents to D&T USA.  Chemtech argues otherwise because – in its view – an

independent auditor is not a "potential adversary."  Chemtech (and the cases it relies on) ignores

---

[1]Rather we contend that work-product protection was waived by Dow's disclosure of the
documents to its auditor, a point we address next.

the Supreme Court's understanding of an independent auditor's role in relation to the company that it is auditing and narrows the meaning of "potential adversary" to include only a party's most immediate and obvious adversaries.

Chemtech's argument is based on the faulty – and immaterial – premise that there is a low likelihood of litigation between a company and its independent auditor.  (Chemtech Opp. p. 12.)  In Chemtech's view, the fact that an independent auditor's duty is to independently and objectively assess the accuracy of financial statements is "beside the point."  (Id. p. 13.)  So long as there is no prospect of dispute between a company and its independent auditor, Chemtech argues, the company does not waive work-product protection of documents by disclosing them to the auditor.  The Supreme Court, however, has rejected any notion that Dow and D&T USA enjoy a symbiotic relationship that is immune from conflict.  United States v. Arthur Young & Co., 465 U.S. 805 (1984).

The Supreme Court, in Arthur Young, permitted the IRS to obtain an independent auditor's tax-accrual workpapers, reasoning that an independent auditor's function is quite different from the "private attorney's role" upon which the "Hickman work-product doctrine was founded."  465 U.S. at 817-18.  Emphasizing the auditor's "public watchdog" role, the Court determined that the auditor's "ultimate allegiance [is] to the corporation's creditors and stockholders, as well as to the investing public," not its client.  465 U.S. at 818.  Indeed,

> [b]y certifying the public reports that collectively depict a corporation's financial status, the independent auditor assumes a *public* responsibility transcending any employment relationship with the client. . . . This "public watchdog function demands that the accountant maintain total independence from the client at all times and requires complete fidelity to the public trust."

465 U.S. at 817-18.  Given this reality, the possibility of an adversarial relationship between an independent auditor and its client cannot be ignored or overlooked in the manner Chemtech posits.

In fact, besides being a potential adversary of any company it audits, an independent auditor is a conduit to other potential adversaries, such as the SEC. As the Supreme Court noted in <u>Arthur Young</u>, the SEC is "entitled" to obtain a company's tax-accrual information from its independent auditor. 465 U.S. at 820.  Indeed, the opportunities for disclosure to the SEC and the public have expanded since <u>Arthur Young</u> was decided.  In 1995, Congress enacted Section 10A of the Securities and Exchange Act, which imposes an affirmative and absolute duty on independent auditors to make certain disclosures to the SEC regarding company violations of law, rule, or regulation. 15 U.S.C. § 78j-1. Even if auditors do not routinely make such disclosures to the SEC, that potential is present in every audit.  Thus, D&T USA is both a potential adversary of Dow and a potential conduit to other potential adversaries of the Dow-controlled entities.

The fact that Dow expected D&T USA to maintain the confidentiality of the withheld documents does not change this analysis.  That a party has promised to keep certain materials confidential does not imbue all documents provided to it with work-product protection, for a waiver of work-product protection occurs even when the parties agree "that the information disclosed will remain confidential as against the rest of the world."  <u>Griffith v. Davis</u>, 161 F.R.D. 687, 700 (C.D. Cal. 1995).  That Dow disclosed the documents at issue to a third party whose first responsibility was to "the public trust" completely undermines its claim that the work-product doctrine applies in this case.

In light of the above, Chemtech's reliance on district court decisions holding that disclosure of information to independent auditors does not waive work-product protection is misplaced.  While we recognize the split of authority on the issue, the decisions finding waiver (although fewer in number) are based on the independent auditor's public-watchdog function and its potentially adversarial relationship with its client.  See, e.g., Medinol, Ltd. v. Boston Scientific Corp., 214 F.R.D. 113 (S.D. N.Y. 2002) (finding that "in order for auditors to properly do their job, they *must* not share common interests with the company they audit"); In re Diasonics Sec. Lit., 1986 WL 53402, at *1 (N.D. Cal. June 15, 1986) (disclosure to independent auditor waives work-product protection because auditor "has responsibilities to creditors, stockholders, and the investing public which transcend the relationship").  As such, these decisions are better reasoned and far more persuasive than the authorities on which Chemtech relies, all of which assume–wrongly– that an auditor owes its allegiance to its client.

Chemtech's efforts to distinguish United States v. Massachusetts Institute of Technology, 129 F.3d 681, 687 (1st Cir. 1997), are equally unpersuasive.  Chemtech argues that because the auditing agency in MIT was the Department of Defense, "whose job it was to review the expense submissions of MIT in its role as a DOD contractor . . . litigation between the parties was a real possibility."  (Chemtech Opp. p. 13.)  But just as litigation was a real possibility for MIT and the Department of Defense, a conflict could develop between D&T USA and Dow as to the accuracy of Dow's financial statements.  Moreover, the potential for an adverse outcome of that conflict is far more devastating here than in MIT.  As Dow's auditor, D&T USA could potentially issue an "adverse opinion" as to the accuracy of Dow's financial statements, thereby notifying the investing public of possible problems with Dow's financial statements.  This is a far more

devastating outcome than the denial of expenses at issue in MIT, see Arthur Young, 465 U.S. at 818, and one that could easily result in litigation between Down and D&T USA.

In contrast, courts finding no waiver are of the view that the company and the auditor shared common interests and therefore the auditor could not be "a conduit to a potential adversary." Merrill Lynch & Co. v. Allegheny Energy, Inc., 229 F.R.D. 441, 446 (S.D.N.Y. 2004); Gutter v. E.I. Dupont & Co., 1998 WL 2017926, at *5 (S.D. Fla. May 18, 1998); In re Pfizer Inc. Sec. Lit., 1993 WL 561125, at *6 (S.D.N.Y. Dec. 23, 1993). These courts did not consider the extent to which law and accounting standards required disclosure of information provided to auditors. Nor did these courts properly consider the independent, and potentially adversarial, role of an auditor the Supreme Court articulated in Arthur Young.

Finally, a determination that disclosure of work-product information to an independent auditor does not constitute a waiver of work-product protection is contrary to the law in this circuit. As a general matter, work-product protection "is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries." United States v. Adlman, 134 F.3d 1194, 1196 (2nd Cir. 1998) (quoting Hickman v. Taylor, 329 U.S. 495, 511 (1947)). Consequently, this circuit recognizes disclosures "made in the pursuit of such trial preparation, and not inconsistent with maintaining secrecy against opponents, should be allowed without waiver of the privilege." United States v. AT&T, 642 F.2d 1285, 1299 (D.C. Cir. 1980). Thus, "[t]he existence of common interests between transferor and transferee is relevant to deciding whether the disclosure is consistent with the nature of the work product privilege." Id. Where a "transferor and transferee anticipate litigation against a common adversary on the same issue or

issues, they have strong common interests in sharing the fruit of the trial preparation efforts." Id.

In this case, Dow and D&T USA share no common interests or common adversaries. Furthermore, Dow's disclosures to D&T USA were not made as a part of trial preparation or even in relation to any litigation. Instead, Dow disclosed the withheld documents to D&T USA in furtherance of the audit of Dow's financial reports. As the Supreme Court found, an independent auditor is not an ally of its client but must maintain its independence and allegiance to the public at large. Viewed in that context, Dow's disclosures to D&T USA are completely inconsistent with the nature of the work-product doctrine, and waived any protection the doctrine might have otherwise afforded the withheld documents.

B.    Chemtech raises no legitimate grounds for withholding the documents based on the attorney-client or tax practitioner's privilege

While conceding that the law dictates that the disclosure of otherwise protected communications to an independent auditor waives the attorney-client privilege, Chemtech nevertheless asserts that the withheld documents are protected by attorney-client privilege. First, Chemtech argues that because of the creation of a tax practitioner's privilege in 26 U.S.C. § 7525, such an accountant-client privilege should now be considered a part of the attorney-client privilege. (Chemtech Opp. pp. 9, 15-16.) Not surprisingly, Chemtech cites no authority for this proposition. As we noted in our motion to compel, however, the attorney-client privilege protects exchanges between a the client and an accountant only when the accountant's role is to clarify communications between attorney and client. (Motion to Compel p. 8.) Chemtech does not argue that D&T USA was engaged for that purpose. Recognizing that it will be unable to demonstrate the elements of the attorney-client privilege–which must at all events be narrowly construed–Chemtech argues that Section 7525 expands the attorney-client privilege to all

communications involving accountants.  In truth, § 7525 is a separate privilege that does not

apply here, either on its own, or in conjunction with the attorney-client privilege.

Second, ignoring the case law and its own voluntary disclosure of the withheld

documents, Chemtech also claims that attorney-client privilege applies because "Dow intended

and maintained confidentiality over [the Curry tax opinion]" and that "[the File memo] contains

and is based upon confidential information provided by Dow's management team."[2]  (Chemtech

Opp. pp. 27-28.)  This argument, too, has no merit.  Regardless whether Dow intended to keep

the withheld documents confidential, its disclosure of the documents to its independent auditor,

D&T USA, destroyed any attorney-client privilege that may have existed.  See, e.g., In re Grand

Jury, 475 F.3d 1299, 1305 (DC Cir. 2007).

Chemtech also argues that one document–the File memo–is protected from disclosure by

the tax practitioner's privilege.  Although it is not clear, Chemtech's argument appears to be that

the File memo, simply because it was co-authored by a Dow accountant, is protected from

disclosure by § 7525 and that the disclosure of the File memo to D&T USA did not waive the

privilege because D&T USA renders a type of tax advice.  Contrary to this broad interpretation,

documents prepared by, and communications with, tax practitioners are entitled to protection

under § 7525 only where the tax practitioner is performing lawyers' work.  United States v.

KPMG, LLP, 316 F. Supp. 2d 30, 35 (D.D.C. 2004).  But Chemtech concedes that D&T USA

was its independent auditor and was engaged to review Dow's reserve tax accounts.  Thus,

Chemtech's § 7525 argument fails for the same reason that its attorney-client argument must.

---

[2]Despite asserting attorney-client privilege over the Valdez Memo in its privilege log, Chemtech now does not even attempt to argue that the Valdez Memo is protected.

And regardless whether the File memo reflects tax advice within the meaning of § 7525, Dow

waived any privilege claim by disclosing the document to D&T USA.

**II.     D&T USA's working relationship with D&T Zurich demonstrates that has the
         practical ability to obtain the Zurich Documents**

D&T USA argues at length that it does not have the "legal right" to obtain documents

from its Swiss affiliate.  D&T USA fails to explain, however, why the "legal right" test should

apply in this case.  Of the three decisions cited by D&T USA in support of the "legal right" test,

only one, Tequila Centinela, 242 F.R.D. 1 (D.D.C. 2007), mentions the "legal right" test, and it

does so only in passing, as the definition of control had no impact on the court's holding.  242

F.R.D. at 12 (holding, in relevant part, that ordinarily discoverable materials are not precluded

from discovery simply because they are located outside of the United States).  The remaining

two cases cites by D&T USA, U.S. International Trade Commission v. ASAT, Inc., 411 F.3d

245, 254 (D.C. Cir. 2005) and Chaveriat v. Williams Pipe Line Co., 11 F.3d 1420, 1426 (7th Cir.

1993), do not address the "legal right" test at all, and those decisions are of little utility here in

light of the fact that this circuit applies the "practical ability" test when considering whether

documents are in a subpoenaed party's possession, custody, or control.  U.S. International Trade

Commission, 411 F.3d at 254.

Indeed, D&T USA points to only one decision applying the "legal right" test to

determine a party's control over documents held by an affiliate, In re Citric Acid Litigation, 191

F.3d 1090 (9th Cir. 1999) (D&T USA Opp. p. 11.)  Citric Acid is an outlier, and, as we explained

in our opening brief, unpersuasive.  None of the decisions relied upon by the court in Citric Acid

dealt with control over documents in the possession of an affiliate.  See Citric Acid, 191 F.3d at

1107-08.  Moreover, the court's reasoning suggests that the facts of the case, rather than the test

-10-

applied, were dispositive.  The court noted that "[o]rdering a party to produce documents that it does not have the legal right to obtain will oftentimes be futile, precisely because the party has no certain way of getting those documents."  Id. at 1108.  Thus, the court essentially applies the "practical ability" test.  In light of the numerous decisions to the contrary, and this circuit's precedent, this Court should apply the "practical ability" test.

As to the application of that test here, D&T USA does not dispute the close working relationship that existed between D&T USA and D&T Zurich, that D&T USA and D&T Zurich worked jointly on the Dow audit, or that documents flowed freely between the two affiliates. Instead, it argues that D&T USA and D&T Zurich, though working together on the Dow audit, were separate entities–a "participating firm and referring firm"–and that D&T Zurich's denial of D&T USA's belated request for the Zurich documents–in the wake of a motion to compel– proves that D&T USA cannot obtain them.[3]  As the cases relied upon by D&T USA make clear, however, a party's "practical ability" to obtain documents depends on the facts of the case, and it is the objective facts surrounding the Chemtech engagement – not the labels D&T USA chooses to employ – that demonstrate D&T USA's ability to obtain the Zurich documents.

D&T USA relies on several cases addressing whether affiliates of international accounting firms are distinct entities for discovery purposes, but all these cases do is support the

--------

[3]D&T USA also argues in passing that obtaining the documents "may constitute a crime under Swiss law."  (D&T USA Opp. p. 2.)  Presumably, this is in reference to the letter D&T USA received from D&T Zurich, which states that "we believe that the submission of documents by us in these circumstances . . . is prohibited under Swiss law (article 271 of the Swiss Penal Code).  (D&T USA Opp. Ex. F.)  Article 271 of the Swiss Penal Code prohibits performing "acts for a foreign state on Swiss territory that are reserved to an authority or an official."  (D&T USA Opp. Ex. G.)  It is unclear how the disclosure of documents from D&T Zurich to D&T USA could be considered an act for a foreign state, and D&T USA provides no explanation for this interpretation.

United States' primary point–that the determination of whether an American affiliate has the ability to obtain subpoenaed documents from its foreign affiliate is fact-specific.  See, e.g., Goh. v. Baldor Electric Co., 1999 WL 20943, *2 (N.D. Tex. 1999) ("The relationship is determined on the facts, therefore, [a court] must examine the facts of the case before it in order to determine if the relationship is such that [discovery] is to be compelled.").  To make that determination, courts have considered "the manner in which the custodian has handled the documents at issue and similar categories of documents in the ordinary course of business," In re Nortel Networks Corp. Securities Litigation, 2004 WL 2149111, *3 (S.D.N.Y. 2004), and whether the American affiliate performed any work related to the subpoenaed documents, Motorola Credit Corp. v. Uzan, No. 021-CV-666, slip op. at 4 (S.D.N.Y. Feb. 19, 2003).  The only cases that find the international accounting firm's structure dispositive are those that address liability rather than the production of documents.  See, e.g., Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP, 2004 WL 112948 (S.D.N.Y. 2004); In re Royal Ahold N.V. Sec. & ERISA Litigation, 351 F. Supp. 2d 334 (D. Md. 2004); In re Lernout & Hauspie Sec. Litigation, 230 F. Supp. 2d 152 (D. Mass. 2002).  Obviously, that is not the situation facing this Court.

Ignoring the working relationship between D&T USA and D&T Zurich on the Dow audit, D&T USA instead emphasizes only one fact–that, like the accounting firm in Citric Acid, its foreign affiliate denied its request for the Zurich documents.  A face-saving request for documents–sent by a party after the deadline to produce the requested documents expired and after a motion to compel has been filed–cannot be given the same weight as a request made in direct response to a subpoena, as occurred in Citric Acid.  Id. at 1107.  More important, as discussed in our opening brief, the facts taken as a whole demonstrate that D&T USA can obtain

-12-

the Zurich documents from D&T Zurich and that D&T Zurich's recent response is merely one of convenience.  The Dow audit was initiated by D&T USA, not D&T Zurich.  (Motion to Compel, p. 17.)  D&T USA and D&T Zurich coordinated with each other throughout the life of the audit, and in at least one case, an employee of D&T USA sought to have final approval over financial statements issued by Chemtech and expressed displeasure when that did not happen.  (Motion to Compel, p. 17-18.)  As the case law indicates, whether a party has the "practical ability" to obtain documents held by a foreign affiliate turns on the facts of the case.  The facts here demonstrate that D&T USA, despite D&T Zurich's last-minute denial, has the ability to obtain the Zurich documents.

## CONCLUSION

The United States respectfully requests that the Court compel Deloitte & Touche USA LLP to produce the three documents it has withheld from the United States on privilege grounds and all documents responsive to the United States' subpoena maintained at its Zurich, Switzerland affiliate.

Respectfully submitted,

UNITED STATES OF AMERICA, by

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY

/s/ Thomas F. Koelbl
Thomas F. Koelbl
Deborah M. Morris
Robert L. Welsh
Trial Attorneys, Tax Division
U.S. Department of Justice
Post Office Box 14198
Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 514-5891
           (202) 353-1758
           (202) 514-6068
Fax: (202) 514-9868

-14-

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the foregoing United States' Reply was sent to the parties below

by United States mail, postage prepaid, addressed to:

Michael D. Warden
Sidley Austin LLP
1501 K Street NW
Washington, DC 20005

Eric P. Witiw
Deloitte & Touche USA LLP
Suite 500
555 12th Street NW
Washington, DC 20004

John B. Magee, Esq.
McKee Nelson LLP
1919 M Street, NW, Suite 800
Washington, DC 20036

Dated this 2nd day of September, 2008.

<u>/s/ Thomas F. Koelbl</u>
Thomas F. Koelbl
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 14198
Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 514-5891
Fax: (202) 514-9868